PETITION FOR WRIT OF HABEAS CORPUS
UNDER 28 U.S.C. § 2241

Prisoner's Name:                          Ronald A. Gray

Prisoner's Number:                      73786

Place of Confinement:                 U.S. Disciplinary Barracks
                                                   Fort Leavenworth, Kansas

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

RONALD A. GRAY,                    )
   Private, U.S. Army,              )
                                                 )
         Petitioner,          )
                                                 )
v.                                              )          Case No. 08-3289-RDR
                                                 )
JAMES W. GRAY,                      )
   Colonel, U. S. Army,            )
   Commandant                         )
   U.S. Disciplinary Barracks,    )
   Fort Leavenworth, Kansas   )
                                                 )
         Respondent.        )

**PETITION FOR WRIT OF HABEAS CORPUS**

Comes now the Petitioner, U.S. Army Private Ronald A. Gray, an indigent

death row inmate, and petitions this Court for a writ of habeas corpus pursuant to

28 U.S.C. § 2241.  This is the first and only time Petitioner has sought habeas

corpus relief in federal court.

1

This Court has previously granted Petitioner's motion for leave to file *in forma pauperis* and granted Petitioner's request for appointment of counsel. Order dated November 26, 2008.

This petition pleads Private Gray's claims for relief and alleges the constitutional errors raised.[1] The petition does not fully brief the issues, make complete legal argument or address procedural issues or affirmative defenses that the Respondent may choose to raise. Instead, the petition conforms to D. Kan. Rule 9.1 (b)(15) which state that a petition for writ of habeas corpus shall:

> In concise form, the grounds upon which petitioner bases his or her allegations that he or she is held in custody unlawfully or that his or her sentence is illegal, imposed in an illegal manner, or should be reduced; the facts which support each of the grounds; whether any such grounds have been previously presented to any court by petition, motion or application; if so, which grounds have been previously presented and in what proceedings; if any grounds have not been previously presented, which grounds have not been presented and the reasons for not presenting them.

This petition states the claims that have been raised in military courts in exhaustion of military court remedies. It is being filed on this date in order to comply with this Court's Scheduling Order. However, the investigation and

---

[1] Each claim of this petition separately numbers the paragraphs within that claim sequentially.

research of Petitioner's case continues, and Petitioner anticipates seeking permission for discovery and evidentiary development of some of the issues contained in the petition.  Thus, the petitioner may seek permission of the Court to amend, correct or modify the claims based upon the result of this continued investigation and research.

After proper briefing, any discovery as may be necessary and evidentiary development of any additional facts necessary to resolve these constitutional claims for relief, Petitioner requests that relief be granted under the habeas corpus statutes, 28 U.S.C. § 2241 *et. seq.,* and all other pertinent court rules, statutes and case law.

## I.  INTRODUCTION

Petitioner, Specialist Four Ronald Gray, an African-American from Miami, Florida, enlisted in the United States Army in 1983.  At the time of the crimes, he was serving with the 82nd Airborne Division at Fort Bragg, North Carolina.  His case raises substantial questions concerning the scope constitutional rights of members of the Armed Forces facing court-martial for capital murder during peacetime.  The questions present significant and important systemic issues concerning the size, manner of selection and fundamental fairness and impartiality of court-martial panels in capital cases under the Uniform Code of Military

Justice.  The presentation of these systemic issues make this a case of first impression.

## II.  NATURE OF RELIEF SOUGHT AND ALLEGATION OF ERROR

Private Gray seeks relief in the form of an order granting the writ of habeas corpus as to the convictions and death sentence, and granting all other relief which the Court may deem just, proper and equitable.  Petitioner submits that the court-martial convictions, death sentence, and affirmances on direct appeal in the military appellate courts resulted from violations of Petitioner's rights under the Fifth, Sixth and Eighth Amendments to the United States Constitution.  Petitioner submits that the rulings of the military courts also involved an unreasonable determination of the facts in light of the evidence; resulted in a decision not entitled to deference as a matter of law and fact, since the merits were not appropriately resolved by the military courts; and/or involved the unreasonable and arbitrary denial of relief.  The federal law upon which Petitioner relies in this action had been established at the time Private Gray's convictions and death sentence became final on July 28, 2008, when the President approved his death sentence.

## III.  PROCEDURAL HISTORY

1.     The last execution of a service member by the United States military

was almost fifty years ago, in April of 1961.  James J. Fisher, A Soldier Is Hanged,

KANSAS CITY STAR, Apr. 13, 1961, at 7.  Since then, death penalty

jurisprudence has significantly evolved providing greater constitutional safeguards

for capital defendants (*see e.g. Ford v. Wainwright*, 477 U.S. 399, 411 (1986))

and, as the United States Supreme Court noted, "federal habeas corpus has a

particularly important role to play in promoting fundamental fairness in the

imposition of the death penalty."  *McFarland v. Scott*, 512 U.S. 849, 859 (1994).

Petitioner's case is the first capital court-martial conviction to be reviewed under

28 U.S.C. § 2241 since the United States Supreme Court's decision in *Furman v.

Georgia,* 408 U.S. 238 (1972).

      2.     The name and location of the court-martial which entered the

judgment of conviction and sentence under attack are:

> General Court-Martial convened by the Commanding General of the
> 82nd Airborne Division, Fort Bragg, North Carolina.

      3.     The date of the judgment of conviction was April 11, 1998.  The date

of the judgment of sentence was April 12, 1988.

      4.     Petitioner was sentenced to death, a dishonorable discharge,

forfeitures of all pay and allowances and reduction to Private E-1.

      5.     Petitioner was found guilty of premeditated murder (2

specifications) and attempted premeditated murder in violation of U.C.M.J.

articles 118(1) and 80, respectively.  He was also found guilty of rape (3

specifications), robbery (2 specifications), and forcible sodomy (2 specifications),

in violation of U.C.M.J. articles 120, 122 and 125, respectively.  The three female

victims in this case were all Caucasian.

6.     At his court-martial, Petitioner pled not guilty because he was

prohibited from pleading guilty as a matter of  law.

7.     The court-martial on the issue of guilt or innocence and on the issue

of sentence was before a court-martial panel of six members.

8.     Petitioner did not testify at the court-martial or at the sentencing

hearing.

9.     On July 29, 1988, the Commanding General of the 82d Airborne

Division approved the sentence.  Petitioner appealed his conviction and sentence

of death.

10.     The facts of Petitioner's appeal are as follows:

(a)     On September 15, 1989, counsel for Petitioner filed initial

pleadings with the United States Army Court of Criminal Appeals (formerly the

United States Army Court of Military Review).  The Court of Criminal Appeals

ordered a sanity board which found that Petitioner was mentally responsible at the

time of the offense and that he was mentally competent to understand his trial and the present appellate proceedings.  Petitioner's convictions and sentence were subsequently affirmed by the United States Army Court of Criminal Appeals (formerly the United States Army Court of Military Review). *United States v. Gray* 37 M.J. 730 (A.C.M.R. 1992).  The Army court denied a timely filed petition for reconsideration.  *United States v. Gray*, 37 M.J. 751 (A.C.M.R. 1993).

(b)     The United States Court of Appeals for the Armed Forces affirmed the Army court's decision on May 28, 1999.  *United States v. Gray*, 51 M.J. 1, 49 (1999).  On April 6, 2000, the Court of Appeals denied a petition for reconsideration.  Petitioner filed a timely Motion for Leave to File Second Petition for Reconsideration and a Second Petition for Reconsideration in accordance with the Court of Appeals rules.  On June 26, 2000, the Court of Appeals granted Petitioner leave to file the Second Petition for Reconsideration and denied the Second Petition.

(c)     Petitioner filed a Petition for Writ of Certiorari in the United States Supreme Court which was denied.  On March 19, 2001, the Supreme Court denied Private Gray's request for certiorari review. *Gray v. U.S.*, 532 U.S. 919 (2001).

11.    Private Gray's convictions and death sentence became final on July

28, 2008, when the President approved his death sentence.

12.     On August 14, 2008, the Secretary of the Army signed an Execution Order directing that Private Gray be executed at the Federal Correctional Complex, Terre Haute, Indiana, on December 10, 2008, at 2200 hours, by lethal injection.  (Execution Order, Attachment 2).

13.     On November 26, 2008, this Court granted Petitioner's motion for a stay of execution and appointment of counsel.  In accordance with this Court's Scheduling Order, Petitioner now files his Petition for Writ of Habeas Corpus.

## IV.  CLAIMS ENTITLING PETITIONER TO RELIEF

Each claim for relief raised below is predicated upon the Fifth, Sixth and Eighth Amendments to the United States Constitution.

### CLAIM ONE

**DURING PEACETIME, ALLOWING A MEMBER OF THE ARMED FORCES TO BE SENTENCED TO DEATH BY A COURT-MARTIAL PANEL OF LESS THAN TWELVE,  WHEN THERE IS NO FIXED PANEL SIZE, PROMOTES UNRELIABILITY, UNDERMINES THE RIGHT TO AN IMPARTIAL FACT FINDER AND SENTENCER AND CREATES AN ARBITRARY FACTOR IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS**

1.     All other allegations in this Petition are incorporated into this claim

8

by specific reference.

## 1.   *RELEVANT FACTS*

2.   The Convening Authority originally detailed a panel of fifteen prospective court members for Petitioner's court-martial.  This was done based upon the specific, legal advice of the Convening Authority's official lawyer, his Staff Judge Advocate ("SJA").  After *voir dire* and the challenge process, only six members remained on the panel.[2]

3.   Defense counsel then moved "as a matter of equal protection and due process, to require that there be a panel of twelve persons and to delay this proceeding (*sic*) the appointment - or the detailing of enough members to get up to twelve." (R. 768-69).  Defense counsel specifically moved to require a twelve

---

[2]At Petitioner's court-martial, the military judge granted defense counsel's challenges to five court members and defense counsel exercised its sole peremptory challenge against a sixth member in an attempt to select a fair and impartial jury.  The military judge granted prosecution challenges for cause against two detailed African-American, enlisted court members because of their alleged opposition to the death penalty.  *See* Claim Two, *infra*.  The prosecution then exercised its sole peremptory challenge against one of the two remaining African-American court members.   The defense counsel objected to the challenge and demanded an explanation, on the record, for the prosecution's biased peremptory challenge citing *Batson v. Kentucky*, 476 U.S. 79 (1986).  R. 762.  The military judge ruled on Petitioner's *Batson* claim after the prosecutor denied that his peremptory challenge of the African-American court member was based on discriminatory intent, but before the prosecutor provided a race neutral explanation for the challenge.  *See* Claim Three, *infra.*

member panel "the number that is utilized in all civilian courts in capital cases."

(R. at 768).  Defense counsel also objected that the lack of a fixed number of

members violated the Eighth Amendment as being arbitrary under *Furman v.*

*Georgia,* 408 U.S. 238 (1972).

    4.    In response, the Military Judge noted:

> That may be a point that, in the future, is well-founded if
> the Congress thought – perhaps the Supreme Court itself,
> in their infinite wisdom, decided that's the way it should
> be, and I applaud you for recording for posterity . . . .The
> Law, as it exists under the military system, which is a
> system unto itself which the Congress has elected to
> enact and which the Congress - no, it was the Supreme
> Court - thus far at least have blessed, is to the effect that
> the minimum requirement is five officers - is five
> members.  We have six and we meet the criteria. (R. at
> 769).

The prosecution opposed the motion, stating, "We agree with the court in this

case."  (R. at 769).

    5.    The following exchange then took place:

> MJ:    Well, I interrupted my thought merely because **if
> the government were to be of the mind that
> they wanted to have twelve members, I
> certainly wouldn't contest it.** (emphasis added)

> TC:    We are not, Your Honor.

> MJ:    All right.  Based upon the rationalization advanced
> previously, the motion for requirement of at least

twelve members is denied.

(R. 770).

6.      Here the Convening Authority upon the advice of his lawyer, detailed fifteen members to Gray's court-martial.  But, when the panel's size was reduced to six members after challenges, the defense moved to "delay this proceeding" to allow additional members detailed so as to have a jury of twelve.  It was arbitrary, capricious and constitutionally erroneous for the military judge to have deferred to the Prosecutor, the very person seeking death, on this fundamental issue.  Since Congress gave the Convening Authority the exclusive authority to select and detail court members, the military judge's error was compounded by his refusal to seek the Convening Authority's input.

7.      Petitioner was convicted and sentenced to death by a court-martial panel that contained only six members – all male, and one African-American.  At the time of Petitioner's court-martial, neither the Uniform Code of Military Justice, or the *Manual for Courts-Martial*, specifically addressed the size or number of members necessary in a peacetime, capital case.  Rather, Article 18, U.C.M.J., provided that a general court-martial shall consist of "a military judge and not less than five members" and, pursuant to Article 16(1)(A), a general court-martial may "adjudge any punishment … including the penalty of death."

11

8.      Congress has now mandated a court-martial panel of twelve members in a capital court-martial.  Article 25a, U.C.M.J., now provides that:

> In a case in which the accused may be sentenced to a penalty of death, the number of members shall be not less than 12, unless 12 members are not reasonably available because of physical conditions or military exigencies, in which case the convening authority shall specify a lesser number of members not less than five, and the court may be assembled and the trial held with not less than the number of members so specified.  In such a case, the convening authority shall make a detailed written statement, to be appended to the record, stating why a greater number of members were not reasonably available.

In short, during peacetime, a court-martial panel of at least twelve is required to sentence a service member to death.

9.      Furthermore, the Military Commissions Act of 2006, established to bring enemy combatants to justice, requires a twelve member panel for any case in which the death penalty is sought.  10 U.S.C. § 949m(c)(1).  Khali Sheikh Mohammed, the alleged mastermind of 911, is entitled to the protection of a twelve member panel which was denied to Private Gray.

**B.**      ***Fewer Than Twelve Member Panels in Capital Cases***

10.     Private Gray stands convicted and sentenced to death by the fewest number of lay members of any death row inmate in the country.  While capital

defendants in 29 states and the federal government have their sentences determined by a twelve-member jury[3], Petitioner Gray was sentenced to death by a panel consisting of a mere six members.  The sole reason for the alarming disparity in the size of his panel as compared with other capital juries is his status as a member of this country's Armed Forces.

11.     Four justices of the United States Supreme Court have expressed the opinion that "when the punishment may be death, there are particular reasons to ensure that the men and women of the Armed Forces do not by reason of serving their country receive less protection than the Constitution provides for civilians." *Loving v. United States*, 517 U.S. 748, 774 (1996) (Stevens, J., concurring).[4]  This opinion is also shared by the former chief judge of the U.S. Court of Appeals for the Armed Forces [C.A.A.F.].  *See United States v. Curtis*, 32 M.J. 252, 271 (C.M.A. 1991) (Sullivan, C.J., concurring) ("It is my personal view, however, that, in peacetime, a service member in a capital case should be tried by a 12-member court-martial. *The value of a soldier's life is surely equal to the value of the life of*

---

[3] *See* Dwight H. Sullivan, *Playing the Numbers: Court-Martial Panel Size and the Military Death Penalty*, 158 MIL. L. REV. 1, 1-3, nn.3-4 (1998).

[4] Joining in Justice Stevens' concurring opinion were Justices Souter, Ginsburg and Breyer.

*his fellow citizens*." (emphasis added)), *cert. denied*, 502 U.S. 952 (1991); *see also United States v. Loving*, 41 M.J. 213, 310 (1994) (Sullivan, C.J., concurring in part and in the result).[5]  Petitioner's case puts this principle squarely to the test.

12.     Petitioner, by virtue of his decision to serve his country in the Armed Forces, received less protection than any civilian facing a capital charge would have received in state or federal court.  The court-martial panel that convicted Ronald Gray and sentenced him to death numbered one-half the size of the jury he would have received had he remained a civilian.  In consideration of the fact that it only takes a single vote to save an accused from the death penalty, the difference between twelve votes and six votes simply cannot be underestimated, nor tolerated under the Constitution.

13.     The United States Supreme Court has held that the Sixth Amendment guarantees to all civilians the right to a trial by jury of no less than six members in

---

[5] Notwithstanding his "continuing concern that servicemembers be treated fairly in capital cases" by being tried by twelve-member panels, *Loving*, 41 M.J. at 310, then Chief Judge Sullivan concurred in the results of both *Curtis* and *Loving*, in large part due to the defendants' failure to particularly object to a trial by less than twelve members and their failure to request the detailing of additional members.  In this case, however, Petitioner specifically objected to a trial by court-martial of fewer than twelve panel members and requested the military judge to order the detailing of additional members to ensure a panel size of twelve. Inexplicably, Judge Sullivan, who authored the opinion in Petitioner's case for the C.A.A.F., failed to comment on petitioner's objection to a trial by a panel of fewer than twelve members. *See Gray*, 51 M.J. at 49.

any criminal case.  *See Ballew v. Georgia*, 435 U.S. 223, 245 (1978); *Burch v. Louisiana*, 441 U.S. 130, 139 (1979) (holding that non-unanimous verdicts by six-member juries in criminal cases violates the 6th Amendment).  Although this Court has found that courts-martial are not subject to the jury trial requirements of the Sixth Amendment, it has never done so in the context of a capital case. *Ex parte Quirin*, 317 U.S. 1, 39-43 (1942); *Reid v. Covert*, 354 U.S. 1, 37 n.68 (1957) (plurality opinion); *O'Callahan v. Parker*, 395 U.S. 258, 261 (1969).  Furthermore, the Supreme Court has had the occasion to consider the constitutionality of fewer than twelve lay members sentencing a defendant to death, primarily because neither the federal government nor any state in this country has adopted such a system.[6]  Significantly, Congress has now spoken that at least in peacetime, no service member can any longer be sentenced to death by a court-martial panel of less than twelve.  Private Gray is entitled to the same protections – when it comes to the punishment of death, the men and women of the Armed Forces, by virtue of serving their country, must receive equal protection

---

[6] Of the 38 states that have the death penalty, 29 of them delegate the sentencing decision to a twelve-person jury and require unanimous consent. Sullivan, *supra*, at 2 n.3.  The federal government also utilizes twelve person juries in determining sentences in capital cases. *Id*.  In the remaining nine states the decision to impose death is delegated to the trial judge, with four of these states allowing for an advisory recommendation from the jury as to an appropriate sentence. *Id*. at 3 n.4.

15

under the Constitution..

14.     The Supreme Court has recognized that, due to the qualitative difference in a sentence to death, there is a heightened "need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (plurality opinion).  The C.A.A.F. has applied this heightened standard of reliability to capital courts-martial. *United States v. Loving*, 41 M.J. 213, 278 (1994), *aff'd on other grounds*, 517 U.S. 748 (1996).  Congress took action to ensure no more men and women of the Armed Forces should face the death penalty unless tried by a court-martial of at least twelve members recognizing that the military's use of fewer than twelve-member panels in capital cases violates this heightened reliability requirement.  As the Supreme Court has previously noted, six-member panels are statistically less reliable than twelve-member ones.[7] *Ballew*, 435 U.S. at 232 ("[R]ecent empirical

---

[7] Granting review in Petitioner's case would also allow the Court to resolve a tension between its decisions in *Ballew* and *Williams v. Florida*, 399 U.S. 78 (1970).  In *Williams*, this Court upheld the use of six-member juries in criminal cases.  Eight years later in *Ballew*, the Court held that a five-member criminal jury was impermissible under the Sixth and Fourteenth Amendments.  Professor David Kaye has argued that the empirical evidence upon which Justice Blackmun's lead opinion in *Ballew* relied to strike down five-member juries also "create[s] grave doubts about the proper function of the six-member jury." David Kaye, *And Then There Were Twelve: Statistical Reasoning, the Supreme Court, and the Size of the Jury*, 68 Cal. L. Rev. 1004, 1025 (1980).  After analyzing the empirical data, Professor Kaye concluded, "[A]ny departure from the traditional conception of the

data suggest that progressively smaller juries are less likely to foster effective

group deliberation.  At some point, this decline leads to inaccurate fact-finding

and incorrect application of the common sense of the community to the facts.").

15.     The Supreme Court has previously acknowledged the value of

twelve-member juries in cases where the punishment may be death. *See Williams*

*v. Florida*, 399 U.S. 78, 103 (1970) ("In capital cases … it appears that no State

provides for less than 12 jurors – a fact that suggests implicit recognition of the

value of the larger body as a means of legitimating society's decision to impose

the death penalty.").  Nevertheless, despite the fact that 29 states and the federal

government place the sentencing authority in capital cases in the hands of a

twelve-member jury, the military stands alone as the only capital jurisdiction in the

country that allows fewer than twelve lay members to sentence a person to death.

Moreover, the only capital defendants in this country who do not have the right to

have their guilt or innocence determined by a twelve-member jury were  those

tried by the military prior to 2001.  Therefore, Petitioner's case directly confronts

the principle announced by four members of the Supreme Court that "when the

---

'jury' as a body of twelve persons should be held unconstititutional." *Id*. at 1033.
As Petitioner's capital trial was heard by a six-member panel, granting review in
his case would allow the Court to reexamine the relationship between *Williams*
and *Ballew*.

punishment may be death ... the men and women of the Armed Forces [should] not by reason of serving their country receive less protection than the Constitution provides for civilians." *Loving*, 510 U.S. at 774 (Stevens, J., concurring).

## C.   *The Effects of a Variable Panel Size in Capital Courts-Martial*

16.    Far more disturbing than the lack of a twelve-member guarantee in capital courts-martial, however, is the lack of a fixed number of members who make the ultimate decision between life and death.  While a general courts-martial cannot consist of less than five members, there is no maximum number of members that can hear a case. Article 16(1)(A), U.C.M.J.  Therefore, the size of court-martial panels in capital trials varies from one case to the next.[8]  In consideration of the fact a sentence to death requires a unanimous verdict, this variability in the panel size will almost invariably operate to the prejudice of the accused.

17.    Every time a panel member is removed from the court-martial, either through a challenge for cause or by either side's peremptory challenge, the number of votes needed by the government to secure a death sentence is also reduced. Therefore, because each successful challenge of a member by the defense makes the government's job correspondingly easier, a service member accused of a

---

[8]   *See* Sullivan, *supra*, at 4 n.5.

18

capital offense has little to no incentive of either engaging in *voir dire* or

exercising challenges.

18.     The dilemma for capital accuseds caused by a less than twelve

variable number of panel members in capital cases was commented on by one of

the judges of the Air Force Court of Criminal Appeals in the case of *United States

v. Simoy*, 46 M.J. 592, 623-28 (A.F. Ct. Crim. App. 1996) (Morgan, J.,

concurring), *rev'd on other grounds*, 50 M.J. 1 (1998).  Judge Morgan wrote:

> Little mathematical sophistication is required to
> appreciate the profound impact in this case of reducing
> the court-martial panel size.  To use a simple metaphor –
> if appellant's only chance to escape the death penalty
> comes from his being dealt the ace of hearts from a deck
> of 52 playing cards, would he prefer to be dealt 13 cards,
> or 8?  If he had been made to understand the algorithm of
> his trial court in those terms, would he have consented to
> his counsel's connivance in reducing the number of
> cards he was dealt?
>
> . . .
>
> Simple arithmetic tells us that the chances of finding .. a
> person [who would vote against the death penalty]
> improve linearly with each additional individual placed
> into a pool.  Each challenge of an individual "spots" the
> prosecution a vote, and becomes, in essence, a vote for
> death.  Instead of having to convince 13 people that
> appellant deserved death in three different votes[9], the

---

[9] Rule for Courts-Martial 1004 requires a unanimous vote by the members
at four separate stages before death may be adjudged.  First, the panel members

> government only had to convince 8, a considerably
> simplified task.

*Id*. at 625-26.

19.     Judge Morgan noted that, because the jury size is fixed at twelve in

civilian capital cases, "those members challenged off *are replaced*.  A defendant

considering challenging a juror can be assured that the decision to do so will not

correspondingly reduce the size of his jury." *Simoy*, 46 M.J. at 627.  The

fundamental problem with the military justice system, however, is that a military

accused is rarely dealt another "card" when he is compelled to exercise challenges

against the first ones that have been dealt him by the convening authority. *Id*. at

627.  Therefore, it is practically never to his advantage to conduct *voir dire* or to

exercise challenges against the members.  "[W]here there is no replacement

standing by, if there is even a 1 percent chance that a given individual will vote for

─────────────────

must unanimously find the accused guilty of a death-eligible offense. M.C.M,
R.C.M. 1004(a)(2).  Second, the members must unanimously find at least one
aggravating factor that has been proven by the government beyond a reasonable
doubt. M.C.M., R.C.M. 1004(b)(4)(A)&(B) & 1004(c).  Third, the members must
unanimously conclude that any mitigating and extenuating circumstances are
substantially outweighed by any aggravating circumstances. M.C.M., R.C.M.
1004(b)(4)(C).  And fourth, the members must unanimously conclude, even if
mitigating evidence are substantially outweighed by the aggravating
circumstances, death is appropriate.  At any one of these four stages, a single panel
member is empowered to preclude the court-martial from imposing a sentence to
death.

life, there is everything (literally) to gain and nothing to lose by retaining that

person on the court." *Id*. at 626.

20.    Judge Morgan based his conclusions in *Simoy* in large part on the

Supreme Court's seeming acceptance of "certain statistical conclusions

strengthening the playing card analogy." *Simoy*, 46 M.J. at 626 (citing *Ballew*, 435

U.S. at 234).  One statistic in particular greatly disturbed Judge Morgan, and

underscores the problems with capital sentencing by a variable-sized panel of

fewer than twelve members:

> Remarkably, a minority viewpoint held by 10 percent of
> the population (such as a strong moral aversion to the
> death penalty, perhaps?) has only a 28.2 percent chance
> of going unrepresented in a 12-member jury, but more
> than half of 6-members juries could be expected to have
> no representative of that view at all.  The studies point
> ineluctably to one conclusion: for defendants in criminal
> cases, particularly capital trials, so long as unanimity is
> required, more is always better.

*Id*. at 627 (citing *Ballew*, 435 U.S. at 234-36).

21.    The lack of a fixed number of panel members of less than twelve in

capital courts-martial thus places a capital accused in an impossible situation.  On

the one hand, the benefits of maximizing the panel's size dictate that he not

engage in any *voir dire* (other than to rehabilitate those members who appear

vulnerable to challenge) and obviously not exercise challenges against any of the

21

members.  Completely forfeiting his right to *voir dire* and challenge the members,

however, will only result in member biases against the accused going undetected,

with the disturbing result of such members remaining on the panel.  Obviously,

any system of justice that places a capital accused in such an impossible "damned

if you do, damned if you don't" situation is a system that is broken, and in serious

need of repair.

22.    The lack of a fixed number of panel members in capital courts-martial

therefore creates a *voir dire* scenario whereby one side (the defense) is attempting

to maximize the size of the panel while the other side (the government) is

attempting to reduce the panel size to the minimum number of five members.  The

implications for the accused in this scenario can be severe:

> The rules governing capital court-martial panel size thus
> promote the spectacle of a panel vetted and groomed by
> the government but not the defense.  Providing the
> government with an incentive to voir dire members and
> exercise challenges while discouraging the defense from
> doing so is particularly perverse in court-martial practice,
> as the convening authority's power to select members
> gives the government "the functional equivalent of an
> unlimited number of peremptory challenges."  A system
> that encourages the defense counsel in a capital case to
> imitate a potted plant is constitutionally suspect.

Sullivan, *supra*, at 37 (quoting *United States v. Carter*, 25 M.J. 471, 478 (C.M.A.

1988) (Cox, J., concurring)).  The constitutional rights that the lack of a fixed

number of panel members in capital courts-martial violates the right to due process

under the Fifth Amendment and the right to be free from cruel and unusual

punishment under the Eighth Amendment.

**1.     The Fifth Amendment Due Process Clause**

23.     The Supreme Court has recognized that an accused has a due process

right to a fair and impartial FACT FINDER. *See Gentile v. State Bar of Nev.*, 501

U.S. 1030, 1075 (1991); *Irwin v. Dowd*, 366 U.S. 717, 722 (1961) (holding that

denial of the right to a trial before "a panel of impartial, 'indifferent' jurors …

violates even the minimal standards of due process.").  A vital aspect of the right

to a fair and impartial jury is the ability to engage in meaningful *voir dire*.

*McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984); *see also*

*Morford v. United States*, 339 U.S. 258, 259 (1950) (per curiam) (recognizing *voir*

*dire* as the "guarantee of a defendant's right to an impartial jury.").

24.     While the military does not prevent defendants from engaging in *voir*

*dire* or exercising challenges in capital cases, the enormous price it exacts for

exercising these options acts as the functional equivalent of such a prohibition.

Imposing such high costs on a defendant's right to ensure an impartial FACT

FINDER violates the doctrine of unconstitutional conditions, which recognizes

"rights of constitutional stature whose exercise a state may not condition by the

23

exaction of a price." *Garrity v. New Jersey*, 385 U.S. 494, 500 (1967).

25.    In *United States v. Jackson*, 390 U.S. 570 (1968), the Supreme Court struck down the death penalty provision of the Federal Kidnapping Act.  Under the statute, only a jury was authorized to impose death as a sentence for a violation of the law, such that only those defendants who contested their guilt before a jury were exposed to the possibility of the death penalty. *Id*. at 572.  The Supreme Court held that the law had the "inevitable effect of … discourag[ing] assertion of the Fifth Amendment right not to plead guilty and … deterring exercise of the Sixth Amendment right to demand a jury trial." *Id*. at 582 (footnote omitted).  The Supreme Court reasoned that "[w]hatever might be said of Congress' objectives, they cannot be pursued by means that needlessly chill the exercise of basic constitutional rights.  The question is not whether the chilling effect is 'incidental' rather than intentional; the question is whether that effect is unnecessary and therefore excessive." *Id*. (citations omitted).  Deterring defendants from exercising their Fifth and Sixth Amendment rights is unnecessary when Congress can adopt other sentencing provisions, which is exactly what Congress has done concerning court-martial panels of at least twelve members in capital case, that do not penalize defendants for exercising their constitutional rights.  *Id*.

26.    The right to an impartial FACT FINDER, although arising from the

Fifth Amendment Due Process Clause in the military[10], is derived from the same Sixth Amendment right to a trial by an impartial jury that was at issue in *Jackson*. Similar to the chilling effect of the death penalty provision of the Federal Kidnapping Act, the deterring effect that a variable panel size has on a capital accused's use of *voir dire* and challenges is both unnecessary and excessive. Congress has now fixed the problem  prospectively by requiring at least twelve court member in a capital court-martial.  The U.C.M.J.,  prior to addition of Article 25a, created an unconstitutional condition on the exercise of a fundamental right.

Discouraging a defendant from engaging in *voir dire* and exercising challenges in capital cases challenges this Court's holding that Congress "is subject to the requirements of the Due Process Clause when legislating in the area of military affairs." *Weiss v. United States*, 510 U.S. 163, 176 (1994).  If a system that punishes a capital accused for utilizing the tools necessary to guarantee his fundamental right to a fair and impartial panel does not offend due process, it is difficult to imagine what would.  Accordingly, whatever "measure of protection"

---

[10]  *See United States v. Carter*, 25 M.J. 471, 473 (C.M.A. 1988) ("Although an accused tried by a court-martial has no Sixth-Amendment right that its membership reflect a representative cross-section of the military population, he does possess a due-process right to a fair and impartial factfinder."); *but see United States v. Curtis*, 44 M.J. 312, 321 (1996) ("Appellant has a Sixth Amendment right to a fair and impartial jury."), *rev'd on other grounds* 46 M.J. 19 (1997).

25

the Due Process Clause affords "defendants in military proceedings," it is surely

sufficient to invalidate the variable size of capital courts-martial. *Id.*

> **2.      The Eighth Amendment's Right to Be Free from Cruel and
> Unusual Punishments**

27.      The Supreme Court has previously "assumed that *Furman* [*v.

Georgia*, 408 U.S. 238 (1972)] and the case law resulting from it are applicable"

to capital courts-martial. *See Loving*, 517 U.S. at 755; *but see Loving*, 517 U.S. at

777 (Thomas, J., concurring in the judgment).  Furthermore, the C.A.A.F. has held

that although "there may be circumstances under which the rules governing capital

punishment of service members" may have to yield to military necessity, service

members are nonetheless entitled to protection against cruel and unusual

punishments both by statute and the Eighth Amendment.  *United States v.

Matthews*, 16 M.J. 354, 368 (C.M.A. 1983).  The C.A.A.F. has further held that in

enacting Article 55, U.C.M.J., "Congress 'intended to grant protection covering

even wider limits' than 'that afforded by the Eighth Amendment.'" *Id*. (quoting

*United States v. Wappler*, 2 U.S.C.M.A. 393, 396, 9 C.M.R. 23, 26 (1953)).

28.      One aspect of the protection against cruel and unusual punishments is

the "heightened need for reliability in capital punishment cases," a protection that

the C.A.A.F. has specifically held applies to capital courts-martial. *United States*

*v. Loving*, 41 M.J. 213, 278 (1994) (citing *Woodson v. North Carolina*, 428 U.S.

280, 305 (1976) (plurality opinion)), *aff'd on other grounds* 517 U.S. 748 (1996).

Since its decision in *Furman v. Georgia*, 408 U.S. 238 (1972), the Supreme Court

has consistently held that "death as a punishment is unique in its severity and

irrevocability.  When a defendant's life is at stake, the Supreme Court has been

particularly sensitive to insure that every safeguard is observed." *Gregg v.*

*Georgia*, 428 U.S. 153, 187 (1976) (opinion of Stewart, Powell, & Stevens)

(citations omitted).

29.     A death penalty system that deters *voir dire* and the exercise of

challenges by one party, while encouraging the vigorous use of these tools by the

other, violates the heightened reliability requirement of the Eighth Amendment.

While biases against the government are likely to be discovered during *voir dire*,

and members possessing such biases removed, biases against the accused are

likely to go uncovered, thereby allowing such members to remain on the panel.

The inevitable result of such a system is a panel that is drastically biased either in

favor of the government or against the defense, or both.  Such an extreme

departure from the adversarial system's norms substantially diminishes the

reliability of all capital courts-martial.

30.     A corollary to the heightened reliability requirement of the Eighth

Amendment is the protection against the arbitrary imposition of a sentence to death. *See McCleskey v. Kemp*, 481 U.S. 213, 278 (1987); *Woodson*, 428 U.S. at 303; *Gregg*, 428 U.S. at 188-89.  The lack of a fixed number of panel members of at least twelve member in capital courts-martial injects an entirely arbitrary factor into the death penalty equation: the number of members needed to sentence a service member to death.  The fact that the sheer randomness of this number can mean life or death from one capital accused to the next painfully illustrates the wanton and freakish nature of the military death penalty system.

31.    The arbitrary and capricious nature that the variable panel size has on the imposition of the death penalty in capital courts-martial can be illustrated by two hypothetical capital cases arising from the same murder:

> The commanding general of one accused convenes a court-martial with twenty members; the commanding general of another convenes a court-martial with only ten members.  While no legal principle justifies treating the two accused differently, one has a far greater statistical chance of obtaining the single vote necessary to preclude a death sentence.  Such an irrelevant factor determining who lives and who dies is precisely the sort of arbitrariness that the Supreme Court has condemned.

Sullivan, *supra*, at 43.

32.    The imposition of capital punishment in the military justice system shows that the above hypothetical is not far from reality.  Although Congress has

28

fixed the problem by requiring at least twelve members in a capital court-martial,

Petitioner was denied his constitutional rights under the Fifth and Eighth

Amendments.  By donning a military uniform, does a U.S. citizen shed the

Constitutional protections he or she previously held?  Or will the military instead

be made to follow the guidance of its first Commander-in-Chief, who maintained

that "[w]hen we assumed the soldier, we did not lay aside the citizen"?[11]  This

Court must grant the writ.


### CLAIM TWO

### IN A CAPITAL COURT-MARTIAL DURING PEACETIME,  THE CONVENING AUTHORITY'S POWER TO HAND-PICK MILITARY SUBORDINATES – WHOSE CAREERS HE CAN DIRECTLY AND IMMEDIATELY AFFECT AND CONTROL –  TO SERVE AS COURT MEMBERS VIOLATES THE FIFTH, AND EIGHTH AMENDMENT

A district attorney is vested with prosecutorial discretion.  What if he picked the jury from among those who work directly for him?  The governor wields the power of clemency.  What if she picked the jury.  The grand jury, guided by the prosecutor and cloaked in

---

[11]  THE WRITINGS OF GEORGE WASHINGTON 13 (Jared Sparks ed., 1834)(from George Washington, Answer to an Address of the New York Provincial Congress, June 26, 1775).

secrecy, formally investigates criminal allegations.  What
if they chose the membership of each petit jury?  The
military commanding officer is apprised of suspected
misconduct within his unit.  He stays informed and may
properly influence the course of ongoing criminal
investigations.  He decides whether, who, and on what
charges to prosecute.  Ultimately, he determines the
propriety of all convictions and sentences.  He is the
district attorney, the governor and the grand jury rolled
into one.  In the exercise of justice, he is as close to a
true sovereign as this nation has, and he picks the jury
from among those who work for him.[12]

1.    All other allegations in this Petition are incorporated into this claim

by specific reference.

2.    Petitioner was convicted of capital murder and sentenced to death by

a court-martial composed of six members who were hand-picked by the convening

authority.  The court members were subordinates of the convening authority and

the convening authority had the power to directly and immediately effect and

control the court members' military careers.  The convening authority's ability to

exercise subjective judgment on who should serve on a capital court-martial

coupled with the fact that the convening authority is the commanding officer of

the selected members is "without any parallel in civilian justice systems."  *Loving*

---

[12] Major Guy P. Glazier,  *He Called for His Pipe, and He Called for His
Bowl, and He Called for His Members Three – Selection of Military Juries by the
Sovereign: Impediment of Military Justice*, MIL. L. REV. 157, 2 (1998).

*v. United States,* 517 U.S. 748, 753 (1996) (Wiss, J., dissenting).  During

peacetime, the convening authority's power to hand-pick military subordinates –

whose careers he can directly and immediately effect and control –  to serve as

members on a court-martial empowered to sentence a member of the Armed

Forces to death violates the fifth, and eighth amendment.

> 3.    Three relevant constitutional principles delimit this issue.  First, the

Eighth Amendment imposes a heightened standard for "reliability in the

determination that death is the appropriate punishment in a specific case."

*Woodson v. North Carolina*, 428 U.S. 280, 305 (1976).  Second, because the

Eighth Amendment requires consideration of the "evolving standards of decency,"

*see Trop v. Dulles,* 356 U.S. 86, 100 (1958), this Court has consistently

acknowledged and executed its obligatory task of "examin[ing] capital sentencing

procedures against evolving standards of procedural fairness in a civilized

society."  *Gardner v. Florida,* 430 U.S. 349, 357 (1977).  Finally, the Fifth

Amendment procedural due process analysis, much like the Eighth Amendment

"evolving standards of decency" inquiry, takes into consideration whether a

criminal process "offends some principle of justice so rooted in the traditions and

conscience of our people as to be ranked as fundamental."  *Herrera v. Collins*,

U.S. , 113 S.Ct. 853, 864 (1993)(quoting *Medina v. California,* U.S. ,112 S.Ct.

2572, 2577 (1992) and *Patterson v. New York,* 432 U.S. 197, 202 (1977).

4.      Under the Uniform Code of Military Justice, the commanding officer (convening authority) "convenes" a court-marital, *see* U.C.M.J. articles 22-24, and refers charges to it for trial, *see* U.C.M.J. articles 30, 32-35.  The process of convening a court-martial includes selecting the court members (jury) according to criteria set forth in Article 25, U.C.M.J.  Article 25(d)(2), U.C.M.J. provides that "when convening a court-martial, the convening authority shall detail as members thereof such members of the armed forces as, in his opinion, are best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament."  The subjective criteria set forth in Article 25(d)(2) gives the convening authority unfettered discretion in appointing members to a court-martial panel.  The convening authority's power to select members "is the most vulnerable aspect of the court-martial system."  *United States v. Smith*, 27 M.J. 242, 252 (1988)(Cox, J., concurring).  Personal appointment of the members by the convening authority is also "[a]rguably the most critical and least necessary vestige of the historical origins of the military justice system."  Colonel Francis A. Gilligan and Professor Fredric I. Lederer, COURT-MARTIAL PROCEDURE § 15-31.00 (1991).

5.      This system for selecting court members set forth in Article 25 is

especially susceptible to arbitrary influence in a court-martial empowered to sentence a service member to death because of the inherent peril of command influence.  *See* U.C.M.J. Article 37 (unlawful command influence in the action of a court is prohibited).  Command influence is a term of art in the military, but generally implies a commander's improper influence based on rank and position of authority (either intentionally or unintentionally) on the decisions of court-martial members.  It is an innate problem because all panel members are selected -- and supervised in their military careers -- by the general court-martial convening authority, *see* U.C.M.J. Article 25(d)(2), who is typically the base commander and a general officer.  The unfairness of this in the context of a capital case is apparent.  The convening authority makes the prosecutorial determination that an accused shall be tried by a general court-martial.  S*ee* U.C.M.J. Article 22.  He makes the determination that the case will proceed to a court-martial as a death penalty eligible case.   The convening authority hand-picks the members of his command who will serve on the court martial panel.   He must approve any resulting death sentence.  *See* U.C.M.J. Article 60.

      6.     Thus, a capital defendant in the Armed Forces, like Petitioner, goes on trial for his life before court members who are hand picked by their commanding officer.  The members are aware that the commanding officer has

already determined that the offenses are atrocious enough that the government

should seek the death penalty.  The members know that they must later answer to

the commanding officer in their career development.  *See* Hearings on S. 857 and

H.R. 4080, 81st Cong., 1st Sess. (1949) *reprinted in* Index and Legislative History

of the Uniform Code of Military Justice, at 78-85 (1950)(Testimony of George

Speigelberg for the Special Committee on Military Justice, American Bar

Association).[13]  This unparalleled system for selecting court members for a capital

---

[13]    Mr. Speigelberg observed:

> Today, the average convening power of a general
> court martial . . . is a divisional commander.  As a matter
> of fact, . . . the commanding general appoints or controls
> the appointment of the trial judge advocate who is the
> prosecutor, . . . and of the court which tries the man
> accused of crime.

> That court is chosen exclusively from members of
> the commanding officer's command.  They look,
> properly and necessarily, to the commanding officer for
> promotion, for assignment, for efficiency ratings, for
> quarters.  Indeed, it is no exaggeration to say that their
> future in the Army is entirely dependent of their
> commanding officer's good will.

> Now, if it please the committee, that situation, so
> long as it is allowed to exist, carries in ti the germ of
> injustice.

*Id.* at 76-77.

court-martial during peacetime is an intrinsic obstacle to obtaining a fair and impartial panel and trial in capital courts-martial in the Armed Forces.

7.     The Supreme Court emphasized that the military justice system's history strongly influences what process is due under the Constitution.  *Weiss v. United States*, 510 U.S. 163 (1994). "Although American courts-martial from their inception have had the power to decree capital punishment, they have not long had the authority to try and to sentence members of the Armed Forces for capital murder committed in the United States in peacetime." *Loving v. United  States,* 517 U.S. 748, 753 (1996).  It was not until 1950, with the passage of the Uniform Code of Military Justice, that Congress first authorized courts-martial to impose a sentence of death against a member of the Armed Forces for murder committed during peacetime.  *See* Article 118, U.C.M.J.  Thus, for the first time in the history of this nation's military justice system, the U.C.M.J. gave convening authorities the unprecedented and unparalleled power to hand-pick members of a court-martial who were to decide whether a member of the Armed Forces should live or die for a murder committed during peacetime.  Any historical defense of the convening authority's ability of hand-pick members for a court-martial during peacetime must be limited to non-capital cases.

8.     Recent concerns over the power of a convening authority to select

court members have been raised by Congress and by the courts in Canada and Europe where similar provisions in the Canadian and British military justice systems have come under attack.  These developments support Petitioner's request that this Court grant review of this unprecedented and unparalleled  power of a convening authority to hand-pick court members in a capital court-martial during peacetime.

9.      Congress has shown a renewed interest in the court member selection process.  In the Strom Thurmond National Defense Authorization Act for Fiscal Year 1999, Congress ordered the Secretary of Defense to submit alternatives to current method for selecting members of the Armed Forces to serve on courts-martial.  The only alternative selection method mentioned by Congress was a random selection method divesting the convening authority of any power to personally select court members.

10.      In 1992, the Supreme Court of Canada found that Canada's military justice system which allowed the selection of court-martial members by the convening authority violated the 1982 Canadian Charter of Rights and Freedoms' guarantee that an accused is "presumed innocent until proven guilty according to law in a fair and public hearing by an independent and impartial tribunal." *Genereux v. The Queen,* [1992] S.C.R. 259.  The Court found that the military's

court member selection procedure violated the "independence" prong of this
guarantee:

> It is unacceptable that an external force be in a position
> to interfere in matters that are directly and immediately
> relevant to the adjudicative function, for example, . . .
> sitting of the court and court lists.  Although there must
> of necessity be some institutional relations between the
> judiciary and executive, such relations must not interfere
> with the judiciary's liberty in adjudicating individual
> disputes and in upholding the law and values of the
> Constitution.

*Id.* at 286.  The Court stressed that the lack of tribunal independence, real or

perceived, violates the Charter.  The Court concluded that a reasonable person,

familiar with the constitution and structure of the General Court Martial would

conclude that the tribunal did not enjoy the necessary judicial independence.

    11.    In February 1997, the European Court of Human Rights ruled that the

British court-martial member selection system violated the European Convention

for the Protection of Human Rights and Fundamental Freedoms.  Like the Article

25, U.C.M.J., the British system authorized the convening authority to prefer

charges, specify the type court-martial and personally select the court members.

The European Court of Human Rights held that the court member selection

method violated Article 6(1) of the Human Rights Convention which guarantees a

fair trial before "an independent and impartial tribunal established by law."  The

Court held that "in order to maintain confidence in the independence and impartiality of the court, appearance may be of importance.  Since all members of the court-martial which decided Mr. Finlay's case were subordinate in rank to the convening officer and fell within his chain of command, Mr. Findlay's doubts about the tribunal's independence and impartiality could be objectively justified." The Court concluded that in light of "the central role played by the convening officer in the organization of the court-martial, . . . Mr. Findlay's misgivings about the independence and impartiality of the tribunal which dealt with his case were objectively reasonable. . . . [T]here has been a violation of Article 6 § 1 of the Convention."

12.     Canada, Great Britain, and the European Community all agree that court member selection by the convening authority fails to meet minimum standards of independence and impartiality in practice and appearance.  The United States stands alone in the free world in denying its members of the Armed Forces the right to be tried by an independent and impartial court-martial panel. This Court should grant the writ to ensure that this practice ends in courts-martial empowered to sentence a member of the Armed Forces to death during peacetime. Basic due process demands as much.

## CLAIM THREE

**AN APPELLATE COURT CAN NOT *ASSUME* THAT THE TRIAL JUDGE MADE A DETERMINATION AS TO WHETHER TRIAL COUNSEL'S EXPLANATION WAS CREDIBLE OR PRETEXTUAL PURSUANT TO *BATSON V. KENTUCKY*, 476 U.S. 79 (1986), WITHOUT CONDUCTING A FURTHER HEARING ON THE ISSUE, WHEN THE TRIAL JUDGE RULED ON PETITIONER'S *BATSON* CLAIM WITHOUT EVEN REQUIRING THE PROSECUTOR TO PROVIDE A RACE NEUTRAL EXPLANATION FOR THE CHALLENGE.**

1.      All other allegations in this Petition are incorporated into this claim by specific reference.

2.      In *Batson v. Kentucky*, 476 U.S. 79 (1986), the Supreme Court held that the discriminatory use of peremptory challenges by the prosecution against members of the same racial minority group as the defendant violated the defendant's right to equal protection.  The Supreme Court established a three step procedure for addressing objections to the discriminatory exercise of peremptory challenges.  First, the trial judge must determine whether the defense has established "a *prima facie* case of purposeful discrimination."  *Id.* at 96-97.  Second, if "the requisite showing" is made, "the burden shifts" to the prosecution to "articulate a neutral explanation [for the challenge] related to the particular case

39

to be tried." *Id.* at 96-98.  Finally, the trial judge "will have the duty to determine

if the defendant has established purposeful discrimination." *Id.* at 98.  At

Petitioner's capital court-martial, the military judge failed to perform his duty

under *Batson* after the Petitioner made a *prima facie* case of purposeful

discrimination.  The military judge allowed the prosecution to merely deny a

discriminatory intent and not state a race neutral explanation for the challenge.

The Court of Appeals for the Armed Forces compounded the error by assuming

that the military judge actually complied with *Batson* three days after the initial

objection to the discriminatory challenge.  *United States v. Gray,* 51 M.J. 1, 35

(1999).

      3.    At Petitioner's court-martial, the prosecution used its sole peremptory

challenge, *see* Article 41(b), U.C.M.J.,[14] to remove Major Francis A. Quander, Jr.,

one of two African-American members remaining on Petitioner's court-martial

_____

     [14]   Petitioner questions the use of peremptory challenges by the prosecution
in a capital court-martial during peacetime.  Under Article 25, U.C.M.J., the
convening authority has already hand-picked members of his command who are
"best qualified" to serve as court members.  The apparent reason for peremptory
challenges is to remove any lingering doubt about a court member's fitness to
serve by permitting the party to remove that member from the panel.  *See Ford v.
Georgia*, 498 U.S. 411 (1991).  Thus, the use of a peremptory challenge by the
prosecution in a court-martial does not serve the same purpose as it does in the
civilian criminal justice system, because the members selected have already been
determined to be the "best qualified" by the convening authority, the prosecutor's
commanding general.

panel.  R. at 762.  The trial defense counsel objected and demanded an

explanation, on the record, for the prosecution's biased peremptory challenge. Id.

After establishing this *prima facie* case, the trial defense counsel attempted to

explain further why he believed that the challenge was discriminatory.  The

military judge stopped him.  The military judge did not require the prosecutor to

provide an explanation for the challenge.  Instead, the Military Judge asked the

prosecution if the challenge was the "result of his bias or prejudice against the

black race."  The prosecutor indicated that he had not challenged Major Quander

because of his race.  Again, the military judge asserted that no further elaboration

was necessary. R. at 763.  Three days later, the prosecutor attempted to clean up

the record.  At that time, the prosecutor asked that an unsworn statement be

appended to the appellate record which attempted to justify the removal of Major

Quander. R. at 779; App. Exh. LVIII.  The statement contends that Major

Quander was not peremptorily challenged because of his race, but because the

prosecutor believed that Major Quander's responses concerning the death penalty

were "equivocal."[15]  R. at 779; App. Exh. LVIII.  The court made no additional

---

[15]     Petitioner contends that the record indicates that Major Quander was anything but equivocal concerning the death penalty.  As Judge Effron notes:

> "[t]he credibility of the prosecution's rationale was
> clearly at issue in this case.  The record of trial reelects

41

ruling or findings of fact based on the proffered rationale.   In fact, there is no evidence in the record that the military judge even read the proffered statement. *See* R. 779.  More importantly, the military judge's failure to conduct a hearing as dictated by *Batson* deprived trial defense counsel from developing further the basis for his objection to the peremptory challenge of Major Quander.

4.   The military judge erred by granting the peremptory challenge without requiring the Government to provide a race neutral explanation for the peremptory challenge of Major Quander and by relying solely upon the Government's mere denial of discriminatory intent.  At that time, "the military judge made clear that he was not going to enter any findings of fact or conclusions of law on the issue of discrimination." *Gray,* 51 M.J. at 68 (Effron, J., and Cox, C.J., dissenting).   Even after the prosecutor proffered a *post-hoc* explanation

---

> thoughtful responses by Major Quander to questions about the death penalty.  He made clear that he could do his duty, follow the law as instructed by the military judge, and vote for the death penalty.  He stated: 'I can definitely consider it.  I would honestly have to say I would have some problems saying yes, but I could do it.'  Such a response is not particularly remarkable from a member facing the awesome responsibility of adjudging the ultimate penalty.

*United States v. Gray, at 69.*

three days later, the military judge made no further findings.   As Judge Effron

points out "[t]here is absolutely no indication that the military judge attached any

evidentiary value to trial counsel's statement, and the statement did not constitute

in any way a ruling on the part of the military judge." *Id.* at 69.   The record does

not even reflect that the military judge read the proffered statement.   "The mere

filing of an appellate exhibit, after the military judge has refused to require

compliance with *Batson*, does not remedy the error by the military judge." *Id.* at

68.

5.      The Supreme Court has made clear that the mere denial of

discriminatory intent does not comply with *Batson'*s second step.   *Batson*, at 98;

*see also Purkett v. Elem*, 514 U.S. 765, 769 (1995).   The record in this case

establishes that such a bald denial is all that the military judge had before him

when he overruled petitioner's objection to the challenge of Major Quander.   The

military judge failed to comply with the clear procedural dictates of *Batson*.   The

prosecution was not required to provide an explanation for its challenge of Major

Quander.   The military judge failed to ensure that procedural dictates of *Batson*

were followed.   In *Hernandez v. New York,* 500 U.S. 352 (1991), this Court

emphasized the critical role of the trial judge in evaluating the sincerity of the

prosecution's explanation for a peremptory challenge:

> In the typical peremptory challenge inquiry, *the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed.* There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies "peculiarly within a trial judge's province."

*Id.* at 365 (emphasis added); *see also Purkett v. Elem,* 514 U.S. 765, 768 (emphasizing that it is the responsibility of the trial judge, at the third step of the *Batson* inquiry, to assess the "persuasiveness" of the proffered "justification"). In this case, the military judge failed to even attempt to comply with this Court's clear procedural requirements as set forth in *Batson*. The military judge prevented the trial defense counsel from making the record as to his objection. The military judge failed to require the prosecutor to state a basis of the challenge on the record. And finally, the military judge allowed the challenge based solely upon the prosecutor's statement that the challenge was not based upon race.

6.     The record establishes that the military judge ruled on the *Batson* objection after the prosecutor denied a discriminatory intent, but before he proffered a factual basis for the challenge. In a 3 - 2 opinion, the three member majority of the Court of Appeals for the Armed Forces concluded that the military

44

judge "did more than require the trial counsel to simply state whether his 'challenge was a result of his bias or prejudice'" and that the military judge made an "implied ruling" on the question of pretext three days later. *Gray,* at 34. The Court of Appeals ignores the simple, yet necessary, procedural requirements of *Batson.* Petitioner was denied a full and fair hearing on his allegation that the prosecution's challenge was racially discriminatory. The Supreme Court's holding in *Batson* requires strict compliance with the three step procedure. The Court of Appeals decision in this case eviscerates the clear requirements of *Batson.* As Judge Effron eloquently concludes:

> The prosecution's unsworn after-the-fact memorandum [regarding its explanation for the challenge of Major Quander] is no substitute for the findings and conclusions that should have been made by the military judge who had presided over the *voir dire* of Major Quander, observed the demeanor of trial counsel and Major Quander and heard the tone of trial counsel's questions and Major Quander's responses. The end result in this case is that [the prosecutor] was, in effect, both the advocate for striking Major Quander and the judge of the credibility of his own explanation. That is unacceptable under *Batson* . . . and [its] progeny.

*Gray,* at 71 (Effron, J., and Cox, C.J., dissenting).

      7.    The military judge "expressly declined on the record to apply [this Court's] precedent." *Id.* at 71. The majority opinion's assumption that the

45

military judge properly ruled on the prosecutions *post-hoc* proffered explanation

compounded the error.  Petitioner was denied his right to a full and fair resolution

of his objection to the prosecution's challenge of Major Quander.  The Court of

Appeals for the Armed Forces should have followed its clear precedent, *see*

*Untied States v. Santiago-Davila,* 26 M.J. 380, 393 (1988), and remanded the case

for a limited evidentiary hearing on the reasons for the peremptory challenge of

Major Quander by the prosecution.  *Gray* at 71.  This Court should grant the writ

to ensure that  Supreme Court's bedrock holding that a defendant has "the right to

be tried by a jury whose members are selected pursuant to nondiscriminatory

criteria" is not eroded by the failure of judges to comply with strict procedural

requirements of *Batson v. Kentucky*, 476 U.S. 79, 85-86 (1994).

## CLAIM FOUR

### PETITIONER WAS DENIED THE RIGHT TO A FAIR AND IMPARTIAL JURY WHEN THE MILITARY JUDGE  IMPROPERLY GRANTED GOVERNMENT CHALLENGES FOR CAUSE AGAINST TWO MEMBERS

1.      All other allegations in this Petition are incorporated into this claim

by specific reference.

2.      In *Gray v. Mississippi*, 481 U.S. 648 (1987), the United States

Supreme Court held that in a capital case, the trial court's improper excusal for

cause of a juror, based upon that juror's opposition to the death penalty,

constitutes reversible error – not subject to any harmless error analysis.  In doing

so, the Supreme Court upheld its previous decisions in *Wainwright v. Witt*, 469

U.S. 412 (1985), *Davis v. Georgia*, 429 U.S. 122 (1976) (per curiam), and

*Witherspoon v. Illinois*, 391 U.S. 510 (1968).  These decisions stand for the

proposition that "a capital defendant's right, under the Sixth and Fourteenth

Amendments, to an impartial jury [prohibits] the exclusion of venire members

simply because they voiced general objections to the death penalty or expressed

conscientious or religious scruples against its infliction."  *Gray v. Mississippi*, 481

U.S. at 657 (quoting *Witherspoon*, 391 U.S. at 522).  Furthermore, excluding such

jury members "must be limited to those who were 'irrevocably committed. . .to

vote against the death penalty regardless of the facts and circumstances that might

emerge in the course of the proceedings,' and to those whose views would prevent

them from making an impartial decision on the question of guilt."  Id. at 657-58

(quoting *Witherspoon*, 391 U.S. at 522 n.21); *see also Wainwright v. Witt*, 469

U.S. at 424 (where the United States Supreme Court held that the relevant inquiry

is "whether the juror's views would 'prevent or substantially impair the

performance of his duties as a juror in accordance with his instructions and his

oath.'"  (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1979)).  Simply put, the

improper exclusion of a juror from a capital jury "stack[s] the deck" and will violate the constitutionally protected right to due process of law. *Gray v. Mississippi*, 481 U.S. at 658 (quoting *Witherspoon*, 391 U.S. at 523).

3.      At Petitioner's court-martial, the military judge improperly granted not one, but two, government challenges for cause of African-American enlisted members who expressed that they were *not* "irrevocably committed to vote against the penalty of death regardless of the facts and circumstances . . ." *Gray v. Mississippi*, 481 U.S. 658 (quoting *Witherspoon*, 391 U.S. at 527 n.21).

## A.      *Cause Challenge Against MSG McCormick*

4.      In point of fact, one of the two members who was improperly challenged, MSG McCormick, clearly and unambiguously indicated to the trial counsel his willingness (1) to vote for the death penalty, (R. at 742, 747, 751); (2) to obey the law and follow the instructions of the military judge, (R. at 749); and (3) to evaluate the facts and the evidence impartially, (R. at 750).  Therefore, there was no basis to conclude that MSG McCormick's views on capital punishment "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Gray v. Mississippi*, 481 U.S. at 658.  Nevertheless, the military judge improperly granted the government challenge.

48

5.      When defense counsel demanded that the military judge "state on the record the criteria under [*Wainwright v. Witt*, 469 U.S. 412]" which the judge used to grant the government challenges the military judge refused and replied, "I-do you know the law?  Do you think the appellate courts are not familiar with the law?  Do you not think they will apply the law?"  (R. at 753).

6.      Regarding the challenge of MSG McCormick, the military judge also based his grant of the challenge for cause on a mistaken belief that MSG McCormick had "read a couple of articles concerning the accused."  (R. at 752).  Such a basis for challenge is totally unwarranted based upon the voir dire of MSG McCormick:

> TC:    Good morning, Master Sergeant.
>
> MEMBER (MSG MCCORMICK):    Good morning, sir.
>
> TC:    Now, you've had a chance to take a look at these charges on the flyer there and you've had a chance to take a look at the accused in this case.  Have you read anything in the newspaper or seen anything on television, or heard anything on the radio concerning these charges or this accused?
>
> MEMBER (MSG MCCORMACK):   Yes, sir.  A couple of months ago, I read about it, but I haven't read much about it, because I haven't had time do much reading the past - the past five or six months or so . . . .

TC:   Now, you said you had read something a couple of months back.  Do you recall what it was that you read?

MEMBER (MSG MCCORMICK):   It was only that he was assigned to Division and there was a murder charge.  That's what I read, sir.

TC:   Okay, was it - the facts that you recall concerned - listed his name (Pointing at accused).  Is that right?

MEMBER (MSG MCCORMICK):     Yes, sir.

TC:   And did it give you any more information than what you got on the flyer, that he was charged with these offenses?

MEMBER (MSG MCCORMICK):     No, sir.

TC:   Were there any facts or other statements in there that may have indicated guilt or innocence to you?

MEMBER (MSG MCCORMICK):     No, sir.

TC:   Based on what you have read, did you have occasion to talk to other people about Specialist Gray or these charges?

MEMBER (MSG MCCORMICK):     No, sir.

TC:   Did you have an occasion to form an opinion or express an opinion as to guilt or innocence?

MEMBER (MSG MCCORMICK):     No, sir.

TC:    You have a complete – do you have an open mind about the accused in this case and the charges in this case?

MEMBER (MSG MCCORMICK):    Absolutely, sir.

TC:    And you can set aside anything that you may have you heard and listen solely to the evidence that will be presented to you, and reach a decision based on that evidence?

MEMBER (MSG MCCORMICK):    Yes, sir.

TC:    Is there anything else that may - that you recall?  Has anybody talked to you about this case or said anything to you that - involving the facts or the accused in this case?

MEMBER (MSG MCCORMICK):    No, sir.

R. at 738-40.

6.    Accordingly, there was only one remaining basis for the military judge to have possibly granted the government challenge: MSG McCormick had a moral, (R. at 741), not religious, background which caused him "for the most part," (R. at 743), to oppose the death penalty.

7.    MSG McCormick repeatedly, and consistently – without any indication to the contrary – indicated his willingness to impose the death penalty under the appropriate circumstances, (R. at 747), such as "a series of capital

offenses" or a "really brutal" offense. (R. at 747.) The relevant portion of *voir*

*dire* demonstrating MSG McCormick's willingness to impartially fulfill his duties

as a panel member in accordance with the instructions and his oath is set out, in

pertinent part, below:

> TC:    Let me just ask you, how do you feel about the
> death penalty? Are you opposed to it or do
> you think it is necessary, or a good law?

> MEMBER (MSG MCCORMICK): Well, for the
> very most part, sir, I'm opposed to it. It's –
> that for the very most part. I've – the way
> that I was brought up and just my family's
> moral character –

> TC:    Sure.

> MEMBER (MSG MCCORMICK): – and I just –
> to the very most part, I am opposed to it.

> TC:    Okay, and is this a long held belief?
> I mean, have you had this belief or opposition
> to the death penalty for a long time?

> MEMBER (MSG MCCORMICK):    Yes, sir, I have.

> TC:    Okay, and this is as a result of a religious –

> MEMBER (MSG MCCORMICK):    No, sir.

> TC:  – background or moral background, or
> did –

> MEMBER (MSG MCCORMICK):    Well, I guess,

just more of a moral background.

TC:     Okay.  This is the kind of something that you developed with your family and – how did it . . .

MEMBER (MSG MCCORMICK):     Well, it's just – just that and - and I guess, along with just my personal feelings.

                    * * * *

TC:     Okay, for the most part.  Well, let me put it to you this way.  Could you be part of the legal machinery - could you be part of a jury here that would impose the death penalty?

MEMBER (MSG MCCORMICK):  (Pause) Well, sir, I'd – I'd have to – you know, I'd really have to do a lot of soul searching to do that. I really can't, at this point, actually say I can, but I mean – I'd do what I felt was necessary, sir.

                    * * * *

TC:     And the question becomes whether you're going to vote for the death penalty or not vote for the death penalty, *could you and would you vote for the death penalty based on your opposition to the death penalty?*

MEMBER (MSG MCCORMICK):     Well, not knowing very much about - it's hard for me to say, sir, but I – I would say that – I've thought about it and thought about it and it's

53

very difficult for me to say, but I would say on
a – I would say yes, but it would be farfetched,
far –

\* \* \* \*

TC:   So, – but you can conceive of circumstances
that would make you vote for the death
penalty.  Is that right?

MEMBER (MSG MCCORMICK): Yes, sir, extreme
circumstances, sir.

\* \* \* \*

TC:   And that is, given your opposition and . . .
your personal belief that you oppose the
death penalty . . . *could you vote for the
death penalty under any circumstances?*

MEMBER (MSG MCCORMICK):     (Pause)

TC:   You see what I'm getting to?

MEMBER (MSG MCCORMICK): Yes, sir, I see,
what you're getting to, sir, but on a very
remote – *under very remote circumstances,
sir.*

TC:   Premeditated murder?

MEMBER (MSG MCCORMICK): Well, *it depends on the
fact, sir, of the case.*

\* \* \* \*

TC:   And *what you're saying then is that, given*

54

*the law, given the facts, and when the time
comes, you could make the decision*,
assuming you feel it's a - the appropriate
sentence.  Is that right?

\* \* \* \*

MEMBER (MSG MCCORMICK):    Well, I guess, if
– I guess, *a series of capital offenses* would
be, but – and I guess, really, really brutal or
something like that, but other than that – and
then too, that would have to – I'd still
have to do a lot of soul-searching in
advance.  I would have to make the decision
and I would have to weigh that –

TC:    Sure.

MEMBER (MSG MCCORMICK):  – and come out with
the end result, sir.

TC:    I understand.  No further questions, Your Honor.

DC:    Master Sergeant McCormick.

MEMBER (MSG MCCORMICK):  Yes, sir.

\* \* \* \*

DC:    Would there be anything that would stop you
from following the law and the directions
of the military judge?

MEMBER (MSG MCCORMICK):  (Pause) *No, sir.*

DC:    All right.  Would you – you would do your duty?

MEMBER (MSG MCCORMICK): Yes, sir.

DC:   You would do your sworn duty?

MEMBER (MSG MCCORMICK):  Yes, sir.

DC:   You would evaluate the facts and the
      evidence impartially?

MEMBER (MSG MCCORMICK):     Yes, sir.

* * * *

DC:   And then – in performing your duty as a
      court-martial panel member, you're going to
      follow your sworn duty.  Is that correct?

MEMBER (MSG MCCORMICK):  Yes, sir.

DC:  And if it is the instruction of the military
judge that under the facts and circumstances
as you find them, that the death penalty is a
possibility, you will consider the death penalty?

MEMBER (MSG MCCORMICK): (Pause) *Yes,
      sir*.

R. at 740-751 (emphasis added).

8.  The military judge improperly held that MSG McCormick was unfit to

serve as a panel member.  The voir dire of MSG McCormick reveals, to the

contrary, that MSG McCormick's moral background, and his personal feelings

that the death penalty should be limited to extreme cases (i.e., a series of capital

56

offenses, or a brutal offense), did not preclude him from "set[ting] aside [his] scruples" and serving as a panel member in appellant's case.  Gray v. Mississippi, 481 U.S. at 663.  Thus, he was not "'irrevocably committed . . . to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings.'" Id. at 657-658 (citing *Witherspoon v. Illinois*, 391 U.S. at 522 n. 21).

**B.      *Cause Challenge Against CSM Wood***

9.      Petitioner submits that the military judge's grant of the government challenge for cause against MSG McCormick violated appellant's right to due process so that the findings and the sentence must be set aside. Grant of relief based on the previous assignment of error would obviate the need for this Court to address the remaining assignments of error.  Nevertheless, Petitioner will address the same error inherent in the military judge's grant of the government's challenge for cause of CSM Wood.

10.      It should be pointed out that the military judge had originally denied the government challenge for cause against CSM Wood immediately following individual voir dire of that member.  (R. at 609.)  Subsequently, and to the apparent surprise of both trial counsel and defense counsel, the military judge reversed himself, *sua sponte*.  He announced that he would "give" each counsel

"something unique."  He then granted the government challenge of CSM Woods and a defense challenge that he had previously denied.  (R. at 760-61.)  The defense counsel objected to the granting of the government challenge for cause without the opportunity to rehabilitate CSM Woods.  (R. at 761.)  The military judge, in "giving" each counsel the grant of a challenge, apparently attempted to be even-handed.  Such a quasi-harmless error analysis violates the express holding of the United States Supreme Court in *Gray v. Mississippi*, 481 U.S. at 660 (Blackmun, J.)  The law regarding the standard for determining whether to grant a government challenge for cause against a member with scruples against the death penalty is set out in the previous assignment of error regarding the challenge of MSG McCormick.

11.     In the case of CSM Woods, the government challenge was based on CSM Woods' religious convictions that "thou shall not kill."  (R. at 591.)  As an ordained deacon, R. at 589), CSM Woods initially expressed his concern about the death penalty during individual voir dire by the trial counsel and was reluctant to determine whether he could vote for or against the death penalty without first hearing the facts of the case:

> TC:   All right, Sergeant Major. Let me just ask you this:
>         how do you feel about the death penalty?  Do you
>         oppose the death penalty? – or do you think it's a

good law?

CSM WOODS:  The bible says "Thou shall not kill," sir.

TC:   Could you be part of the legal machinery that could bring about the imposition of the death penalty? Now, when I say that I mean, could you be part of a jury that voted to impose the death penalty?

CSM WOODS:  I could be within the system, sir, on the jury, but – but being a part of that jury and that decision-making, if that's the question that you're asking me, sir, I don't think I could, sir.

TC:  Okay. So, Sergeant Major, is what you're saying, then, under no circumstances, regardless of what the law or the circumstances might be, that you could not vote for or return a verdict that might require-or-would require the death penalty?

CSM WOODS:  No, sir, I didn't say that, sir.

* * * *

TC: Are there any circumstances that you can think of that you would not vote for the death penalty?

CSM WOODS:  *Sir,* I'll make myself clear again, that given the evidence, sir, almost proof, sir, to me and I'm being faced with the evidence and the proof, then, sir, I could come back to you sir, and give you that answer, yea or nay. But sitting here right now, sir, I – I  just – I cannot give you that answer.

TC:  Okay, were not talking about this case in particular.

59

We're just talking about any case where you're given the duty to make a decision. Are the circumstances that you can envision that you would vote for the death penalty?

CSM WOODS:  Sir, you ask me the same question over and over, *sir.*

MJ:   That's cause he needs for you to answer it, Sergeant Major.

CSM WOODS:  Yes, I understand sir.

MJ:   He needs for you to answer for us to ascertain whether or not you should sit on this panel. Now, you've already said the bible says – and you're an ordained minister –

CSM WOODS:  Yes, sir.

MJ:   Recognizing that fact, and your religion, the question is, could you vote for the death penalty? Yes or no?

CSM WOODS:  No, sir. R. at 591-96.)

12.     Defense counsel then focused the court's attention on the relevant question, as set out by Chief Justice Rehnquist, (i.e. whether the jurors in capital cases "state clearly that they are willing to temporarily set aside their beliefs in deference to the rule of law." *Lockhart v. McCree*, 476 U.S. at 176. The defense counsel did effectively elicit CSM Wood's willingness to follow the instructions of the military judge:

DC:   Recognizing that we all have personal feelings, but
at the same time knowing that it is your sworn
duty to be a member of this panel, the judge will
instruct
you on the law. When he instructs you on the law
you're to use that to evaluate the facts as you see
them in this courtroom.

CSM WOODS:  That's fine.

DC:   If the facts warrant what the judge tells you the
law is, could you be part of a panel that
recommends a death sentence?

CSM WOODS:  Sir, I'd like to make one more thing
[clear] here. You only ask me my opinion.  Now,
sitting on this panel here, if that decision, after the
evidence have been put to me and I've been sworn
in as that panel, what else could I do, sir? I gotta
call the facts as the facts are . . . if the
circumstances and evidence . . . were put before
me, the proof put before me, then that's where I
have to make my decision .

DC:   Okay, but you could perform your duty.

CSM WOODS:  Oh, yes, sir. I would have to.

DC:   Yes, that's – yes. In fact, your duty would require
you to push aside your personal opinion, just as it
does us.

CSM WOODS:  That's affirmative, sir.

* * * *

DC:   Just as a summary, because this has been

61

confusing, so please help me out. In spite of
personal opinions, would you be able to fulfill
your military – your sworn duty as a panel member
to impartially judge the facts and the law in this
case?

CSM WOODS: One hundred percent, sir.

DC:    Even if – even if that military duty required to say
that a death sentence is warranted in this case.

CSM WOODS:  I have to, sir.

R. at 600-602.

13.    The trial counsel then continued to question CSM Woods:

TC:   [T]he military judge asked you . . . whether you
personally could vote for the death penalty, and I believe
that you indicated to him that – that you could not vote
for a death penalty.  Is that a fair assessment of what you
told the military judge earlier?"

CSM WOODS: Without me having the facts. And like
the judge asked me, he said on my personal belief.
I firmly believe still, standing here now, no, until I
have been given the evidence and the proof and the
facts on it.

TC:    Okay. Do your religious convictions, or any other
convictions– now, we've gone – done this several
times –

CSM WOODS:  Uh-huh.

* * * *

62

TC:   – could you personally vote for the death penalty?

CSM WOODS:  *Sir,* if the decision have to come to that, and this is my assessment of it, I have no choice. But I'm saying no as of right now.

TC:   Do you believe as – in the death penalty?

CSM WOODS:  If it have to be applied, sir, with due process of evidence proved.

TC:   And assuming all the evidence is in, the law is there, you could vote for the death penalty?

CSM WOODS:  If proof that the evidence is sitting there, I got no choice. But the question was asked to me, sitting right here now, what did I believe in, you
know. I just gave my belief. But if it have to be, after due process, due elimination, proof's there, sir, I got to uphold the law too. If it's a yes answer, sir, I have to give a yes. If it's a no answer I'll give a no answer.

TC:   Okay, you understand that part of your voting involves personal feelings.

CSM WOODS:  That's affirmative, sir.

TC:   Okay, so that personal feelings about the death penalty are important.

CSM WOODS:  Uh-huh. Understand.

TC:   Okay, what are your feelings about the death penalty?

63

CSM WOODS:   I like life, sir, but that's not answering your question still. I understand that. What I'm saying, sir, I'm sitting back on the panel there, and you're giving me evidence, you're giving me proof, which I believe to be a base of fact on it, then I gotta be truthful about it.  If it – if I find it warrant the death penalty, sir, then I got to say yes. If I don't think that, no. sitting here right now, do I want it to happen? --or do I desire it to happen? I have to say no.

TC:   Okay.

(R. at 603-604.)

14.   Based on the above individual voir dire of CSM Woods, the military judge initially denied the government challenge for cause of CSM Woods. (R. at 609.)  At a later date, the military judge, on his own initiative, reversed himself by granting a challenge against CSM Woods. (R. at 760.)  Appellant submits that the military judge, in reversing himself and granting the challenge, violated Petitioner's right to due process.  However inarticulate CSM Woods may have been, he effectively indicated (1) his willingness to follow the instructions of the military judge (i.*e.,* "uphold the law") and (2) his ability to fairly and impartially judge the evidence. While expressing religious scruples against the imposition of the death penalty, CSM Woods, in the end, indicated that if the evidence "warrant (ed) the death penalty, sir, then I got to say yes (to imposing the death penalty)."

64

(R. at 604.)

15.    Petitioner submits that CSM Woods was attempting to demonstrate, during his voir  that he had no predisposition that Petitioner was guilty or deserved the death penalty.  In this respect, CSM Woods was correct.  Unfortunately, CSM Woods was unable to articulate his concerns.  Trial counsel aggravated matters by focusing solely on CSM Woods' reluctance to impose the death penalty.  The proper inquiry, and the one which the trial defense counsel elicited from CSM Woods, was whether CSM Woods would be willing to set aside his scruples temporarily, and follow the rule of law.  This, CSM Woods was willing to do, had he been allowed to remain on appellant's court-martial panel.  *Lockhart v. McCree*, 476 U.S. at 176.  The military judge, however, improperly removed CSM Woods, along with MSG McCormick.  In doing so, he misapplied the law established by the United States Supreme Court.  The writ should issue.  Relief is warranted.

## CLAIM FIVE

**THE PEREMPTORY CHALLENGE PROCEDURE IN THE MILITARY JUSTICE SYSTEM, WHICH ALLOWS THE GOVERNMENT TO REMOVE ONE JUROR WITHOUT CAUSE, IS UNNECESSARY AND SUBJECT TO ABUSE IN ITS APPLICATION AND WAS ABUSED IN PETITIONER'S CASE**

1.      All other allegations in this Petition are incorporated into this claim by specific reference.

2.      Uniform Code of Military Justice, Article 25 sets out the legislatively prescribed procedure for convening a court-martial to try a soldier for offenses committed while on active duty.  Article 25 (d) (2) provides: "When convening a court-martial, the convening authority shall detail as members thereof such members of the armed forces as, in his opinion, are best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament."

3.      The intent of Article 25 is to establish a fair and impartial body to try military personnel for offenses under the UCMJ.  This provision establishes that the convening authority will select a panel composed of "best qualified" military personnel.  As such, the panel is the functional equivalent of the civilian jury.

4.      As pointed out by the Army Court of Military Review sitting *en banc* in *United States v. Moore*, 26 M.J. 692 (A.C.M.R. 1988), the convening authority's action in promulgating a convening order constitutes completion of the selection of a jury:

> In reality, "petit jury" selection for trial
> by court-martial is done by the convening

66

> authority.  He is provided a "jury venire" by
> the Army, composed of personnel assigned to
> his command.  He selects the "jury" from his
> "venire"  by a reverse striking, i.e. by
> selecting a given number rather than striking
> all over the given number.  The single
> peremptory challenge therefore may be used to
> finally form the court-martial panel, but, it
> is not a jury selection method as exists, and
> as was discussed by the Supreme Court [in
> Batson], in civilian jurisdictions.

*United States v. Moore*, 26 M.J. at 699 n.7 (1988), *rev'd and returned for*

*rehearing*, 28 M.J. 366 (C.M.A. 1989).

     5.     Accordingly, the peremptory challenge in the military[59] does

not serve the same purpose as it does in the civilian community, because the

members selected to sit on the court-martial panel are already "best qualified."

The court-martial panel is the petit jury, and peremptory challenges are rendered

---

     [59]    Article 41(b), UCMJ, provides that "each accused and the trial counsel
is entitled to one peremptory challenge . . ."  R.C.M. 912(g) (1) provides:

> (1) Procedure. Each party may challenge one
> member peremptorily.  Any member so challenged
> shall be excused.  No party may be required
> to exercise a peremptory challenge before the
> examination of members and determination of
> any challenges for cause has been completed.
> Ordinarily the trial counsel shall enter any
> peremptory challenge before the defense.

unnecessary.

6.      There was no sound reason for the government to use a peremptory challenge in appellant's case, and doing so deprived appellant of the hand-picked petit jury selected for him.  (R. at 762.)  Rule for Courts-Martial 912(g) permits the exercise of one peremptory challenge by each party, and any such member challenged "shall be excused."  The apparent reason for the one peremptory challenge procedure is to remove any lingering doubt about a panel member's fitness to serve by permitting a party to remove that member from the panel.  *See Ford v. Georgia*, 498 U.S. 411 (1991).  For example, when the military judge denies a defense challenge for cause where the issue is closely decided, the defense may peremptorily challenge that member.  On the other hand, where the government peremptorily challenges a member, without first challenging that member for cause, there exists no valid basis for that member's removal.  Under such circumstances, the peremptory challenge becomes a device subject to abuse.[60] Thus, the peremptory challenge by the government serves no valid purpose in a military court-martial, and should be struck down altogether.

7.      At Petitioner's court-martial, the government used its peremptory

---

[60]  In Petitioner's case, the member peremptorily challenged by the government had not been challenged for cause.  (R. at 586.)

challenge to remove Major (MAJ) Francis A. Quander, Jr., one of two African-
American members from Petitioner's panel. (R. at 762.)  The defense counsel
objected and demanded an explanation, on the record, for trial counsel's
peremptory challenge.  *Id*.  The trial counsel indicated that he had not challenged
MAJ Quander because of his race but was not permitted by the military judge to
provide further elaboration.  (R. at 763.)  No explanation for the challenge
appeared until the next session, three days later.  At that time, the trial counsel
moved for the admission of an unsworn statement that attempted to justify the
removal of the panel member, MAJ Quander.  (R. at 779; App. Exh. LVIII.)  The
statement contends that MAJ Quander was not peremptorily challenged because of
his race.  R. at 779; App. Exh. LVIII.)

      8.      Petitioner asserts that the challenge of MAJ Quander violates *Batson*.
*See* Claim Three *supra.*  Additionally, Petitioner contends that the government
should not have been allowed to exercise a peremptory challenge against MAJ
Quander when no challenge for cause against him was suggested.  The
government proffered an additional unconstitutional basis for its challenge of MAJ
Quander.  The unsworn statement offered by the government to attempt to justify
the defense's allegation that a *Batson* violation had occurred is dispositive.  R. at
779; App. Exh. LVIII.)  The statement contends that MAJ Quander was

69

peremptorily challenged because the government "believed his responses

concerning the death penalty were equivocal."  (App. Exh. LVIII.)  The record,

however, indicates that while MAJ Quander may have been uncomfortable with

the prospect of imposing a death sentence, he was unequivocal in his testimony

that he would follow the law and could impose death if justified:

> TC:   Well, we're – of course the imposition of the death
> penalty, of course, is a difficult concept for
> everybody, and I can see that you're struggling
> with it.   What I'm trying to find out, and what I'm
> trying to determine is, is there something that's
> going to prohibit you or prevent you from
> following the law and voting to impose the death
> penalty if you think it's appropriate?

> MAJOR QUANDER:  No.  I would have a very
> difficult time doing it, but no.  That's the
> best way I can answer your question.  Yes, I
> could do it, but I would have a difficult
> time doing it.   And when you're not – you're
> not painting the picture either.  You're just
> asking me the questions.  See, I don't know
> anything about what's going on here.  I
> really don't.

> TC:   So you're having a difficult time, I
> guess.  What you're--correct me if I'm wrong
> – what you're trying to say is that it would
> depend on the facts, and of course that we
> would have to satisfy you.

> MAJOR QUANDER:  It would depend on the facts
> and the way they come in, but it could be

done.

TC:    Thank you.  I have no further questions.

R. at 580-81.

9.      There was no evidence that MAJ Quander's "views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412 (1985).  In fact, the government never raised challenge for cause against MAJ Quander.  Petitioner contends that under the unique circumstances of this case, the government should not have been allowed to exercise a peremptorily challenge against MAJ Quander.  Relief is appropriate.

## CLAIM SIX

**PETITIONER WAS DENIED HIS RIGHTS UNDER THE FIFTH, SIXTH AND EIGHTH AMENDMENTS BECAUSE THE PANEL MEMBER SELECTION POOL IN PETITIONER'S CASE DID NOT INCLUDE ANY FEMALES.**

1.      All other allegations in this Petition are incorporated into this claim by specific reference.

2.      In *J.E.B. v. Alabama, ex rel. T.B.*, the Supreme Court held that it was a violation of the Equal Protection Clause of the Fourteenth Amendment to purposely exclude female jurors through the use of peremptory challenges.  *J.E.B.*,

71

114 S.Ct. at 1422. Specifically, the Court stated that jury selection based on gender was not outweighed by the state's interest in establishing the paternity of a child born out of wedlock. Id. at 1425-426. Similarly, no convening authority can justify the exclusion of eligible females from service on court-martial panels. *See also Batson v. Kentucky*, 476 U.S. 79 (1986) (the Equal Protection Clause of the Fourteenth Amendment prohibits a prosecutor from using race as the basis for peremptory strikes of veniremen).

3.      The panel member selection pool in Petitioner's case did not include any females. In examining the issue of deliberate exclusion of women from the panel in the present case, it is useful to bear in mind two general analogies. First, "panel stacking" in the military and the use of discriminatory-based peremptory challenges are similar in that they are both means of jury exclusion; the government has the "functional equivalent of an unlimited number of peremptory challenges." *United States v. Carter*, 25 M.J. 471,478 (C.M.A. 1988) (Cox, J., concurring). Secondly, for this discussion, the factors of race and gender with regard to jury service have three critical similarities:

> First, both groups have historically suffered disparate
> treatment because of their membership to an identifiable
> group. Second, race and gender are immutable
> characteristics, which cannot be changed. Finally, both
> members of minority races and members of the female

72

> gender, have historically been politically powerless.
> Because of these reasons, race and gender classifications
> have traditionally been treated with special care by the
> courts.

Jo, *Reconstruction of the Peremptory Challenge System: A Look at Gender-Based Peremptory Challenges,* 22 Pac. L.J. 1305 (1991).

4.     Like the exclusion of black jurors, the exclusion of women had the distinctly non-benign and harmful effect of perpetuating views of women's inferiority.  In addition, women and blacks experienced the same type of exclusion from self-governance, political participation, and community involvement in the administration of justice.  Note, *Gender-Based Peremptory Challenges*, 105 Hard. L. Rev. 1920, 1924 (1992).  Although military members do not enjoy the civilian citizens' right to a panel composed of a "fair cross- representation of the community," they are nevertheless entitled to a panel which is free from selection practices based on discrimination.  Petitioner is entitled to habeas corpus relief.

## CLAIM SEVEN

### THE MILITARY JUDGE IMPROPERLY DENIED A DEFENSE MOTION FOR A MISTRIAL BASED ON TRIAL COUNSEL'S COMMENTS ON PETITIONER'S RIGHT TO REMAIN SILENT

1.     All other allegations in this Petition are incorporated into this claim by specific reference.

73

2.      During his presentencing argument the trial counsel stated the

following to the members:

> TC:   You've had the opportunity to– to see the accused
> on a daily basis here for about three weeks.  Ask
> yourself a question: has he ever indicated to you
> by his actions any remorse for what he's done?
> You can consider that.  You
> should consider that.

(R. at 2537.)

3.      At the conclusion of the trial counsel's argument, the defense counsel

requested a side-bar.  ®. at 2540.)  Concerning the trial counsel's statement, the

following objection was made:

> IDC:   Your Honor, the – language in his argument that I
> found objectionable was this – and you probably
> recall.  Consider by his action – meaning the
> accused – consider by his actions, first of all, did
> he ever show remorse?  Now, that comes – in my
> estimation, that's a comment on his silence
> throughout this – his obvious silence.

> MJ:    Well, I have it noted as a potential reading of that
> comment.

> IDC:   I think the way he said –

> MJ:    I will instruct them.

> ATC:   Your Honor, demeanor is proper to comment upon.

> MJ:    I wish he would've used the word "demeanor."  It

74

> says (pointing to judge's notes) ". . .indicated by
> his actions . . ."  That's susceptible to it.  I'm
> going to give the instruction.

(R. at 2541-542.)

    4.    The military judge then delivered the following instruction to the

members concerning the comment in issue:

> MJ:   With regard to the counsel's indication, or phrase,
> "has the accused indicated by his actions any
> remorse?"  That is susceptible of an interpretation
> of a comment upon his – the accused having
> remained silent and not having testified in the
> case, as I'm sure you aware [sic].  The right to
> remain silent is a constitutional guarantee of all of us,
> and no inference –adverse inference may be drawn
> from the fact that the accused elected not to testify
> in this case.  And I'm sure that you will not draw
> any such adverse inference, nor read into it – the
> counsel's – trial counsel's closing argument, that
> was a comment upon his right to remain silent.

(R. at 2542-543.)

    5.    At the conclusion of the military judge's instructions on sentencing,

trial defense counsel made a motion for a mistrial:

> IDC:   Your Honor, we appreciate, and we're not
> unmindful of the court's cautionary instruction –
>
> MJ:   Absolutely.
>
> IDC:   – nevertheless, we'd ask for a mistrial based on the
> comment.  What makes that comment of the trial

           counsel particularly damaging is that he tied in the
accused's lack of action in this trial to a lack of
remorse.  And you could just see that hitting the
panel.  And we're just afraid your cautionary
instruction is not – is not enough to cure that
problem.

MJ:     Well, I'm not sure I share defense counsel's
perception that there was an impact – visual
impact – the court members.  In fact, indeed, I do
not.  But be that as it may, motion for mistrial is
denied.

(R. at 2773.)

      6.     Trial counsel commented repeatedly and emphatically on appellant's

election not to testify at his trial and in so doing, turned a constitutional right into

an aggravating factor and prejudiced determination of appellant's sentence.  It was

error which was not harmless beyond a reasonable doubt.  The instruction given

by the trial judge was neither sufficiently correct  nor complete to correct the

degree of error.

      7.     It is a fundamental and well established principle of our system of

jurisprudence that an accused may not be compelled to testify against himself in a

criminal prosecution.  U.S. Const. Amend. V; 18 U.S.C. § 3481; UCMJ art. 31.

The obvious corollary to this principle, that the failure of an accused to take the

witness stand may not be commented upon, is equally fundamental.  R.C.M. 919

discussion.  Case law support for this proposition has been well established for at least a century.  *U.S. v. Wilson*, 149 U.S. 60, 65 (1893).

8.      Trial counsel not only commented upon Petitioner's decision to not testify, he further reinforced the emphasis in his insistence, bordering on an instruction, that the trial members not only could, but in fact should consider appellant's silence:

> TC:     You've had the opportunity to – to see the accused on a daily basis here for about three weeks.  Ask yourself a question: has he ever indicated to you by his actions any remorse for what he's done?  You can consider that.  You should consider that.

(R. at 2537.)

9.      In making the comment that trial members had had the opportunity to observe appellant for three weeks, trial counsel further exacerbated the harm by alluding to appellant's silence both during the merits and the sentencing phases. Trial counsel was aware of the panel's sensitivity and concern over any expression of regret on the part of Petitioner.  This interest was clearly evidenced in the inquiry made by a panel member to a forensic psychiatrist who had examined Petitioner. (R. at 2446; App. Exh. XCVI.)  Where an argument is directly related to a legitimate concern on sentencing, such as future dangerousness, the

fact that it evokes strong emotions does not independently indict it as improper. However, there was no such legitimate concern in this case. The trial counsel's comments improperly focused the deliberations of the panel members on Petitioner's failure to testify. Such a tactic only served to inflame the passions of the panel members. See the ABA Standards for the Prosecutorial Function, § 5.8(c)(1971), ("The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.") The trial counsel's comments on Petitioner's lack of remorse possibly may also have attenuated consideration of mitigation evidence on the part of the members. *See Woodson v. North Carolina*, 428 U.S. 280 (1976)). Finally, the error was especially harmful because Petitioner was precluded from pleading guilty in this case. *See* Claim Nine *infra*.

10.     The curative instruction issued by the military judge was neither as comprehensive nor as effective as it should have been, as error affected a fundamental constitutional right. Relief is appropriate.

## CLAIM EIGHT

**THE MILITARY JUDGE PRECLUDED THE SENTENCING PANEL FROM CONSIDERING PETITIONER'S BACKGROUND AS A BASIS FOR A SENTENCE LESS THAN DEATH IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS**

78

1.      All other allegations in this Petition are incorporated into this claim by specific reference.

2.      During a UCMJ, Art. 39a hearing on sentencing instructions, Petitioner's defense counsel requested that the military judge instruct the panel members that his impoverished upbringing and abusive childhood were mitigating factors which they could consider in their decision whether or not to sentence appellant to death.  Petitioner's counsel had elicited testimony from Petitioner's mother and sister regarding his childhood in the "projects" of Miami, (R. at 2322, 2360), as well as his abusive relationship with his stepfather.  (R. at 2353.)  When counsel requested that the sentencing panel be instructed that Petitioner's difficult and impoverished upbringing were included as mitigating circumstances to be weighed against the aggravating factors, the military judge denied the request stating, "That's so far remote that I can't imagine it as being a legitimate consideration."  (R. at 2389.)

3.      When the court was reconvened, defense counsel called Dr. David Armitage and Dr. Selwyn Rose to testify about their diagnoses of Petitioner. When the doctors were testifying, defense counsel questioned them about the impact of Petitioner's upbringing and parental-child relationships on his psychological development.  Both doctors discussed Petitioner's background and

acknowledged that these areas could have had an impact on his development.  (R.
at 2415, 2432, 2443, and 2444.)

4.     Defense counsel also offered a video tape of the CBS television show
"48 Hours" addressing the social dynamics and general living conditions in
Liberty City, the Miami inner city community where SPC Gray grew up.  The
military judge denied this request, as well.  When he denied this request, the judge
informed defense counsel that he had asked deliberate questions of the experts to
determine if SPC Gray was affected by his upbringing.  The military judge
summarized the responses to his questions as showing "there's no facts to support
anything but a conclusion in evidence before the court – there's opinions,
potentially."  (R. at 2497.)

5.     It is difficult to ascertain from the record to which questions the
military judge was referring.  At one point he asked Dr. Armitage if evidence of
environment was relevant "if the evidence indicated that the individual was not
affected by that particular environment at all?"  (R. at 2440.)  Dr. Armitage replied
that his discipline was unable to ascertain why some people were affected by
environment, but others were not.  Dr. Armitage did acknowledge, though, that
"[p]eople from backgrounds similar to SPC Gray have much greater incidents of
violations of societal rules and crime."  (R. at 2441.)  Dr. Armitage also testified

about the effect that the new opportunities and freedoms available in the Army

would have on a person of his nature.  (R. at 2440-43.)  The military judge

summarized Dr. Armitage's theory as follows:

> Under – given, what you've said, I would surmise that,
> and correct me if I'm wrong, but – that's the same sort of
> a unique world opening up, as it were, would be equally
> applicable to a young fella from Louisiana or from the
> back woods of Arkansas?

(R. at 2443).  Dr. Armitage responded, "It all depends what baggage you bring

with you."  *Id.*  The military judge renewed his inquiry asking, "It would have the

same – the same degree of depravation, as it were?"  *Id.*  Dr. Armitage repeated his

answer stating:

> Assuming everything is the same, which, of course, one
> cannot do because its those little wrinkles that we don't
> fully understand, yes.  It's the baggage you bring with
> you to the barracks that affect somewhat how you
> behave.

*Id.*

     6.    Following the sentencing arguments of counsel, the military judge

instructed the panel members on the sentencing proceedings. The military judge

stated:

> You must consider all evidence in extenuation
> and mitigation and balance them against the
> aggravating factors using the test I

> previously instructed you upon.  Thus, you
> should consider the following extenuating and
> mitigating factors. . . .

(R. at 2563.)  He then listed the factors previously discussed with counsel, but did

not include SPC Gray's background or abuse.  By not mentioning Petitioner's

troubled childhood, the military judge's instruction unconstitutionally precluded

the panel from considering this significant mitigation.  *Hitchcock v. Dugger*, 481

U.S. 393 (1987) (declaring the Florida death penalty statute was unconstitutional

because it limited the consideration of mitigating factors to those specifically

enumerated in the Florida statute).

7.     Furthermore, it was also error to refuse to admit the offered video in

order to give greater depth and understanding to the evidence of SPC Gray's

background.  "[T]he Eighth and Fourteenth Amendments require that the sentencer

. . . not be precluded from considering, as a *mitigating factor*, any aspect of a

defendant's character or record and any of the circumstances of the offense of the

offense that the defendant proffers as a basis for a sentence less than death."

*Lockett v. Ohio*, 438 U.S. 586, 605 (1978).

8.     Because the military judge only allowed trial defense counsel to

present a limited amount of evidence regarding upbringing and background, and

then excluded that evidence from a defined set of mitigating circumstances, the

military judge failed to provide the panel with a "vehicle for expressing its 'reasoned moral response'" to such evidence as required.  By this action, the military judge "creat[ed] the risk that the death penalty [was] imposed in spite of factors which may call for a less severe penalty," *Lockett*, 438 U.S. at 605, and as the Court noted, "When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments." *Id.* at 605.  Petitioner is entitled to habeas relief.


## CLAIM NINE

### ARTICLE 18 OF THE UCMJ AND R.C.M. 201(F)(l)(c), WHICH REQUIRE TRIAL BY MEMBERS IN A CAPITAL CASE, VIOLATES THE FIFTH, SIXTH AND EIGHTH AMENDMENT GUARANTEE OF DUE PROCESS AND A RELIABLE VERDICT

1.     All other allegations in this Petition are incorporated into this claim by specific reference.

2.     In a non-capital court-martial, an accused has the right to elect trial by military judge alone.  In a capital case, however, he does not.[102]  Although for tactical purposes an accused may elect trial by members, it is a deprivation of due

---

[102]  UCMJ Art. 18, R.C.M. 201 (f)(1)(c); R.C.M.  903 (a)(2).

process to *mandate* that he must be tried by members.  Petitioner was denied his right to due process by the statutory mandate under UCMJ Art. 18 that he must be tried by members.  This prohibition is unconstitutional and relief is appropriate.

### CLAIM TEN

**R.C.M. 1004'S PROHIBITION AGAINST GUILTY PLEAS IN CAPITAL COURT-MARTIAL DEPRIVED PETITIONER OF A CRITICAL MITIGATING FACTOR AND CAUSED OTHER IRREPARABLE PREJUDICE IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS**

1.     All other allegations in this Petition are incorporated into this claim by specific reference.

2.     Because SPC Gray was facing capital charges, he was precluded from pleading guilty by R.C.M. 1004.  During an Article 39a session, his individual military defense counsel requested that the panel be instructed regarding this fact; however, the military judge declined to do so.  (R. at 2393-94.)  The R.C.M. 1004 prohibition against entering a plea of guilty, and the military judge's refusal to inform the members of the rule's effect, prevented SPC Gray from availing himself of a unique mitigator available to all other military accuseds, *i.e.*, that "[a] plea of guilty is a matter of mitigation which must be considered along with

all other facts and circumstances of the case. . . . [s]uch a plea may be the first step toward rehabilitation." Benchbook, para. 2-37. Furthermore, had Petitioner been permitted to plead guilty, his defense counsels' efforts could have been focused solely on the case in mitigation for sentencing. Habeas relief is appropriate.

## CLAIM ELEVEN

**PETITIONER WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL AT HIS CAPITAL COURT-MARTIAL**

1.      All other allegations in this Petition are incorporated into this claim by specific reference.

2.      The Sixth Amendment to the Constitution and UCMJ Art. 27 guarantee a military accused the effective assistance of counsel. *United States v. Scott*, 24 M.J. 186 (C.M.A. 1987). "The purpose of guaranteeing the effective assistance 'of counsel is to ensure that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding.'" *Scott*, 24 M.J. at 188 (quoting *Strickland v. Washington*, 466 U.S. 668, 691-92 (1984)).

3.      In *Strickland*, the Supreme Court held that in order to prevail on a claim of ineffective assistance of his defense counsel, "[f]irst, the defendant must

85

show that counsel's performance was deficient . . . [s]econd, the defendant must show that the deficient performance prejudiced his defense." *Strickland v. Washington,* 466 U.S. at 687.  Petitioner alleges that he was denied the effective assistance of counsel at his capital court-martial.

a.      Counsel failed to conduct an adequate pretrial investigation into the State's case and the potential defenses available to Petitioner, including, but not limited to, defenses involving Petitioner's psychological and neurological mental state before, during, and after the murders for which he was charged.  There is a reasonable probability that these defenses, if properly raised, would have been able to overcome the government's contention that Petitioner possessed the requisite mental state to intentionally and with premeditation kill the victims and that  would supported the defenses of lack of mental responsibility and lack of a specific intent to kill, based on the combined effects of organic brain damage and Petitioner's traumatic childhood;

b.      Counsel failed to develop and present compelling mitigation evidence available to Petitioner, including, but not limited to, evidence of Petitioner's history of psychological, physical, emotional  and sexual abuse and neglect, a disruptive and chaotic family history, a long history of mental health problems, including organic brain damage, and humanizing evidence of Petitioner's  good

86

character and positive personality traits.  Had such evidence been presented, there is a reasonable probability that Petitioner would not have been sentenced to death;

c.     Counsel failed to seek the appointment of proper experts and investigators, including a mitigation specialist, a trauma expert, and others, to evaluate Petitioner's psychological, educational, neurological and social history, as well as that of his family;

d.     Counsel failed to develop and provide to its own mental health expert the available records and information regarding Petitioner's family and his psychological, educational, neurological and social history which were necessary to perform a thorough and accurate evaluation;

e.     Counsel failed to adequately prepare for the sentencing phase of the trial and failed to ensure the presence of necessary witnesses for Petitioner mitigation presentation;

f.     Counsel failed to adequately prepare the witnesses he did call to the stand during Petitioner's mitigation presentation;

g.     Counsel failed to adequately investigate and challenge the government's evidence that the two homicide victims had been anally sodomized;

h.     Counsel failed to adequately challenge the government's crime scene evidence;

I.      Counsel failed to request the appropriate jury instructions at the guilt/innocence and penalty phases and failed to object to erroneous instructions given by the trial court;

j.      Counsel failed to adequately investigate Petitioner's medical and mental health history and status.  Counsel also failed to ensure that Petitioner was afforded a competent mental health evaluation, which would have conclusively revealed that Petitioner suffered from organic brain damage and trauma throughout his life and at the time of the crimes, which impaired Petitioner's ability to form the requisite intent to convict on the murder charges and would have mitigated his culpability for the offenses;

k.      Counsel failed to ensure that appropriate diagnostic testing was performed by its mental health experts;

l.      Counsel failed to develop and present evidence which would have indicated that Petitioner was remorseful for his crimes and had accepted responsibility for his actions.

m.      Counsel failed to adequately file and litigate motions for expert assistance and further failed to protect the record on appeal by ensuring that the trial court ruled separately on each;

n.      Counsel lacked the requisite credentials to render effective assistance

88

of counsel in a death penalty case.

15.     But for counsel's ineffective representation, there is a reasonable probability that the outcome of Petitioner's capital trial and sentencing proceeding would have been different.  *See Strickland v. Washington*, 466 U.S. 688 (1984); *Williams v. Taylor*, 529 U.S. 362 (2000).

14.     Petitioner is entitled to habeas relief.


## CLAIM TWELVE

### PETITIONER'S APPELLATE COUNSEL RENDERED INEFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF THE FIFTH, SIXTH, AND EIGHTH, AND FOURTEENTH AMENDMENTS

1.     All other allegations in this Petition are incorporated into this claim by specific reference.

2.     The appellate level right to effective assistance of counsel is rooted in the Sixth Amendment right to effective assistance of counsel.  *Evitts v. Lucey*, 105 S.Ct. 830 (1985).  Appellate counsel must function as "an active advocate on behalf of his client," *Anders v. California*, 386 U.S. 738 (1967), who must receive "expert professional . . . assistance . . . [which is] necessary in a legal system governed by complex rules and procedure."  *Lucey*, 105 S.Ct. at 835 n.6.

89

3.      These are not merely arcane jurisprudential precepts.  "Lawyers in criminal cases are necessities, not luxuries."  *United States v. Cronic*, 466 U.S. 648 (1984).  Providing counsel at the appellate level is crucial to "meet the adversary presentation of the prosecution."  *Lucey*, 105 S.Ct. at 835 n.6.  Thus, the participation effective counsel at the appellate level does not leave the appeals court with "the cold record which it must review without the help of an advocate." *Anders*, 386 U.S. at 745.  Counsel must "affirmatively promote his client's position before the court . . . to induce the court to pursue all the more vigorously its own review but also to the legal authorities furnished by its counsel."  *Id*.; *see also Matire v. Wainwright*, 811 F.2d 1430 (11th Cir. 1987); *Mylar v. Alabama*, 671 F.2d 1299 (11th Cir. 1982).

4.      The system of appointing capital counsel in the United States Army prejudiced Petitioner because he was not guaranteed either continuity of counsel or competent counsel during his direct appeal of his capital convictions and sentence of death.  As a result, Petitioner contends that he was denied the right to the effective assistance of counsel on direct appeal.

5.      Defense appellate counsel attempted to litigate the effectiveness of trial defense counsel, specifically that defense counsel unreasonably failed to conduct an "thorough" and "detailed" investigation into Petitioner's background

90

for potential mitigating evidence),[103] but the government and the courts denied

appellate counsel the reasonable funds necessary to investigate, develop and

present evidence to support that claim.  Private Gray has been denied the funds to

retain a defense investigator or mitigation specialist to conduct a "thorough" and

"detailed" investigation into Petitioner's background for potential mitigating

evidence at every step in the process.  The United States Court of Appeals for the

Armed Forces has recognized that the right to the expert assistance of a mitigation

specialist in a capital case is determined on a case-by-case basis. *See United States*

*v. Loving,* 41 M.J. 213, 250 (C.A.A.F.1994).  CAAF has recently emphasized the

importance of a mitigation specialist:

> In light of recent Supreme Court decisions in this area,
> when a defendant subject to the death sentence requests a
> mitigation specialist, trial courts should give such
> requests careful consideration in view of relevant capital
> litigation precedent and any denial of such a request
> should be supported with written findings of fact and
> conclusions of law.  We find unpersuasive the dissent's
> reliance on a line of cases that precedes the Supreme
> Court's opinion in *Wiggins v. Smith,* 539 U.S. 510, 123
> S.Ct. 2527, 156 L.Ed.2d 471 (2003).  We note that
> because there is no professional death penalty bar in the
> military services, it is likely that a mitigation specialist
> may be the most experienced member of the defense
> team in capital litigation.

---

[103] *See Williams v. Taylor*, 529 U.S. 362 (2000).

91

*U.S. v. Kreutzer*, 61 M.J. 293, 299 n7 (C.A.A.F 2005).  ***Private Gray is the only service member facing death who has been denied such funds*** .  *See* Dwight H. Sullivan, *Raising the Bar: Mitigation Specialists in Military Capital Litigation*, 12 Geo. Mason U. Civ. Rts. L. J. 199, 226-7(2002)("Gray is the only service member on military death row who did not receive funding for a mitigation specialist either at the trial or appellate level.").  Private "Gray's status as the lone military death row inmate never to have the services of a government-funded mitigation specialist raises obvious constitutional concerns."  Id. at 227 n177.  The denial of these reasonable and necessary funds rendered Petitioner's appellate counsel ineffective.

6.    But for appellate counsel's ineffective representation, there is a reasonable probability that the result of Petitioner's capital trial and sentencing direct appeal would have been different.

## CLAIM THIRTEEN

### THE MILITARY JUDGE  IMPROPERLY INSTRUCTED THE PANEL JURY IN VIOLATION OF PETITIONER'S FIFTH, SIXTH, AND EIGHTH, AMENDMENT RIGHTS

1.    All other allegations in this Petition are incorporated into this claim by specific reference.

92

2.    The right to trial by jury guaranteed by the Sixth Amendment to the United States Constitution and analogous provisions of the Georgia Constitution includes the right to a competent jury that is fairly and properly instructed by the court.  *Cheek v. United States*, 498 U.S. 192 (1991).  Where the jury is not properly charged or is given instructions which are ambiguous and open to multiple and competing interpretations, at least one of which results in an invalid application of the law, the jury's verdict is inherently unreliable.  *Boyde v. California*, 494 U.S. 370 (1990).  The test for assessing the validity of a jury verdict imposing the death penalty when the instructions given to the jury regarding sentencing are ambiguous or unclear is whether there is a reasonable likelihood that the jury applied the instruction to prevent consideration of constitutionally relevant evidence.  *Id*.; *see also Penry v. Texas*, 121 S.Ct. 1910 (2001).

3.    The military judge at Petitioner's court-martial improperly and ambiguously instructed the court-martial panel regarding, *inter alia*, the elements of premeditated murder, the requirement of intent, and the imposition of the death penalty.  Specifically, Petitioner challenges the following instructions which were raised in the military appellate courts:

a.    Failure to instruct on the double counting of aggravating factors;

93

b.      Instruction on meaning of "substantially outweighed;"

c.      No statement that finding regarding "substantially outweighed" was unanimous;

d.      Failure to instruct that decision on "substantially outweighed" as requiring finding beyond a reasonable doubt;

e.      Failure to instruct on absolute discretion not to impose death sentence;

f.      Failure to specify which offenses carried death penalty and to instruct that a death sentence could not be imposed based on aggregate effect of all offenses;

g.      Sufficiency of murder instructions on distinction between premeditated and unpremeditated murder;

h.      Sufficiency of instruction on reasonable doubt;

I.      Failure to instruct that "substantially outweighed" finding must be unanimous; and,

j.      Failure to instruct that race could not influence sentencing.

4.      There is a reasonable likelihood that the court-martial panel applied these erroneous instructions to preclude the consideration of constitutionally relevant evidence regarding Petitioner's culpability and ultimate punishment.  The

94

writ should issue.

## CLAIM FOURTEEN

### THE MILITARY JUDGE DENIED RESOURCES NECESSARY TO RETAIN EXPERT SERVICES IN CRIMINAL INVESTIGATION TO ASSIST THE DEFENSE IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS

1.      All other allegations in this Petition are incorporated into this claim

by specific reference.

2.      On March 6, 1987, in accordance with R.C.M. 703(d), Petitioner

made an initial request to the general court-martial convening authority (GCMCA)

for an independent criminal investigator.  (App. Exh. XXXVII.)  This request was

denied by the GCMCA on March 13, 1987.  (App. Exh. XXXVII.)  On May 13,

1987, the request was renewed to the GCMCA and denied once again

on June 24, 1987.  (App. Exh. XXXVII.)  Prior to trial, the government indicated

that the CID would investigate at least some of the areas requested by the defense,

and some investigation and communication between the CID and the defense

occurred.  (App. Exh. XXXVII.)  On March 7, 1988, a motion in support of the

request was made to the trial court, (R. at 156; App. Exh. XXXVII), and

summarily denied.  (R. at 161.)  This denial of the request for expert services in

criminal investigation denied Petitioner the tools necessary to investigate and

95

develop a defense.  As a matter of military due process, service members are

entitled to investigative assistance at government expense when necessary for an

adequate defense.  *Garries*, 22 M.J. at 290; U.S. Const. amends. V, XIV; see *Ake*

*v. Oklahoma*, 470 U.S. 53 (1985). The motion for an independent criminal

investigator was made at trial as a result of the failure of government investigators

(CID special agents) to adequately provide the defense with critical information

necessary for the formation of appellant's defense.  Despite the prior detailed

requests of the defense concerning the areas in which investigative assistance was

desired, CID was unable or unwilling to accomplish the relevant tasks.  (R. at 159-

61; App. Exh. XXXVII.)  This distinguishes appellant's case from *Garries* where

the defense refused to make a showing of necessity on the record.  *Garries,* 22

M.J. at 291.

3.    In light of the necessity and reasonableness of Petitioner's request at

trial, the military judge abused his discretion by denying the requested resources.

Garries, 22 M.J. at 291.  Petitioner acknowledges that he was provided with the

"voluminous reports of investigation . . ." and that the CID did provide some

assistance.  *Id*.  However, it was made clear to the military judge that there were

critical areas necessary to the formation of the defense case that were left

untouched by the government criminal investigators. (R. at 159-61; App. Exh.

XXXVII.)  Not having the resources itself to investigate the previously mentioned areas, the defense had no choice but to rely on the pressure the government exerted on the CID to accomplish the requested tasks.

4.      Petitioner prays that this Court set aside the findings of guilty and the sentence.

### CLAIM FIFTEEN

**THE AGGRAVATING FACTOR STATED IN R.C.M. 1004(c)(7)(I) IS VAGUE, FAILS TO SUFFICIENTLY CLARIFY THE FACTOR INVOLVED, AND DOES NOT NARROW THE CLASS OF PERSONS ELIGIBLE FOR THE DEATH PENALTY, AND IS THEREFORE INVALID UNDER THE EIGHTH AMENDMENT**

1.      All other allegations in this Petition are incorporated into this claim by specific reference.

2.      Prior to his pleas, Petitioner made a timely written motion that R.C.M. 1004(c)(7)(I) be declared unconstitutional.  (R. 143-145; App. Exh. XXXI.)  The motion was renewed during presentencing.  (R. at 2394-395.)  The military judge denied both motions.  (R. at 145-46, 2395.)  The provision attacked by Petitioner states that a UCMJ Article 118(1) aggravating factor exists if the members find beyond a reasonable doubt that:  "The murder was preceded by the intentional infliction of substantial physical harm or prolonged, substantial mental

97

or physical pain and suffering to the victim." R.C.M. 1004(c)(7)(I). Appellate Exhibit CII reflects that the members unanimously found that the premeditated murders of both Laura Lee Vickery-Clay and Kimberly Ann Ruggles were "preceded by the intentional infliction of substantial mental and physical pain and suffering to the victim[s]."

3.   Petitioner asserts that the aggravating factor in R.C.M. 1004(c)(7)(I) does not in fact provide an objective standard by which the class of persons eligible for the death penalty may be sufficiently narrowed nor does it provide sufficient guidance to limit juror discretion.  This failure to adequately inform the panel of what they must find to impose the death penalty violated Petitioner's rights under the Eighth Amendment.  Considering the function of the aggravating factor under the sentencing scheme, and the specific requirement that the sentencing authority balance aggravating and mitigating factors, Petitioner's sentence to death is invalid.

## CLAIM SIXTEEN

**BASED ON THE SUPREME COURT'S REASONING IN RING V. ARIZONA, 536 U.S. 584 (2002), CONGRESS UNCONSTITUTIONALLY DELEGATED TO THE PRESIDENT THE POWER TO ENACT THE FUNCTIONAL EQUIVALENT OF ELEMENTS OF CAPITAL MURDER, A PURELY LEGISLATIVE FUNCTION**

98

1.     All other allegations in this Petition are incorporated into this claim by specific reference.

2.     The Supreme Court held in *Loving v. United States* that Congress could delegate to the President the authority to specify capital sentencing aggravating factors and that the President properly did exactly that in promulgating R.C.M. 1004(c).   *Loving v. United States*, 517 U.S. 748, 770-74 (1996).  But in the military, the President is prohibited under the UCMJ from independently permitting an offense to be punished by the death penalty. See Art. 18, UCMJ; see also *United States v. Curtis*, 32 M.J. 252, 261 (C.M.A. 1991). Thus, the Supreme Court's holding in *Loving* implicitly held, consistent with case law of the day, that capital-aggravating factors were not part of the offense of capital murder in the military.

3.     The Court of Military Appeals stated this succinctly in *United States v. Curtis*:

> If 'aggravating factors' used in channeling the discretion of the sentencing authority in death cases were elements of the crime, we would have no choice but to hold that they must be set forth by Congress and cannot be prescribed by the President . . . . However, the Supreme Court has made clear that "aggravating factors" are not elements of a crime.

*Id*. at 260 (*citing Walton v. Arizona*, 497 U.S. 639, 648-49 (1990)).

4.      Therefore, the Supreme Court's recent decision in *Ring v. Arizona sub silentio* overruled the Supreme Court's holding in *Loving v. United States* when it held that factors identical to those in R.C.M. 1004(c) are not sentencing factors, but "the functional equivalent of an element" of the offense of capital murder. *See Ring v. Arizona*, 536 U.S. at 608-09 (*citing Apprendi*, 530 U.S. at 494, n. 19). Thus, when the President promulgated the "functional equivalent of an element" of the offense of capital murder in R.C.M. 1004(c), either the President exceeded his authority to prescribe procedures for sentencing in the military or Congress improperly delegated a strictly legislative function, i.e. the power to specify elements of a capital offense committed by a service member.  Petitioner is entitled to habeas relief.

## CLAIM SEVENTEEN

### THE PROPORTIONALITY REVIEW IN THIS CASE WAS INSUFFICIENT AS A MATTER OF LAW IN VIOLATION OF THE FIFTH, SIXTH AND EIGHTH AMENDMENTS

1.      All other allegations in this Petition are incorporated into this claim by specific reference.

2.      Under Article 66(c), UCMJ, and the Court of Appeals for the Armed

Forces decision in *United States v. Curtis*, 33 M.J. 101, 109 (C.M.A. 1991),

Petitioner's  death sentence must be reviewed for proportionality.  At the time

*Curtis* was decided, it was the first death sentence adjudged and approved under

the procedural changes in the 1984 Manual for Courts-Martial.  Therefore, the

Court of Military Appeals instructed military appellate court to conduct

proportionality review based on similar cases reviewed by the United States

Supreme Court from various state decisions imposing the death penalty.  The

Court instructed this lower courts to determine whether the each death sentences

was "appropriate for the crimes which the accused stands convicted and whether

the sentence is generally proportional to those imposed by other jurisdictions in

similar situations."  *Id*. (*citing McCleskey v. Kemp*, 481 U.S. 279, 306-08 (1987);

*Pulley v. Harris*, 465 U.S. 37, 42-44 (1984)) (emphasis original).

3.      In 1999 in *United States v. Gray*, 51 M.J. 1, the Court of Appeals for

the Armed Forces approved the proportionality review conducted by the Army

Court of Military Review in 1992.  The Army Court in 1992 reviewed Supreme

Court cases involving the death penalty since the Supreme Court's decision in

*Furman v. Georgia*, 408 U.S. 238 (1972).  *Gray*, 37 M.J. at 749 n.13.  The Army

Court cited five cases in its opinion as among the cases it reviewed. *Id*. The Court

of Appeals for the Armed Forces, in reviewing the procedure employed by the

Army Court, noted that more extensive procedures employed in jurisdictions such as New Jersey were not required by Art. 66(c), UCMJ or the Court of Appeals for the Armed Forces mandate.  *See Gray*, 51 M.J. at 62-63 (*citing State v. Marshall*, 613 A.2d 1059 (N.J. 1992)).

4.      Petitioner contends that the limited proportionality review is constitutionally insufficient to guard against discrimination in the application of the death penalty.  Petitioner asserts that the limited proportionality review fails to ensure that the death penalty is administered fairly and free from racial discrimination.  *See Furman v. Georgia*, 408 U.S. 238, 240 (1972) (Douglas, J., concurring)(Discrimination in the application of the death penalty  on the basis of race is "unusual punishment" under the Eighth Amendment).  Petitioner is entitled to habeas corpus relief.

### CLAIM EIGHTEEN

**THE MANNER IN WHICH THE GOVERNMENT WOULD CARRY OUT PETITIONER'S EXECUTION VIOLATES THE EIGHTH AMENDMENT**.

1.      All other allegations in this Petition are incorporated into this claim by specific reference.

2.      Petitioner alleges that the manner of carrying out his execution would

102

violate the Eighth Amendment to the United States Constitution.  This

constitutional violation would arise because of the combination of drugs to be

used, the protocol governing the execution, the use of untrained non-medical and

unqualified personnel and the physical space in which the execution would be

carried out, would all result in the infliction of unnecessary pain and suffering in

violation of the Eighth Amendment.

3.     While Petitioner's belief that the execution under the current

protocols would violate the Eighth Amendment, he believes that for two reasons

this challenge is not appropriate at this time, or in this pleading.

4.     First, since Petitioner's execution is far from imminent, the question

is not yet ripe.

5.     Second, since the Supreme Court's decision in *Hill v. McDonough*,

126 S.Ct. 2096 (2006), a challenge to lethal injection can properly be brought in a

separate civil rights action under 42 U.S.C. § 1983.

6.     Petitioner will litigate this Eighth Amendment challenge in whatever

forum is deemed appropriate.  It would seem like a waste of resources to litigate it

at this time, inasmuch as Petitioner believes he will not be executed, but instead he

is entitled to relief.  Petitioner nonetheless raises the claim herein to avoid a later

claim of waiver, and he will amend it should either the Court or Government

103

believe it should be litigated now.

## V.  PRAYER FOR RELIEF

WHEREFORE, Petitioner respectfully prays that this Court:

1.      Issue a Writ of Habeas Corpus to have Petitioner brought before it to the end that he may be discharged from his unconstitutional confinement and restraint, and/or be relieved of his unconstitutional sentence of death;

2.      Conduct a hearing at which proof may be offered concerning the allegations of this petition;

3.      Grant Petitioner, who is indigent, sufficient funds to secure the expert testimony necessary to prove the facts as alleged in this petition;

5.      Allow discovery;

6.      Grant Petitioner the authority to obtain subpoenas *in forma pauperis* for witnesses and documents necessary to prove the facts as alleged in this petition;

7.      Allow Petitioner to amend his petition after the assistance of experts and discovery;

8.      Allow Petitioner to brief the precedential and statutory law relevant to his case in light of the record and the allegations raised by this petition;

9.      Allow Petitioner to respond to any procedural or affirmative defenses, and to any other arguments that the Respondent might raise in this action; and

10.     Grant such other relief as may be appropriate.

This the 1ˢᵗ day of April 2009.

                                        Respectfully submitted,

                                            */s/ Thomas J. Bath, Jr.*
                                        _____
                                        Thomas J. Bath, Jr.           #12971
                                        Bath & Edmonds, P.A.
                                        Historic Voigts Building
                                        7944 Santa Fe Drive
                                        Overland Park, Kansas 66204
                                        (913) 652-9800
                                        Facsimile  (913) 649-8494
                                        E-Mail:  tom@bathedmonds.com


MARK TELLITOCCI                         THOMAS H. DUNN
Lieutenant Colonel, U.S. Army           303 Elizabeth Street NE
WILLIAM JEREMY STEPHENS                    Atlanta, Georgia 30307
Captain, U.S. Army                         (404) 222-9202
Defense Appellate Division
U.S. Army Legal Services Agency
901 North Stuart Street, #340
Arlington, Virginia 22203


Counsel for Private Gray


                                        105

## CERTIFICATE OF SERVICE

I certify that on April 1, 2009, a copy of the foregoing  was served by e-mail addressed  to:

Major Joshua M. Toman
Joshua.M.Toman@us.army.mil
Captain Patrick Grant
Litigation Division
901 North Stuart Street, #340
Arlington, Virginia 22203
(703) 696-8126
Facsimile (703) 696-1627


*/s/ Thomas J. Bath, Jr.*
_____
Thomas J. Bath, Jr.
Counsel for Private Gray