## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

RONALD A. GRAY,

      *Petitioner,*


  vs.                                  Case No. 5:08-CV-3289-JTM

JAMES GRAY, Colonel
United States Army
Commandant, USDA – Fort Leavenworth

      *Respondent.*

## MEMORANDUM AND ORDER

Petitioner Ronald A. Gray brings this petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 (Dkt. 17).  Petitioner's case has a lengthy history in the military courts as well as the federal civil courts.  Because review of Petitioner's petition and the accompanying court record conclusively shows that he is not entitled to relief, this court denies the motion without an evidentiary hearing.

## I.      Factual Background

The following factual account is taken from the court-martial record as well as the facts established by the United States Army Court of Criminal Appeals and the United States Court of Appeals for the Armed Forces on appeal.  *See United States v. Gray*, 37 M.J. 730 (CMR 1992)

(hereinafter "*Gray I*"); *United States v. Gray*, 37 M.J. 751 (CMR 1993) (hereinafter "*Gray II*"); *United States v. Gray*, 51 M.J. 1 (CAAF 1999) (hereinafter "*Gray III*").

In January 1987, Petitioner, a member of the United States Army, was identified and arrested for the rape of a woman in the vicinity of Fairlane Acres, a trailer park near Fort Bragg, North Carolina.  The next day, the body of Kimberly Ann Ruggles was discovered near the same area.  "She had received multiple stab wounds and had suffered bruises on her eyebrow . . . [and] her nose, and a laceration on her lip."  *Gray III*, 51 M.J. at 10.  Ruggles had been raped and anally sodomized.  Law enforcement officers discovered evidence in her vehicle and in Petitioner's possession that implicated Petitioner.

Later that same month, the body of Private Laura Lee Vickery-Clay was found.  "She had been shot four times (while she was alive), in the neck, forehead, chest, and back of the head.  Also, she had suffered blunt force trauma to the right cheek, the left side of her face, around her left eye, her left breast, abdomen, and both legs and arms."  *Id*.  Like Ruggles, Private Vickery-Clay "had been raped and anally sodomized."  *Id*.  Evidence in her car and the murder weapon implicated Petitioner.

Subsequent media coverage of Petitioner's arrest produced another victim, Private Mary Ann Lang Nameth, who recognized Petitioner's face from photographs she had seen of him on television and in the newspaper.  Private Nameth reported that Petitioner had "raped her, and stabbed her repeatedly in the neck and side," for which she suffered a laceration of her trachea and a collapsed or punctured lung.  *Id*. at 11.

## II.      Procedural History[1]

### A.      Pre-Trial History

Prior to Petitioner's court-martial, and at Petitioner's request, the military court ordered that Petitioner appear before a Sanity Board[2] to determine if, at the time of the alleged criminal conduct, Petitioner: (1) had a severe mental disease or defect, (2) had a mental disease or defect, (3) as a result of a severe mental disease or defect was unable to appreciate the nature and quality or wrongfulness of his conduct, and (4) as a result of a mental disease or defect lacked substantial capacity to conform to the requirements of the law. Dkt. 20-23, 170-71. The Sanity Board was also ordered to determine if Petitioner presently suffered from a mental disease or

---

[1] The following procedural history is significantly more detailed than is typically warranted in habeas proceedings. However, given Petitioner's specific arguments, the court finds such detail necessary.

[2] "If the accused's mental capacity becomes an issue at any point before or after referral, to include post-trial, any party . . . can request a mental capacity inquiry. The standard for ordering this inquiry, commonly referred to as a sanity board, is fairly low . . . The sanity board, like the request preceding it, can come at any stage of the court-martial proceedings . . . If the convening authority or military judge orders the sanity board, a board consisting of one or more persons will be convened. Typically, the commander of the medical treatment facility will appoint the members to the board. The members must all be either a physician or a clinical psychologist. At least one member of the board should be a psychiatrist or clinical psychologist. The order for the board must contain the reasons for doubting the mental capacity of the accused or other reasons for the request. The board must specifically answer four questions. The board must then conclude whether or not the subject is presently suffering from a mental disease or defect rendering him incapable of understanding the court-martial proceedings or unable to conduct or cooperate in his defense. The board can, and often does, consist of only one member." Major Timothy P. Hayes, Jr., *Post-Traumatic Stress Disorder on Trial*, 190/191 MIL. L. REV. 67, 81-83 (2006-2007) (internal citations omitted). The four questions that must be answered are:

> (A) At the time of the alleged criminal conduct, did the accused have a severe mental disease or defect?
>
> (B) What is the clinical psychiatric diagnosis?
>
> (C) Was the accused, at the time of the alleged criminal conduct and as a result of such severe mental disease or defect, unable to appreciate the nature and quality or wrongfulness of his or her conduct?
>
> (D) Is the accused presently suffering from a mental disease or defect rendering the accused unable to understand the nature of the proceedings against the accused or to conduct or cooperate intelligently in the defense?

R.C.M 706(c)(2).

defect that rendered him mentally incompetent to the extent that he was unable to understand the nature of the proceedings or to conduct or cooperate intelligently in his defense. Dkt. 20-23, at 171. The Sanity Board, presided over by Colonel David Armitage, M.D., J.D., diagnosed Petitioner with personality disorder not otherwise specified, with schipotypal [sic], borderline, antisocial and sadistic features; alcohol dependence, mild (currently in remission); voyeurism; and frotteurism and determined:

> d. At the time of the alleged criminal conduct, [Petitioner] was not unable to appreciate the nature and quality or wrongfulness of his conduct and did not have a severe mental disease or defect in the sense that term is generally understood . . .

> g. [Petitioner] at the time of his alleged criminal conduct and as a result of the mental disease or defect mention[ed] [above] did not lack substantial capacity to conform his conduct to the requirements of the law . . .

> h. [Petitioner] presently suffers from a mental disease or deficit but it does not render him mentally incompetent to the extent that he is unable to understand the nature of the proceedings or to conduct or cooperate intelligently in his defense.

Dkt. 20-23, at 168.

Prior to trial, the government agreed to hire a forensic psychiatrist and was ordered to employ an expert serologist to conduct a forensic fiber analysis. Dkt. 20-4, at 32, 39. Petitioner was denied funds to hire an expert investigator on the ground that the government provided an agent from the Criminal Investigative Division Command to assist the defense. Dkt. 20-4, at 162. The military court also declined to grant Petitioner's requests to find: (1) Rule for Court-Martial ("RCM") 1004(b)(4)(c) unconstitutional because it fails to require the panel members to find that any extenuating or mitigating circumstances are outweighed by any aggravating circumstances beyond a reasonable doubt, (2) that the capital referral of the case is defective because the President of the United States exceeded his constitutional authority by intruding into the exclusive legislative providence of Congress by promulgating the aggravating factors listed in

RCM 1004(c), and (3) aggravating factor RCM 1004(c)(7)(i) unconstitutional as too broad. Dkt. 20-4, at 49-50, 53-54, 145-47.

**B.     Court-Martial[3]**

Petitioner, represented by two detailed military defense attorneys, was tried by a general court-martial comprised of officers and enlisted members at Fort Bragg.   Contrary to his pleas, in early April 1988, Petitioner was convicted of the premeditated murder of Ruggles and Private Vickery-Clay, and the attempted premeditated murder of Private Nameth.  Petitioner was also found guilty of rape (three specifications), robbery (two specifications), and forcible sodomy (two specifications) with respect to all three victims, as well as burglary and larceny of property of another person, in violation of Articles 120, 122, 125, 121, and 129, Uniform Code of Military Justice ("UCMJ"), 10 U.S.C. §§ 920, 922, 925, 921, and 929, respectively.  On April 12, 1988, Petitioner was sentenced to death, a dishonorable discharge, total forfeitures, and reduction to Private E-1.  This sentence was approved by the Commanding General of the 82nd Airborne Division on July 29, 1988, and was subsequently forwarded to and received by the United States Army Defense Appellate Division on August 8, 1988. Petitioner's case was forwarded to the Army Court of Military Review for mandatory review pursuant to Article 66, UCMJ, 10 U.S.C. § 866(b).[4]

---

[3] Prior to his court-martial, on November 2, 1987, Petitioner pleaded guilty in the Cumberland County, North Carolina, Superior Court to two counts of second degree murder, two counts of first degree burglary, five counts of first degree rape, five counts of first degree sexual offense, attempted first degree rape, three counts of second degree kidnapping, two counts of robbery with a dangerous weapon, and assault with a deadly weapon with the intent to kill, and inflicting serious injury.  Petitioner was sentenced to three consecutive life terms and five concurrent life terms.  These offenses involved different victims and the state proceedings were wholly separate and apart from Petitioner's court-martial. *See Gray I*, 37 M.J. at 733 n.1

[4] A note here about the process of direct military review.  Under subchapter IX of the UCMJ, "Post-trial Procedure and Review of Courts-Martial," the convening authority conducts the initial review of courts-martial. Article 60, UCMJ, 10 U.S.C. § 860 (2000).  Responsibility for review then transitions to centralized authorities, namely the Army Court of Criminal Appeals, the Court of Appeals for the Armed Forces, and the United States

C.      **Army Court of Criminal Appeals ("ACCA")**[5]

1.      **Direct Appellate Review**

On September 5, 1989, Petitioner's military counsel requested that the ACCA hold its proceedings in abeyance pending a mental evaluation of Petitioner by the Department of Mental Health at the United States Disciplinary Barracks in Fort Leavenworth, Kansas. Dkt. 20-23, at 86-91. Petitioner simultaneously filed his brief raising the following eighteen (18) assignments of error:

I.      The military judge violated [Petitioner]'s right to due process by improperly granting the Government challenge for cause against [Master Sergeant] McCormick based upon that member's opposition to the death penalty, where MSG McCormick never indicated that he was "irrevocably committed...to vote against the death penalty regardless of the facts and circumstances..." *See Gray v. Mississippi*, 481 U.S. 648 (1987).

II.     The military judge improperly granted the Government['s] challenge for cause against [Command Sergeant Major] Woods.

III.    The peremptory challenge procedure in the military justice system, which allows the Government to remove any one juror without cause, constitutes an unconstitutional violation of the Fifth and Eighth Amendments in capital cases, where the prosecutor is free to remove a member whose moral bias against the death penalty does not justify a challenge for cause.

IV.     The military judge failed to comply with *Batson v. Kentucky* and *United States v. Moore*, when he refused to have trial counsel, on the record, articulate a race-neutral explanation for the Government's peremptory challenge of one of only two black members on [Petitioner]'s court-martial panel.

---

Supreme Court, with clemency and parole duties vested with the service secretaries. Articles 66, 67, 67a, and 74, UCMJ, 10 U.S.C. §§ 866, 867, 867a, 874. The ACCA, which is comprised of a three-judge panel, must independently review the entire record of court-martial *de novo* and arrive at a decision that the findings and sentence are correct "in law and fact." The ACCA conducts its review for error regardless of whether error is assigned by the appellant. The CAAF must review the record in all cases in which the sentence, as affirmed by the ACCA, extends to death. Article 67(a)(1), UCMJ, 10 U.S.C. § 867(a)(1).

[5] This court was previously known as the Army Court of Military Review.

V.      The military judge failed to properly determine, and the evidence of record fails to conclusively demonstrate, that [Petitioner]'s election as to forum was knowingly and intelligently made.

VI.     The military judge erred to the substantial prejudice of [Petitioner] by the admission of gruesome photos of the corpses, including Prosecution Exhibit 214, which is a photograph of a victim's badly decayed face, with a gunshot wound to the eye socket.

VII.    The military judge erred to the substantial prejudice of [Petitioner] by allowing the prosecution, during the sentencing portion of a capital case, to engage in improper argument that emphasized victim impact statements in violation of *Booth v. Maryland*, 482 U.S. 496 (1987).

VIII.   Due Process requires that trial and intermediate appellate judges in a peacetime military death penalty case have the protection of a fixed term of office.

IX.     The military judge erred to the substantial prejudice of [Petitioner] by allowing the Government to use [Petitioner]'s statement made pursuant to a guilty plea in a civilian trial, where (1) civilian authorities thought it unnecessary to advise [Petitioner] of his *Miranda* rights; (2) the parties did not contemplate use of the statement unless [Petitioner] pled guilty at the civilian trial; (3) military defense counsel were not present when the statement was rendered; and (4) civilian defense counsel should have known that military authorities had preferred charges against [Petitioner] with a view toward the death penalty on 5 August 1987.

X.      The military judge erred by allowing the Government to make use of [Petitioner]'s statements in violation of a civilian plea agreement.

XI.     Civilian defense counsel were ineffective in failing to limit [Petitioner]'s confession made pursuant to a civilian plea agreement, or alternatively, in failing to draft terms limiting the use of such statement to the civilian trial.

XII.    The military judge failed to instruct the panel members that the Specification of Charge IV (Larceny) is multiplicious for sentencing purposes with the Specification of Charge VII (Breaking and Entering).

XIII.   The military judge failed to instruct the panel that one act cannot be considered as two aggravating factors when determining if aggravating factors substantially outweigh extenuating and mitigating factors.

XIV.    The president exceeded his authority under the Constitution and Uniform Code of Military Justice Article 36 in promulgating Rule for Courts-Martial 1004; therefore, the procedures under which [Petitioner] was sentenced to death are invalid.

XV.   The imposition of the death penalty violated [Petitioner]'s right to equal protection under the Fifth Amendment because R.C.M. 1004 subjects [Petitioner], as a member of the armed forces, to a penalty which is not otherwise available under the Criminal Code of the United States for identical criminal conduct.

XVI.   Rule for Courts-Martial 1004 fails to incorporate congressionally mandated protections to prevent racially motivated imposition of the death penalty in violation of UCMJ Article 55 and the Eighth Amendment to the Constitution.

XVII.   The aggravating factor enumerated in R.C.M. 1004(c)(7)(I) fail[s] to sufficiently clarify the factor involved or narrow the class of persons eligible for the death penalty and is therefore invalid under the Fifth and Eighth Amendment[s] to the Constitution.

XVIII. [Petitioner] was tried in a capital case by a court-martial panel (i.e. jury) composed of less than twelve members.

Dkt. 20-23, at 12-57.

    In addition to these errors raised by counsel, Petitioner himself raised twenty-six (26) *Grostefon* errors.[6]   Dkt. 20-23, at 71-73.   The ACCA denied Petitioner's request to hold the appellate proceedings in abeyance.  Dkt. 20-23, at 91.  On September 15, 1989, Petitioner filed a nearly identical revised brief, with the exception of one additional assignment of error:

XIX.   This court's refusal to waive the arbitrary 50-page limit on assignments of error and briefs set forth in this court's internal operating procedure, constitutes a violation of [Petitioner's] right to due process and as established by UCMJ Art. 66(c) and violates [Petitioner's] right to the effective assistance of counsel on this first appeal of right, by preventing detailed counsel from fully presenting [Petitioner's] appeal to this court for the review mandated by Congress.

Dkt. 20-23, at 57.

---

[6] Pursuant to the holding in *United States v. Grostefon*, 12 M.J. 431, 436 (C.M.A. 1982), a service member has an independent right to personally submit all issues to the military appellate courts through appellate defense counsel, even if not supported by law or fact.  In other words, a service member may himself raise legal claims that his counsel has decided not to present to a military appellate court.  The purpose of the *Grostefon* rule is to ensure that no service member believes that his attorney, who is usually a military officer detailed to the task, has failed to raise a particular claim because of command influence.

On December 22, 1989, Petitioner requested, *inter alia*, that the ACCA direct a second Sanity Board, which the ACCA did on February 13, 1990.  Dkt. 20-22, at 117-18, 132-41.   On June 30, 1990, the three-person Sanity Board concluded Petitioner:

> (a) . . . did not suffer[] from a severe mental disease or defect at the time of the offenses for which he has been convicted; (b) . . . was able to appreciate the nature and quality or wrongfulness of his conduct at the time of the alleged criminal conduct; (c) . . . has [sic] sufficient mental capacity to understand the nature of the court-martial proceedings and to conduct or cooperate intelligently in his defense at the time of trial; and (d) . . . presently possesses sufficient mental capacity to understand the nature of the pending appellate proceedings and to conduct or cooperate intelligently in his appeal.

Dkt. 20-22, at 15-21.

### 2.        Extraordinary Relief

In addition to this direct review, on December 27, 1990, Petitioner filed a motion requesting that the ACCA order the United States Government to provide funds in the amount of $15,000 to hire an expert psychiatrist, a death-penalty-qualified attorney, and an investigator. Dkt. 20-21, at 161-92.   The ACCA interpreted the motion to be a petition for a writ of extraordinary relief in the form of a writ of mandamus, heard oral argument, and on May 12, 1991, denied the request for funding.[7] Dkt. 20-21, at 122-30.

In April 1991, Petitioner requested time to properly investigate his case and prepare supplemental pleadings.  The ACCA denied this motion and scheduled oral argument for July 31, 1991.   Just prior to that date, Petitioner requested, and was granted, a continuance. Meanwhile, Petitioner renewed his request for funding for an expert psychiatrist and an

---

[7] The ACCA also found that Petitioner's appellate counsel was qualified within the meaning of Articles 27 and 70 of the UCMJ to represent Petitioner on appeal in a capital case.

investigator.  Dkt. 20-21, at 20-57.  This motion was again denied on August 23, 1991.  Dkt. 20-21, at 57.

### 3.      Extraordinary Writ Appeal

On September 17, 1991, Petitioner filed a writ appeal petition with the United States Court of Military Appeals seeking review of the ACCA's decision denying his request for funding and for an emergency stay.  Dkt. 20-20, at 291-303.  The writ appeal petition was denied on October 18, 1991.  Dkt. 20-20, at 290.

### 4.      Continued Direct Appeal

Upon return to the ACCA, Petitioner requested that oral argument again be postponed to allow him time to file a brief on the issue of proportionality and to prepare additional assignments of error.  The ACCA granted the motion and reset oral argument for November 13, 1991.

On November 7, 1991, appellate defense counsel filed a motion to withdraw from the case, claiming that he was not competent to represent Petitioner.  The ACCA denied the request.

On December 16, 1991, Petitioner requested that the ACCA order military authorities to perform additional medical and neuropsychological tests.  Dkt. 20-20, at 360-67.  The ACCA agreed and, on December 31, 1991, issued an order requiring the requested testing be completed by February 1, 1992.[8]  Dkt. 20-20, at 367.  On February 18, 1992, Dr. Fred Brown published his Neuropsychological Evaluation Report detailing the tests he performed to evaluate Petitioner's mental health and cognitive skills.  Dkt. 20-19, at 105-18.  Dr. Brown diagnosed Petitioner

---

[8] The ordered testing included the following: (1) an MRI of Petitioner's brain; (2) a 20-channel, scalp electrode, sleep deprived EEG; (3) a SPECT scan of Petitioner's brain; and (4) a complete battery of intellectual, neuropsychological, academic, psychological, and personality tests performed by a fully qualified and credentialed neuropsychologist.

primarily with organic brain syndrome (not otherwise specified), characterized by mild

information processing and attentional deficits.  Dkt. 20-19, at 115. [9]

On February 26, 1992, Petitioner filed a supplementary brief raising the following nine

(9) additional assignments of error:

XIX[a].  [Petitioner]'s sentence and conviction should be set aside and the case remanded
for a new trial concerning whether and to what extent [Petitioner] may be held
criminally responsible in view of newly discovered evidence that [Petitioner]
suffers from the mental disease or defect known as organic brain damage.

XX.  [Petitioner] was convicted and sentenced to death in violation of the Fifth, Sixth,
and Eighth Amendments of the United States Constitution because the sentence
and convictions are founded at least in part upon misinformation concerning his
mental health.

XXI.  [Petitioner] was denied due process of law under the Fifth Amendment to the
United States Constitution and was denied military due process when he was
denied the investigative resources necessary for a constitutionally adequate
defense.

XXII.  [Petitioner] was convicted without due process of law because his Constitutional
right to competent psychiatric assistance in the evaluation, preparation, and
presentation of his case was violated.

XXIII.  [Petitioner] was denied his Sixth Amendment right to effective assistance of
counsel by trial defense counsel's failure to 1) investigate the mitigating
circumstances of [Petitioner]'s traumatic family, social, and medical histories and
[Petitioner]'s intoxication at the time of the offenses; 2) challenge the professional
competence of the pretrial evaluations of [Petitioner] by the two forensic
psychiatrists and to ensure a complete and competent mental health evaluation of
[Petitioner] was performed before trial; 3) develop and present an available
defense on the merits; and 4) present an adequate case during the sentence
hearing.

---

[9] Dr. Brown also diagnosed Petitioner with alcohol dependence (in full remission, by history); personality disorder,
not otherwise specified; tension/migraine headaches (by history); history of mild head injuries with minimal loss of
consciousness; extreme severity of psychosocial stressors due to status as a death sentence inmate; and assigned him
a Global Assessment of Functioning score of 55, indicating moderate limitations.  Dkt. 20-19, at 115.

XXIV.       [Petitioner] was denied a fair trial by an impartial court-martial panel in violation of the Fifth, Sixth, and Eighth Amendments because of prejudicial pretrial publicity.

XXV.        The military judge improperly denied a defense request for a mistrial based upon trial counsel's comments on [Petitioner]'s silence and courtroom demeanor.

XXVI.       The instructions to the court members which purported to define reasonable doubt at [Petitioner]'s trial violated [Petitioner's right] of due process of law by lessening the Government's burden of proof.

XXVII.      Proportionality Review. This court should develop a broad-based comparative proportionality review procedure and give [Petitioner] an opportunity to brief the appropriate application of the procedure to this case.

Dkt. 20-20, at 16-157.

Petitioner subsequently filed a Petition for a New Trial based upon an affidavit from neurologist Dr. Jonathan Pincus who, at the request of Petitioner's military counsel, reviewed several neurological reports as well as the findings from both military Sanity Boards and concluded that Petitioner suffered from organic brain damage. Dkt. 20-20, at 218. Dr. Pincus never examined Petitioner. Dkt. 20-20, at 218.

On April 8, 1992, the ACCA heard oral argument on Petitioner's supplemental assignments of error as well as his motion for a new trial. Dkt. 20-18, at 192. Ultimately affirming the findings of guilty and the sentence, the ACCA noted that some of Petitioner's assignments of error had previously been raised and resolved against him, that Petitioner's *Grostefon* matters lacked merit, and that the sentence of death was appropriate. *Gray I*, 37 M.J. at 734. The ACCA also denied the petition for a new trial, finding that the diagnosis of organic brain damage was not "new" evidence and that Petitioner himself conceded that there were "clear indicators of [his] organic brain damage . . . present at the time of trial . . . ." *Gray II*, 37 M.J. at 753.

-12-

### 5.    Additional Direct Review

Despite the fact that the ACCA confirmed his sentence of death, Petitioner continued to seek additional relief at this level.  On December 30, 1992, Petitioner again filed a motion seeking funding for an expert investigator and behavioral neurologist, citing the fact that such a request had been approved in other cases.  Dkt. 20-18, at 165-71.  The ACCA denied this request on January 22, 1993.  *Gray II*, 37 M.J. at 753.  Petitioner subsequently filed a motion for reconsideration, which was denied on January 22, 1993.  Dkt. 20-18, at 139-40.

On February 11, 1993, Petitioner asked the ACCA to reconsider *en banc* its denials of his motions to fund an expert investigator and behavioral neurologist.  Dkt. 20-18, at 86-94.  He also filed a motion for leave to file supplemental assignments of error, raising the following twenty-nine (29) issues:

XXVIII.    [Petitioner]'s court-martial lacked jurisdiction because the military judge was designated in violation of the appointments clause of the Constitution. Because this error is jurisdictional, and the record contains no evidence of a knowing waiver, the issue is not waived by a failure to raise it at trial.

XXIX.    Uniform Code of Military Justice [A]rticle 18, 10 U.S.C. § 818 (1982)...and [R.C.M.] 201(F)(1)(c)...which require trial by members in a capital case, violates the Fifth and Eighth Amendment[s] Guarantee of Due Process and a reliable verdict.

XXX.    [Petitioner] was denied his Fifth Amendment right to a grand jury presentment or indictment.

XXXI.    Court-martial procedures denied [Petitioner] his Article III right to a jury trial.

XXXII.    The Fifth, Sixth, and Eighth Amendments do not permit, in peacetime, a convening authority to hand-pick military subordinates, whose careers he can directly and immediately affect and control, as members to decide a capital case for offenses that occur on a military base but where there is concurrent jurisdiction with a State authority.

XXXIII.    Court-martial procedures denied [Petitioner] his Sixth Amendment right to jury trial and an impartial cross-section of the community.

-13-

XXXIV.    The peremptory challenge procedure in the military justice system constitutes an unconstitutional violation of the Fifth and Eighth Amendments in capital cases where the prosecutor is free to remove a member whose moral bias against the death penalty does not justify a challenge for cause.

XXXV.    The designation of the senior member as the presiding officer for deliberations denied the [Petitioner] due process of law and a fair and impartial members' consideration of the evidence, by establishing the senior member's superiority in and control of the deliberation process.

XXXVI.    The military judge committed plain error by failing to instruct the members on sentencing as to the term "substantially outweighed" with regard to the relationship of mitigating circumstances to aggravating factors.

XXXVII.    The findings must state explicitly that all members concur that any extenuating or mitigating circumstances are substantially outweighed by the aggravating factors found by the members.

XXXVIII.    The military judge's instruction that "you may not adjudge a sentence of death unless you find that any and all extenuating or mitigating circumstances are substantially outweighed by any aggravating factors..." did not sufficiently inform the members that this finding must be unanimous.

XXXIX.    Military due process and UCMJ Articles 66 and 67 require the Court of Military Appeals and the Courts of Military Review to review all capital cases *in favorem vitae* since capital litigation is in its infancy in the military justice system and trial and appellate defense counsel lack the training and experience necessary to preserve the record on all issues and prevent application of waiver.

XL.    The death penalty sentencing standard requiring aggravating factors to "substantially outweigh" extenuating and mitigating circumstances is in violation of the Fifth and Eighth Amendments in that the only acceptable standard must be "beyond a reasonable doubt[.]"

XLI.    The military judge erred in violation of the Fifth and Eighth Amendments in failing to explicitly instruct that even if the members unanimously found one or more aggravating factors and even if the members unanimously determine that the extenuating or mitigating circumstances are substantially outweighed by the aggravating factors, each member still had the absolute discretion to decline to impose the death sentence.

XLII.    The military judge erred in violation of the Fifth and Eighth Amendments and UCMJ Article 55 in his failure to instruct the panel members that the only offenses for which [Petitioner] could be sentenced to die were felony murder and

premeditated murder and that [Petitioner] could not be sentenced to die on the basis of the aggregate or cumulative effect of all the offenses.

XLIII.     The role of the convening authority in the military justice system denied [Petitioner] a fair and impartial trial by allowing the convening authority to act as a grand jury in referring criminal cases (capital cases) to trial, personally appointing jurors of his choice, holding the ultimate law enforcement function within his command, rating the Staff Judge Advocate who is the functional equivalent to the chief prosecutor, and acting as the first level appeal, thus creating an appearance of impropriety in a perception that he acts as a prosecutor, judge, and jury.

XLIV.     [Petitioner] has been denied equal protection under the law in violation of the Fifth Amendment in that all other civilians in the United States are afforded the opportunity to have their cases reviewed by an Article III Court but members of the United States Army by virtue of their status as service members are not.

XLV.     This Court does not have the jurisdiction, nor the authority to review the Constitutionality of the Rules for Courts-Martial and the Uniform Code of Military Justice because this Court is an Article I Court, not an Article III Court which has the power to check Congress and the Executive under *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803).

XLVI.     [Petitioner] was denied due process of law in violation of the Fifth and Eighth Amendments because he was tried in a peacetime capital case by a court-martial panel (i.e., Jury) composed of less than twelve members.

XLVII.     [Petitioner] was denied his rights under the Fifth and Sixth Amendments because the panel member selection pool in [Petitioner]'s case did not include any females.

XLVIII.     There is no meaningful distinction between premeditated and unpremeditated murder allowing differential treatment and sentencing disparity in violation of the Fifth and Eighth Amendments and UCMJ Article 55.

XLIX.     The military judge's instructions blurred any distinction between the offenses of premeditated and unpremeditated murder and deleted the required element of "premeditation" from the offense of premeditated murder in violation of the Fifth, Sixth, and Eighth Amendments and UCMJ Article 55.

L.     [Petitioner]'s death sentence violates the Eighth Amendment's Prohibition against cruel and unusual punishment.

LI.         Rule for Courts-Martial 1004 fails to incorporate Congressionally mandated protections to prevent racially motivated imposition of the death penalty in violation of UCMJ Article 55 and the Eighth Amendment to the Constitution.

LII.        The imposition of the death penalty in this case violated [Petitioner]'s right to equal protection under the Fifth Amendment because [R.C.M.] 1004 subjected [Petitioner] to a penalty which is not otherwise available under the Criminal Code of the United States for identical criminal conduct.

LIII.       The aggravating factors enumerated in [R.C.M.] 1004(c)(7)(I) fail to sufficiently clarify the factors involved or narrow the class of persons eligible for the death penalty and the rule is therefore invalid under the Fifth and Eighth Amendments.

LIV.        Due process requires that trial and intermediate appellate judges in a peacetime military death penalty case have the protection of a fixed term of office.

LV.         The system of appointing capital counsel in the United States Army prejudiced [Petitioner] because he is not guaranteed either continuity of counsel or competent counsel under any of the qualifications for capital attorneys in force in any jurisdiction in America.

LVI.        The system whereby the Judge Advocate General of the Army appoints trial and appellate judges to serve at his pleasure is unconstitutional as it violates the appointments clause of the Constitution.


Dkt. 20-17, at 178-200; Dkt. 20-18, at 1-84.  The ACCA denied Petitioner's request for *en banc* reconsideration (Dkt. 20-17, at 177) but granted his motion for leave to file supplemental assignments of error.  Dkt. 20-18, at 84.  In its second published opinion, entitled "Opinion of the Court on Supplemental Assignments of Error," the ACCA again affirmed the findings of guilty and Petitioner's death sentence.   *Gray II*, 37 M.J. at 761. Petitioner filed a motion for reconsideration on June 28, 1993, which the ACCA summarily denied two days later.  Dkt. 20-17, at 104-05.

**D.**     **Court of Appeals of the Armed Forces[10]**

    **1.**     **Direct Appellate Review**

Petitioner then sought review before the CAAF, pursuant to Article 67(a)(1), UCMJ, 10 U.S.C. § 867(a)(1).  On September 10, 1993, Petitioner filed a motion seeking $15,000 for an expert investigator and behavioral neurologist.  Dkt. 20-17, at 78-87.  The CAAF denied the motion without prejudice on April 25, 1994, noting that such a request required a determination of fact, an improper question for the court.  Dkt. 20-18, at 59-60.  However, the CAAF noted that, because the ACCA had denied such a request in the court below, it could be reviewed during the ordinary course of appellate review.  Dkt. 20-18, at 60.

On June 20, 1994, Petitioner filed his brief, presenting the following sixty-nine (69) assignments of error:

I.          Military Due Process and UCMJ Articles 66 and 67 require the Court of Military Appeals and the Courts of Military Review to review all capital cases *in favorem vitae* since capital litigation is in its infancy in the military justice system and trial and appellate defense counsel lack the training and experience necessary to preserve the record on all issues and prevent application of waiver.

II.         A fact-finding Court of Military Review must unanimously agree on both findings of guilt and the sentence in a capital case and must apply a policy of *in favorem vitae*.

III.        The [ACCA] abused its discretion in denying [Petitioner]'s Petition for New Trial based upon newly discovered evidence of organic brain damage.

IV.        [Petitioner] was convicted and sentenced to death in violation of the Fifth, Sixth, and Eighth Amendments of the United States Constitution because the sentence and convictions are founded at least in part upon misinformation of a Constitutional magnitude concerning his mental health.

_____

[10] This court was previously known as the Court of Military Appeals.

V.          [Petitioner] was convicted without due process of law because he was denied competent psychiatric assistance in the evaluation, preparation, and presentation of his case.

VI.         [Petitioner] was denied his Sixth Amendment right to effective assistance of counsel by trial defense counsel's failure 1) to investigate the mitigating circumstances of [Petitioner]'s traumatic family, social, and medical histories and [Petitioner]'s intoxication at the time of the offenses; 2) to challenge the professional competence of the pretrial evaluations of [Petitioner] by the two forensic psychiatrists and to ensure a complete and competent mental health evaluation of [Petitioner] was performed before trial; 3) to develop and present an available defense on the merits; and 4) to present an adequate case during the sentencing hearing.

VII.        The [ACCA] erred by refusing to grant [Petitioner]'s funding motion of August 7, 1991.

VIII.       The Judge Advocate General of the Army . . . deprived [Petitioner] of his right to equal protection in violation of the Fifth Amendment to the Constitution because TJAG favorably considered similar funding requests in the Army's two other capital cases, but arbitrarily denied [Petitioner]'s request in a summary manner.

IX.         The policy memorandum of the Judge Advocate General of the Army dated December 17, 1992, deprives [Petitioner] of due process of law in violation of the Fifth, Eighth, and Fourteenth Amendments.

X.          The military judge erred to the substantial prejudice of [Petitioner] by allowing the Government to use [Petitioner]'s statement made pursuant to a guilty plea in a civilian trial where (1) civilian authorities failed to advise [Petitioner] of his Fifth Amendment right against self-incrimination prior to eliciting incriminating information unrelated to his civilian plea; (2) the parties did not contemplate use of the statement unless [Petitioner] pled guilty at the civilian trial; (3) military defense counsel were not present when the statement was rendered; and (4) civilian defense counsel should have known that military authorities had preferred charges against [Petitioner], with a view toward the death penalty, on August 5, 1987.

XI.         The military judge erred by allowing the Government to make use of [Petitioner]'s statements in violation of a civilian plea agreement.

XII.        The opinion of the [ACCA] which found that [Petitioner]'s statements did not contribute to the findings and sentence misinterprets and misapplies the facts of record.

XIII.       Civilian and military defense counsel were ineffective in failing to limit [Petitioner]'s confession made pursuant to a civilian plea agreement, or alternatively, in failing to draft terms limiting the use of such statement to the civilian trial.

XIV.        [Petitioner] was denied a trial by an impartial court-martial panel in violation of the Fifth, Sixth, and Eighth Amendments due to prejudicial pretrial publicity.

XV.         The military judge failed to properly determine, and the evidence of record fails to conclusively demonstrate, that [Petitioner]'s election as to forum was knowingly and intelligently made.

XVI.        [Petitioner] was denied due process under the Fifth and Fourteenth Amendments to the United States Constitution and military due process necessary to retain expert services in criminal investigation to assist the defense in the evaluation, preparation, and presentation of its defense.

XVII.       The military judge violated [Petitioner]'s right to due process by improperly granting the Government['s] challenge for cause against MSG McCormick based upon that member's opposition to the death penalty where MSG McCormick never indicated that he was "irrevocably committed ...to vote against the death penalty regardless of the facts and circumstances..." *See Gray v. Mississippi*, 481 U.S. 648 (1987).

XVIII.      The military judge improperly granted the Government challenge for cause of CSM Woods.

XIX.        The peremptory challenge procedure in the military justice system constitutes an unconstitutional violation of the Fifth and Eighth Amendments in capital cases where the prosecutor is free to remove a member whose moral bias against the death penalty does not justify a challenge for cause.

XX.         The military judge failed to comply with *Batson v. Kentucky*, 476 U.S. 79 (1986), and *United States v. Moore*, 28 M.J. 366 (C.M.A. 1989), when he refused to have trial counsel, on the record, articulate a race-neutral explanation for the Government's peremptory challenge of one of only two black members on [Petitioner]'s court-martial panel.

XXI.        The Government erred by using its peremptory challenge to exclude a panel member based upon his scruples about the death penalty.

XXII.       The military judge erred to the substantial prejudice of [Petitioner] in a capital case by admitting gruesome photos of the decedents, including Prosecution Exhibit 214, which is a photograph of a victim's badly decayed face with a gunshot wound to the eye socket.

XXIII.      The outcome of [Petitioner]'s trial was jeopardized by the errors of the military judge and the prosecution when the prosecution failed to disclose the identity of a registered source in possession of information favorable to the defense and the military judge would not order disclosure.

XXIV.      The military judge improperly denied a defense motion for a mistrial based on trial counsel's comments on [Petitioner]'s demeanor and right to remain silent.

XXV.       [Petitioner] was sentenced to death in violation of the Eighth Amendment prohibition against cruel and unusual punishment when the military judge precluded the sentencing panel from considering [Petitioner]'s background as a basis for a sentence less than death.

XXVI.      The military judge failed to instruct the panel members that the Specification of Charge IV (Larceny) is multiplicious for sentencing purposes with the Specification of Charge VII (Burglary).

XXVII.     Whether [Petitioner]'s death sentence violates the Fifth, Sixth, and Eighth Amendments and UCMJ Article 55 in that [Petitioner] was given the death penalty based upon a conglomeration of aggravating factors which inextricably double counted [Petitioner]'s crimes, and the failure of the military judge to instruct the panel that one act cannot be considered as two aggravating factors when determining if aggravating factors substantially outweigh extenuating and mitigating factors.

XXVIII.    The military judge committed plain error by failing to instruct the members on sentencing as to the meaning of the term "substantially outweighed" with regard to the relationship of mitigating circumstances to aggravating factors.

XXIX.      The findings must state explicitly that all members concur that any extenuating or mitigating circumstances are substantially outweighed by the aggravating factors found by the members.

XXX.       The death penalty sentencing standard requiring aggravating factors to "substantially outweigh" extenuating and mitigating circumstances is in violation of the Fifth and Eighth Amendments in that the only acceptable standard must be "beyond a reasonable doubt."

XXXI.      The military judge erred in violation of the Fifth and Eighth Amendments in failing to explicitly instruct that even if the members unanimously determined that the extenuating or mitigating circumstances are substantially outweighed by the aggravating factors, each member still had the absolute discretion to decline to impose the death sentence.

XXXII.      The aggravating factor stated in R.C.M. 1004(c)(7)(I) is vague, fails to sufficiently clarify the factor involved, and does not narrow the class of persons eligible for the death penalty, and is therefore invalid under the Eighth Amendment to the Constitution.

XXXIII.     The military judge committed plain error, affecting substantial rights of [Petitioner], when he allowed the panel to recess prior to arriving at a sentence, determine a sentence while on recess, and reenter the courtroom to announce the sentence without ever closing the court to deliberate on a sentence, such error seriously affected the fairness, integrity and public reputation of [Petitioner]'s court-martial.

XXXIV.     The [ACCA] erred by refusing to abate the proceeding in [Petitioner]'s case after [Petitioner] ingested an overdose of doxipin.

XXXV.      [Petitioner] was denied his Fifth Amendment right to a grand jury presentment or indictment.

XXXVI.     Court-martial procedures denied [Petitioner] his Article III right to a jury trial.

XXXVII.    Article 18 of the UCMJ and R.C.M. 201(F)(1)(c), which require trial by members in a capital case, violates the Fifth and Eighth Amendment guarantees of due process and a reliable verdict.

XXXVIII.   Assuming arguendo that he desired to plead guilty, R.C.M. 1004's prohibition against guilty pleas in capital cases deprived [Petitioner] of a critical mitigating factor and caused other irreparable prejudice.

XXXIX.     Whether [Petitioner] was denied due process of law in violation of the Fifth, Sixth, and Eighth Amendments, and [UCMJ] Article 55, because he was tried in a peacetime capital case by a court-martial panel (i.e. jury) composed of less than twelve members.

XL.        [Petitioner] was denied his rights under the Fifth and Sixth Amendments because the panel member selection pool in [Petitioner]'s case did not include any females.

XLI.       Article 25(c)(1)'s exclusion from the court-martial service of enlisted members of the same unit as the accused injects an improper criterion (enlisted status) in selecting the members pool.

XLII.      [Petitioner] was denied his right to an impartial jury by the accepted practice in the military of allowing panel members to ask questions of witnesses.

XLIII.     [Petitioner] was denied due process of law when the military judge improperly abandoned his role of impartiality and became a partisan advocate for the Government.

XLIV.      [Petitioner] did not knowingly and intelligently waive his Article 38(b)(2) statutory right to civilian counsel or his Article 38(b)(3)(B) statutory right to military counsel of his own selection where the military failed to advise [Petitioner] of his professional deficiencies (which included no capital experience, no capital training, and no experience in defending a murder charge).

XLV.       [Petitioner] did not knowingly and intelligently waive his Article 38(b)(2) statutory right to civilian counsel or his Article 38(b)(3)(B) statutory right to military counsel of his own selection where the military judge misled [Petitioner] by stating that his counsel were "qualified lawyers" and that his lead counsel was a "lawyer of considerable experience," when neither counsel had tried a capital case, tried a murder case, or received any death penalty continuing legal education.

XLVI.      Whether due process requires that this court establish minimum standards for trial and appellate defense counsel in [a] capital case.

XLVII.     The system of appointing capital counsel in the United States Army prejudices [Petitioner] because he is not guaranteed either continuity of counsel or competent counsel under any of the qualifications for capital attorneys in force in any jurisdiction in America.

XLVIII.    [Petitioner] has been denied equal protection under the law in violation of the Fifth Amendment in that all other civilians in the United States are afforded the opportunity to have their cases reviewed by an Article III court, but members of the United States Army by virtue of their status as service members are not.

L.         The military judge erred in violation of the Fifth and Eighth Amendments and UCMJ Article 55 in his failure to instruct the panel members that the only offenses for which [Petitioner] could be sentenced to die were felony murder and premeditated murder and that [Petitioner] could not be sentenced to die on the basis of the aggregate or cumulative effect of all the offenses.

LI.        There is no meaningful distinction between premeditated and unpremeditated murder in the military, allowing differential treatment and sentencing disparity in violation of the Fifth and Eighth Amendments.

LII.       The military judge erred by insufficiently describing the distinction between the offenses of premeditated and unpremeditated murder.

LIII.       The predominance of misleading language in the reasonable doubt instructions given by the military judge for findings and sentencing created a higher degree of doubt than is required under the Due Process Clause of the Fifth Amendment.

LIV.       The military judge's instructions restricted free consideration of the evidence by requiring the members to vote on the most serious offense first.

LV.        The designation of the senior member as the presiding officer for deliberations establishes the senior member's superiority in and control of the deliberation process and denied [Petitioner] due process of law and a fair and impartial consideration of the evidence by the members.

LVI.       The military judge's instruction that "you may not adjudge a sentence of death unless you find that any and all extenuating or mitigating circumstances are substantially outweighed by any aggravating factors..." did not sufficiently inform the members that this finding must be unanimous.

LVII.      The military death penalty scheme is invalid due to *Furman v. Georgia*, 408 U.S. 238 (1972) and the separation of powers doctrine.

LVIII.     Rule for Courts-Martial 1004 fails to incorporate congressionally mandated protections to prevent racially motivated imposition of the death penalty in violation of UCMJ Article 55 and the Eighth Amendment to the Constitution.

LIX.       The military judge committed plain error when he failed to sua sponte instruct the panel members that race could not be considered as a factor in the sentencing process.

LX.        The imposition of the death penalty in this case violated [Petitioner]'s right to equal protection under the Fifth Amendment because [R.C.M.] 1004 subjected [Petitioner], as a member of the armed forces, to a penalty which is not otherwise available under the criminal code of the United States for identical criminal conduct.

LXI.       The Fifth, Sixth, and Eighth Amendments do not permit, in peacetime, a convening authority to hand-pick military subordinates, whose careers he can directly and immediately affect and control, to serve as members in a capital trial for offenses that occur on a military base but where there is concurrent jurisdiction with a state authority.

LXII.      The military judge erred to the substantial prejudice of [Petitioner] by allowing the prosecution, during the sentencing portion of a capital case, to engage in improper argument that emphasized victim impact statements in violation of *Booth v. Maryland*, 482 U.S. 496 (1987).

LXIII.       Whether due process and fundamental notions of fairness require that each member of the court-martial sign his or her name to the death sentence worksheet or that the condemned accused be afforded the right and opportunity to poll the members.

LXIV.       The capital sentencing procedure in the military is unconstitutional because the military judge lacks the power to adjust or suspend a sentence of death that is improperly imposed.

LXV.       Court-martial procedures denied [Petitioner] his Sixth Amendment right to jury trial and an impartial cross-section of the community.

LXVI.       [Petitioner]'s death sentence violates the Eighth Amendment's prohibition against cruel and unusual punishment.

LXVII.       The numerous errors which occurred during [Petitioner]'s court-martial cannot be found harmless beyond a reasonable doubt when considered collectively.

LXVIII.       The [ACCA]'s proportionality review in this case was insufficient as a matter of law.

LXIX.       The [ACCA] erred in concluding that the death sentence was an appropriate sentence in this case.

Dkt. 20-16, at 7-459.  Petitioner himself also submitted thirty-one (31) *Grostefon* matters.  Dkt. 20-13, at 228-231.

On October 5, 1995, with permission of the CAAF, Petitioner filed a supplemental assignment of error:

LXX.       Whether [Petitioner] was denied due process of law in violation of the Fifth, Sixth, and Eighth Amendments because he was tried by court-martial for capital murder during peacetime.

Dkt. 20-14, at 51-87.

On May 28, 1999, the CAAF issued a lengthy published opinion addressing all seventy (70) assignments of error as well as the additional thirty-one (31) *Grostefon* matters.  *Gray III*, 51 M.J. 1.  The court affirmed the ACCA's order and all related decisions.  *Id*. at 64.

-24-

Petitioner filed a motion for reconsideration on August 14, 1999, arguing that: (1) the CAAF misapprehended several facts in finding a "service connection" existed, (2) the CAAF misapprehended the facts and law in holding that sufficient evidence of Petitioner's organic brain damage was presented to the panel, (3) Petitioner was denied due process of law when the CAAF denied his request for funding to hire experts, (4) the CAAF erred by finding Petitioner's pretrial statements were admissible, (5) civilian defense counsel was ineffective, (6) the CAAF erred by holding Defense Exhibit V was cumulative, and (7) the CAAF erred by holding the panel was adequately instructed to consider Petitioner's background as a mitigating factor. Dkt. 20-12, at 141-200 – Dkt. 20-13, at 1-57. The CAAF summarily denied the petition on April 6, 2000. Dkt. 20-12, at 64. On April 18, 2000, Petitioner filed a second motion for reconsideration, which was summarily denied on June 26, 2000. Dkt. 20-12, at 3, 10-49.

**E.     United States Supreme Court**

On September 25, 2000, Petitioner filed a Petition for a Writ of Certiorari with the United States Supreme Court presenting the following three (3) assignments of error:

I.      During peacetime, allowing a member of the Armed Forces to be sentenced to death by a court-martial panel of less than twelve, when there is no fixed panel size, promotes unreliability, undermines the right to an impartial fact finder and capital sentencer, and creates an arbitrary factor in the administration of the death penalty under the Uniform Code of Military Justice, in violation of the Fifth, Sixth and Eighth Amendments.

II.     In a capital court-martial during peacetime, the convening authority's power to handpick military subordinates -- whose careers he can directly and immediately effect and control -- to serve as court members violates the Fifth and Eighth Amendments.

III.    An appellate court cannot assume that the trial judge made a determination as to whether trial counsel's explanation was credible or pretextual pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986), without conducting a further hearing on the issue, when the trial judge ruled on Petitioner's *Batson* claim without even requiring the prosecutor to provide a race neutral explanation for the challenge.

Dkt. 20-11, at 91-118.   Both the National Institute of Military Justice and the Navy-Marine Corps Appellate Defense Division filed amicus briefs on Petitioner's behalf.  Dkt.  20-11, at 58-81.  The Supreme Court denied the writ on March 19, 2001.  *Gray v. United States*, 532 U.S. 919 (2001).  On April 13, 2001, Petitioner filed a request for a rehearing.  Dkt. 20-11, at 6-17.  The Supreme Court summarily denied the request on April 16, 2001.  *Gray v. United States*, 532 U.S. 1035 (2001).

## F.     Clemency Proceedings

The Supreme Court's March 19th denial of certiorari marked completion of the direct appellate review of Petitioner's capital court-martial.   On March 24, 2003, Petitioner's lead counsel was notified, at the direction of The Judge Advocate General of the Army ("TJAG"), that because Petitioner's case had completed direct appellate review, the case was being transferred to the Secretary of the Army.  Petitioner's counsel was provided the opportunity to submit any matters he wished for the TJAG to consider and was advised that the TJAG would include those matters with Petitioner's case.   Counsel was simultaneously notified of the regulatory right to request the assistance of detailed military defense counsel for pursuing federal habeas review as well as the fact that Petitioner's case would not be held in abeyance beyond May 8, 2003.[11]

On April 23, 2003, Petitioner's lead counsel stated, "I have represented [Petitioner] since 1999 when I gave him my word that I would continue to represent him *pro bono* until his case was finally resolved."  Dkt. 20-1, at 33.  Counsel requested and received a 30-day extension to submit clemency matters.

---

[11] At some time prior to this notification, Petitioner's senior army defense counsel submitted a request to delay clemency matters.  TJAG denied this request on April 14, 2003.

At some time prior to April 23rd, Petitioner's senior Army defense counsel made a formal request for funding of a mitigation expert.  This request was denied by TJAG on April 24, 2003.

On June 9, 2003, the extended deadline to submit clemency matters, Petitioner's lead counsel again provided notice that, "[a]s *pro bono* counsel for [Petitioner], I write to inform you that I will be unable to submit written matters to [TJAG] on behalf of [Petitioner] by today." Dkt. 20-1, at 34.  Counsel assured TJAG that he would provide any written materials within the next 30 days.  It appears from the record that nothing was ever submitted.

On January 26, 2006, Petitioner's lead counsel requested funding from the Army to visit Petitioner.  The Army denied this request, noting that there was no fiscal authority for civilian travel, but did provide Petitioner the assistance of detailed military defense counsel.

On September 12, 2006, the Army notified Petitioner's lead counsel that the Department of Justice was reviewing Petitioner's death sentence as part of the clemency process.  On August 1, 2007, the Army notified Petitioner's counsel that the Department of Justice had completed its review of the case file and had returned the file to the White House.

G.     **Presidential Approval**

On July 28, 2008, the President of the United States approved Petitioner's death sentence. Petitioner was notified of this decision the same day.  On August 1, 2008, Petitioner made known his intention to seek review of his convictions and death sentence in the federal courts. On August 14, 2008, TJAG approved a request granting Petitioner additional detailed military defense counsel.  That same day, Petitioner was notified that the Secretary of the Army had signed the execution order directing Petitioner's execution to take place on December 10, 2008, at 2200 hours.

On November 14, 2008, Petitioner's lead civilian counsel and detailed military defense counsel submitted a request that Petitioner's execution be stayed pending final disposition of federal habeas corpus review of his convictions and sentence.  The request was denied.

## H.  Federal Civil Review

### 1.  Motion for Stay of Execution and Petition for Habeas Corpus

On November 25, 2008, Petitioner's lead civilian counsel filed a Motion for Appointment of Counsel and Stay of Execution in the United States District Court for the District of Kansas. Dkt. 2.  Judge Rogers granted the motion on November 26, 2008.  Dkt. 7. That same day, the United States filed a Motion for Reconsideration (Dkt. 10), which was denied on December 5, 2008.  Dkt. 13.  On December 19, 2008, Judge Rogers issued a scheduling order granting Petitioner an additional 100 days from the date of the original appointment of counsel to prepare a petition for writ of habeas corpus.  Dkt. 15.  On April 1, 2009, Petitioner filed his Petition, alleging the following eighteen (18) assignments of error:

Ground 1:  During peacetime, allowing a member of the armed forces to be sentenced to death by a court-martial panel of less than twelve, when there is no fixed panel size, promotes unreliability, undermines the right to an impartial fact finder and sentencer and creates an arbitrary factor in violation of the Fifth, Sixth, and Eighth Amendments.

Ground 2:  In a capital court-martial during peacetime, the convening authority's power to hand-pick military subordinates –whose careers he can directly and immediately affect and control – to serve as court members violates the Fifth and Eighth Amendments.

Ground 3:  An appellate court cannot *assume* that the trial judge made a determination as to whether trial counsel's explanation was credible or pretextual pursuant to *Batson v. Kentucky*, 476 U.S. 79 (1986), without conducting a further hearing on the issue, when the trial judge ruled on Petitioner's *Batson* claim without even requiring the prosecutor to provide a race neutral explanation for the challenge.

Ground 4:  Petitioner was denied the right to a fair and impartial jury when the military judge improperly granted government challenges for cause against two members.

Ground 5:      The peremptory challenge procedure in the military justice system, which allows the government to remove one juror without cause, is unnecessary and subject to abuse in its application and was abused in Petitioner's case.

Ground 6:      Petitioner was denied his rights under the Fifth, Sixth, and Eighth Amendments because the panel member selection pool in Petitioner's case did not include any females.

Ground 7:      The military judge improperly denied a defense motion for a mistrial based on trial counsel's comments on Petitioner's right to remain silent.

Ground 8:      The military judge precluded the sentencing panel from considering Petitioner's background as a basis for a sentence less than death in violation of the Fifth, Sixth, and Eighth Amendments.

Ground 9:      Article 18 of the UCMJ and R.C.M. 201(f)(l)(c), which require trial by members in a capital case, violates the Fifth, Sixth, and Eighth Amendment guarantees of due process and a reliable verdict.

Ground 10:     R.C.M. 1004's prohibition against guilty pleas in capital court-martial deprived Petitioner of a critical mitigating factor and caused other irreparable prejudice in violation of the Fifth, Sixth, and Eighth Amendments.

Ground 11:     Petitioner was denied his Sixth Amendment right to effective assistance of counsel at his capital court-martial.

Ground 12:     Petitioner's appellate counsel rendered ineffective assistance of counsel in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.

Ground 13:     The military judge improperly instructed the panel jury in violation of Petitioner's Fifth, Sixth, and Eighth Amendment rights.

Ground 14:     The military judge denied resources necessary to retain expert services in criminal investigation to assist the defense in violation of the Fifth, Sixth, and Eighth Amendments.

Ground 15:     The aggravating factor stated in R.C.M. 1004(c)(7)(i) is vague, fails to sufficiently clarify the factor involved, and does not narrow the class of persons eligible for the death penalty, and is therefore invalid under the Eighth Amendment.

Ground 16:     Based on the Supreme Court's reasoning in *Ring v. Arizona*, 536 U.S. 584 (2002), Congress unconstitutionally delegated to the President the power to enact the functional equivalent of elements of capital murder, a purely legislative function.

Ground 17:     The proportionality review in this case was insufficient as a matter of law in violation of the Fifth, Sixth, and Eighth Amendments.

Ground 18:     The manner in which the government would carry out Petitioner's execution violates the Eighth Amendment.

Dkt. 17.  The government filed its Answer and Return on May 1, 2009.

On May 8, 2009, Judge Rogers assigned Petitioner his current civilian defense counsel. Three days later, on May 11, 2009, counsel filed a Motion to Amend and Supplement the current scheduling order (Dkt. 26), which was granted on June 18, 2009, allowing Petitioner until September 30, 2009, to file his Traverse.  Dkt. 33.  On September 18, 2009, Petitioner filed a motion seeking to continue this deadline (Dkt. 36), which was granted on September 25, 2009, extending Petitioner's time to file his Traverse until November 30, 2009.  Dkt. 38.  On November 19, 2009, Petitioner again sought a Motion to Continue this deadline (Dkt. 39), which was granted on December 1, 2009, extending Petitioner's deadline to December 20, 2009.  Dkt. 41.  Petitioner filed his Traverse on December 18, 2009, alleging his original eighteen (18) assignments of error as well as three additional assignments of error:

Ground 19:     Petitioner was denied his rights to due process, to a fair sentencing proceeding, to a public trial, and against cruel and unusual punishment, as guaranteed by the Fifth, Sixth, and Eighth Amendments, where the President, acting in a judicial role, approved Petitioner's death sentence in reliance upon confidential reports that were not disclosed to Petitioner.

Ground 20:     Petitioner was denied his rights under the Sixth and Eighth Amendments when he was tried while incompetent to proceed and when he was incompetent during portions of the appellate proceedings. The trial court and the appellate courts erred in not conducting competency proceedings and prior counsel were ineffective for failing to litigate Petitioner's obvious incompetence.

Ground 21:     The military courts lacked jurisdiction to capitally prosecute Petitioner for crimes committed in the United States during peacetime because Congress' ostensible grant of jurisdiction to prosecute such crimes under the UCMJ was unconstitutional in violation of the separation of powers and the Fifth, Sixth, and

Eighth Amendments; the military courts likewise lacked jurisdiction to capitally prosecute Petitioner in the absence of an adequate service connection to his crimes.

Dkt. 42.

On that same day, Petitioner filed a Motion to Amend and Supplement his Petition for Habeas Corpus.  Dkt. 43.  In response, the government filed a Motion to Strike Petitioner's Traverse.  Dkt. 44.  On September 30, 2010, Judge Rogers granted Petitioner's motion to amend and supplement and denied the government's motion to strike.  Dkt. 47.  The government filed its Response to Petitioner's Traverse on November 1, 2010.  Dkt. 48.

### 2. Petition for Extraordinary Relief in the Nature of a Writ of Coram Nobis

On November 10, 2011, Petitioner requested an extension of time to file his reply to the government's Response to the Traverse.  Dkt. 49.  However, before the court could rule on this motion, Petitioner filed a Petition for Extraordinary Relief in the Nature of a Writ of *Coram Nobis* with the ACCA, alleging the following issues:

Claim 1: Petitioner was denied his rights under the Sixth and Eighth Amendments when he was tried while incompetent to proceed and when he was incompetent during portions of the appellate proceedings; the trial court and the appellate courts erred in not conducting competency proceedings; and prior counsel were ineffective for failing to litigate Petitioner's obvious incompetence.

Claim 2: Petitioner was denied his rights to due process, to a fair sentencing proceeding, to a public trial, and against cruel and unusual punishment, as guaranteed by the Fifth, Sixth, and Eighth Amendments, where the President, acting in a judicial role, approved Petitioner's death sentence in reliance upon confidential reports that were not disclosed to Petitioner.

Claim 3: The proportionality review in this case was insufficient as a matter of law in violation of the Fifth, Sixth, and Eighth Amendments; Petitioner's death sentence must be reversed because the death sentencing system as applied is unconstitutional and his sentence was the result of racial discrimination, in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

Claim 4:       Petitioner was denied his right to effective assistance of counsel where appellate counsel articulated and argued the incorrect standard of law regarding Petitioner's claim under *Witherspoon v. Illinois*.

Claim 5:       Petitioner was denied his Sixth Amendment right to effective assistance of counsel at his capital sentencing.

Claim 6:       Petitioner's appellate counsel rendered ineffective assistance of counsel in violation of the Fifth, Sixth, and Eighth Amendments.

Claim 7:       During peacetime, allowing a member of the Armed Forces to be sentenced to death by a court-martial panel of less than twelve, when there is no fixed panel size, promotes unreliability, undermines the right to an impartial fact finder and sentence, and creates an arbitrary factor in violation of the Fifth, Sixth, and Eighth Amendments.

Dkts. 51-1, 51-2.[12]   On February 14, 2011, Petitioner notified the court of the new military proceedings and requested that the court await the action of the military courts before taking any dispositive action.  Dkt. 51.  Judge Rogers granted this request on September 29, 2011, providing Petitioner with thirty (30) days to report on the status of his pending petition in the military courts.  Dkt. 55.

On October 27, 2011, Petitioner notified the court that the military courts had yet to take any action on the pending petition for writ of error *coram nobis* and requested that the court continue its stay.  Dkt. 58.  On January 26, 2012, the ACCA denied the petition for *coram nobis*.  Dkt. 59-1.  The CAAF affirmed this denial on April 17, 2012.  Dkt. 64-1.  Petitioner filed his Reply to the government's Response to the Traverse on November 1, 2012.  Dkt. 69.

---

[12] These assignments of error correspond to habeas corpus assignments of error 20, 19, 17, 4(d), 11, 12, and 1, respectively.

### 3. Continuation of Federal Habeas Corpus Review

This case was reassigned to the undersigned on November 7, 2014.  On December 22, 2014, the court notified counsel of its wish to conduct an in-person status conference and ordered Petitioner to be present.  Dkt. 72.  The court also provided counsel with specific questions it wished to have addressed.  Dkt. 74.  The hearing was conducted on April 2, 2015, in Kansas City, Kansas.[13]

## IV.    Analysis

It goes nearly without saying that the situation this court now finds itself in is, at the very least, exceptional.  We have arrived here through what likely could not have been imagined in 1988 at the time of Petitioner's sentencing.  For this court, which has had the opportunity to review Petitioner's case only since November 2014, it has been overwhelming.  For counsel, both the government and those who have walked alongside Petitioner, it can undoubtedly be said to be the same.  And for Petitioner, who has had to live with a cloud of uncertainty around what is quite literally a matter of life and death, words likely cannot describe.

Through its review, this court has become intimately familiar with the details of Petitioner's case.  By necessity, it has reviewed the details of Petitioner's crimes.  By obligation and responsibility, it has painstakingly gone through, with a fine-tooth comb, the procedural history, which is replete with extraordinary effort on the part of counsel, on both sides, and, indeed, multiple bites at the apple for Petitioner.  The court has read a mountain of case law, none of which provides a concrete answer, and some of which only muddies the waters further.

---

[13] The hearing was initially scheduled for February 23, 2015, but due to inclement weather, Petitioner's counsel was unable to travel to Kansas City on that date.  April 2, 2015, was the first date available for all parties and the court to reschedule.

It has met with counsel formally on the record.  It has seen Petitioner face to face.  It has likewise looked into the faces of the surviving loved ones of Petitioner's victims and, in one instance, into the face of Petitioner's sole surviving victim herself.

There is some argument to be made that "death is different."  The court hardly needs to be reminded of this: *of course* death is different.  It is the only sentence that courts of this nation may impose that, once carried out, cannot be taken back.  It cannot be corrected; it cannot be altered.  As the Supreme Court has stated, "[d]eath, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two."  *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976).

Despite the murkiness of the present situation and, truth be told, despite the extraordinary delay now present in this case, the court remains bound by this very simple notion: "[o]ur duty to search for constitutional error with painstaking care is *never* more exacting than it is in a capital case."  *Burger v. Kemp*, 483 U.S. 776, 785 (1987).  Unfortunately, this is perhaps easier said than done.  With little precedent, a near-indecipherable roadmap, and no clear directional signposts, this court is forced to draw upon every single resource available; it is obligated to leave no stone unturned, no option unconsidered.

The majority of Petitioner's claims, without a doubt, cannot be granted relief here.  Of all the considerations present in this case, one of the most overarching is this:

> The military has its own independent criminal justice system governed by the Uniform Code of Military Justice.  10 U.S.C. 801-940.  The code is all-inclusive and provides, inter alia, for courts-martial, appellate review, and limited certiorari review by the United States Court . . . Because of the independence of the military court system, special considerations are involved when federal civil courts collaterally review court-martial convictions.

*Lips v. Commandant*, 997 F.2d 808, 810 (10th Cir. 1993). This means "[w]hen a military decision has dealt 'fully and fairly' with an allegation raised in a habeas petition, 'it is not open to a federal civil court to grant the writ simply to re-evaluate the evidence.'" *Watson v. McCotter*, 782 F.2d 143, 144 (10th Cir. 1986) (quoting *Burns v. Wilson*, 346 U.S. 137, 142 (1953)).

But, contrary to the government's argument, not *all* of Petitioner's claims are subject to the full and fair consideration standard. Petitioner raised the following claims which were not before the military courts on direct review:

1.    Petitioner was denied his rights under the Sixth and Eighth Amendments when he was tried while incompetent to proceed and when he was incompetent during portions of the appellate proceedings; the trial court and the appellate courts erred in not conducting competency proceedings; and prior counsel were ineffective for failing to litigate Petitioner's obvious incompetence.

2.    Petitioner was denied his rights to due process, to a fair sentencing proceeding, to a public trial, and against cruel and unusual punishment, as guaranteed by the Fifth, Sixth, and Eighth Amendments, where the President, acting in a judicial role, approved Petitioner's death sentence in reliance upon confidential reports that were not disclosed to Petitioner.

3.    The proportionality review in this case was insufficient as a matter of law in violation of the Fifth, Sixth, and Eighth Amendments; Petitioner's death sentence must be reversed because the death sentencing system as applied is unconstitutional and his sentence was the result of racial discrimination, in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

4.    Petitioner was denied his right to effective assistance of counsel where appellate counsel articulated and argued the incorrect standard of law regarding Petitioner's claim under *Witherspoon v. Illinois*.

5.    Petitioner's appellate counsel rendered ineffective assistance of counsel in violation of the Fifth, Sixth, and Eighth Amendments for appellate counsel's failure to conduct an adequate investigation into Petitioner's background.

But that does not end the matter.  At the time Petitioner's petition for habeas corpus was filed, these claims would have been deemed procedurally defaulted.  The law on this matter was clear: the federal courts "will not review [a Petitioner's] claims on the merits if they were not raised at all in the military courts."  *Watson*, 782 F.2d at 145.

But this is where the situation gets tricky.  Perhaps anticipating that this would be the court's response, Petitioner sought extraordinary relief in the nature of a writ of error *coram nobis* before the ACCA raising these exact issues.  Dkts. 51-1, 51-2.[14]  After a Supreme Court ruling in 2009 in *United States v. Denedo*, 556 U.S. 904 (2009), the military court has jurisdiction to entertain a petition for a writ of error *coram nobis* to challenge its earlier, and final, decision affirming a criminal conviction.

In *Denedo*, the respondent, a native of Nigeria having become a lawful permanent resident, was charged by military authorities with conspiracy, larceny, and forgery, in violation of the UCMJ.  556 U.S. at 907.  Denedo ultimately entered a guilty plea and was convicted of conspiracy and larceny and sentenced to three months' confinement, a bad-conduct discharge, and a reduction to the lowest enlisted pay grade.  *Id*.  He appealed to the ACCA on the ground that the sentence was unduly severe.  *Id*.  In 2006, the Department of Homeland Security commenced removal proceedings against Denedo based upon his court-martial conviction.  *Id*. To avoid deportation, Denedo again attempted to challenge his conviction, even though it had been final for more than eight years, on the basis of ineffective assistance of counsel.  *Id*.  He

---

[14] Petitioner's writ of error *coram nobis* actually raised six issues in total but, as discussed below, the court finds that two of those issues were presented to the military courts on direct appeal and are therefore subject to full and fair consideration.

argued that the military court could set aside its earlier decision by issuing a writ of error *coram nobis*.  *Denedo*, 556 U.S. at 908.

The Supreme Court ultimately granted certiorari and held that "Article I military courts have jurisdiction to entertain *coram nobis* petitions to consider allegations that an earlier judgment of conviction was flawed in a fundamental aspect."  *Id*. at 917.  However, the Court cautioned that "an extraordinary remedy may not issue when alternative remedies, such as habeas corpus, are available."  *Id*. at 911.

A grant of a petition for a writ of error *coram nobis* is rare.  It has, however, served as a useful tool in potential habeas default situations at least once in this Circuit.  In *Thomas v. United States Disciplinary Barracks*, 2009 WL 3125962 (D. Kan. Sept. 29, 2009), the petitioner was convicted, *in absentia*, of two specifications of attempted rape of a minor, rape, two specifications of forcible sodomy with a minor, two specifications of assault consummated by a battery upon a child under sixteen years, adultery, and indecent acts upon a minor, in violation of the UCMJ.  2009 WL 3125962, at *1.  He was sentenced to fifty years confinement, reduction to the grade of Private E-1, forfeiture of all pay and allowances, and a dishonorable discharge.  *Id*.

The petitioner was subsequently arrested in Germany, returned to military custody, and convicted of attempted voluntary manslaughter, wrongful appropriation, two specifications of assault consummated by a battery, and desertion.  *Id*.  He was sentenced to thirteen years confinement, forfeiture of all pay and allowances, and a dishonorable discharge.  *Id*.

Prior to his capture and arrest, the petitioner submitted a brief to the ACCA alleging six assignments of error relating to his original convictions.  *Id*. at *1.  In September 1997, he filed a motion requesting to supplement his original appeal to the ACCA with *Grostefon* errors.  *Thomas*, 2009 WL 3125962, at *1.  The ACCA granted the motion.  *Id*.  In 1999, the petitioner

submitted a supplemental brief to the ACCA alleging that he was prejudiced by the testimony of an expert witness, as well as a motion for a new trial. *Id*. The ACCA granted partial relief by dismissing some of the petitioner's charges as multiplicious, but denied the motion for a new trial. *Id*. The petitioner then sought review in the CAAF. *Id*. at *2. The CAAF granted the request for review but affirmed the decision of the ACCA. *Thomas*, 2009 WL 3125962, at *2. The United States Supreme Court denied the petitioner's request for certiorari. *Id*.

The petitioner then filed an action in this court for habeas corpus relief, which the court denied in July 2004. *Id*. The petitioner appealed but, during the pendency of that appeal, voluntarily sought, and was granted, an abatement to allow him to seek relief in the ACCA, which the petitioner did through a petition for a writ of error *coram nobis*. *Id*. The ACCA summarily denied the petition in 2006. *Id*. In light of the ACCA's decision, the Tenth Circuit remanded the petitioner's habeas claim to the district court. *Thomas*, 2009 WL 3125962, at *2.

On remand, the district court found that because the petitioner had sufficiently briefed and argued his habeas claims in his writ of error *coram nobis*, those claims were subject to the full and fair consideration standard. This was true, the district court stated, even though the CAAF *summarily* denied the writ. *Id*. The petitioner's habeas petition was therefore denied. *Id*.

Petitioner finds himself in much the same situation as did the petitioner in *Thomas* after his writ for *coram nobis* was denied, with the exception of a slight twist. In its opinion on Petitioner's writ of error *coram nobis*, the ACCA held as follows:

> In the military justice system, a Petitioner must satisfy several, stringent threshold requirements in order to obtain *coram nobis* relief:
>
>> (1) the alleged error is of the most fundamental character; (2) no remedy other than *coram nobis* is available to rectify the consequences of the error; (3) valid reasons exist for not seeking relief earlier; (4) the new information presented in the petition could not have been discovered

through the exercise of reasonable diligence prior to the original judgment; (5) the writ does not seek to reevaluate previously considered evidence or legal issues; and (6) the sentence has been served, but the consequences of the erroneous conviction persist.

Here, Petitioner cannot traverse these threshold requirements because there is, as a matter of law, a remedy other than *coram nobis* available to him.  Although in our view Petitioner's right to habeas corpus in the military justice system has ended, this is not so for Article III courts.  In fact, Petitioner has filed a writ of habeas corpus in federal district court and the government does not dispute the jurisdictional basis for doing so.  The merits of Petitioner's claims are now for the federal district court, rather than this court, to decide.

We are cognizant of the preference for military courts to hear issues potentially of first impression, but we are also mindful of clear constraints imposed on this court by statute and our superior court.

Dkt. 59-1, at 3 (internal citations omitted).

Further, on appeal to the CAAF, the CAAF issued what appears to be its own judgment, rather than merely affirming the opinion of the ACCA.  It stated:

On consideration of the writ-appeal petition, it is, by the Court . . . ORDERED:

That said writ-appeal petition is hereby denied without prejudice to raising the issue asserted after the U.S. District Court for the District of Kansas rules on the pending habeas petition.

Dkt. 64-1.

This court has considered at length not only what precedent binds it to do, but also what is *correct*.  In doing so, the court has weighed numerous factors, including, but not limited to: (1) the preference for military courts to rule on the merits on all issues arising from its jurisdiction and prior decisions, (2) the procedural process of this case, (3) the opinions of the military courts, and (4) the fact that this case has been pending essentially since Petitioner's sentencing in 1988, nearly three decades ago.

After full consideration, the court holds, as is explained in detail below, that Petitioner's Assignments of Error 1-3, 4(a)-(c), 5-11, and 13-16 are denied on the ground of full and fair consideration. The "coram nobis" assignments of error, which include habeas assignments of error 1, 4(d), 12, 17, 19, and 20 are denied without prejudice. Assignments of error 18 and 21 are denied.

## A.    Claim 21: Jurisdiction

The court first addresses Petitioner's habeas assignment of error 21, alleging the following:

> The military courts lacked jurisdiction to capitally prosecute Petitioner for crimes committed in the United States during peacetime because Congress' ostensible grant of jurisdiction to prosecute such crimes under the UCMJ was unconstitutional in violation of the separation of powers and the Fifth, Sixth, and Eighth Amendments; the military courts likewise lacked jurisdiction to capitally prosecute Petitioner in the absence of an adequate service connection to his crimes.

This is an issue of first impression. Indeed, perhaps the only case where such an issue *could have* arisen would have been in *Loving v. United States*, 517 U.S. 748 (1996), in which the petitioner (who, like Petitioner here, was sentenced to death for capital crimes committed in the United States during peacetime) challenged the constitutionality of Congressional delegation to the President the task of prescribing the aggravating factors required by Eighth Amendment jurisprudence. However, the petitioner in *Loving* did not challenge the power of the court-martial to try him for a capital offense committed during peacetime. *Loving*, 517 U.S. at 774 (Stevens, J., concurring); *see also* Justice Scalia's concurrence at 775.

A review of the Court's decision reveals that it did, even tacitly, lay out the foundation should such a challenge ever arise:

-40-

Although American courts-martial from their inception have had the power to decree capital punishment, they have not long had the authority to try and to sentence members of the Armed Forces for capital murder committed in the United States in peacetime. In the early days of the Republic the powers of courts-martial were fixed in the Articles of War. Congress enacted the first Articles in 1789 by adopting in full the Articles promulgated in 1775 (and revised in 1776) by the Continental Congress. Act of Sept. 29, 1789, ch. 25, § 4, 1 Stat. 96. (Congress reenacted the Articles in 1790 "as far as the same may be applicable to the constitution of the United States," Act of Apr. 30, 1790, ch. 10, § 13, 1 Stat. 121.) The Articles adopted by the First Congress placed significant restrictions on court-martial jurisdiction over capital offenses. Although the death penalty was authorized for 14 military offenses, American Articles of War of 1776, reprinted in W. Winthrop, Military Law and Precedents 961 (reprint 2d ed.1920) (hereinafter Winthrop); Comment, Rocks and Shoals in a Sea of Otherwise Deep Commitment: General Court–Martial Size and Voting Requirements, 35 Nav. L.Rev. 153, 156–158 (1986), the Articles followed the British example of ensuring the supremacy of civil court jurisdiction over ordinary capital crimes that were punishable by the law of the land and were not special military offenses. 1776 Articles, § 10, Art. 1, reprinted in Winthrop 964 (requiring commanders, upon application, to exert utmost effort to turn offender over to civil authorities). Cf. British Articles of War of 1765, § 11, Art. 1, reprinted in Winthrop 937 (same). That provision was deemed protection enough for soldiers, and in 1806 Congress debated and rejected a proposal to remove the death penalty from court-martial jurisdiction. Wiener, Courts–Martial and the Bill of Rights: The Original Practice I, 72 Harv. L.Rev. 1, 20–21 (1958).

Over the next two centuries, Congress expanded court-martial jurisdiction. In 1863, concerned that civil courts could not function in all places during hostilities, Congress granted courts-martial jurisdiction of common-law capital crimes and the authority to impose the death penalty in wartime. Act of Mar. 3, 1863, § 30, 12 Stat. 736, Rev. Stat. § 1342, Art. 58 (1875); *Coleman v. Tennessee*, 97 U.S. 509, 514 (1879).  In 1916, Congress granted to the military courts a general jurisdiction over common-law felonies committed by service members, except for murder and rape committed within the continental United States during peacetime. Articles of War of 1916, ch. 418, § 3, Arts. 92–93, 39 Stat. 664. Persons accused of the latter two crimes were to be turned over to the civilian authorities. Art. 74, 39 Stat. 662. *In 1950, with the passage of the UCMJ, Congress lifted even this restriction*. Article 118 of the UCMJ describes four types of murder subject to court-martial jurisdiction, two of which are punishable by death:

Any person subject to this chapter who, without justification or excuse, unlawfully kills a human being, when he—

(1) has a premeditated design to kill;

      (2) intends to kill or inflict great bodily harm;

      (3) is engaged in an act which is inherently dangerous to another and evinces a wanton disregard of human life; or

      (4) is engaged in the perpetration or attempted perpetration of burglary, sodomy, rape, robbery, or aggravated arson;

is guilty of murder, and shall suffer such punishment as a court-martial may direct, except that if found guilty under clause (1) or (4), he shall suffer death or imprisonment for life as a court-martial may direct. 10 U.S.C. § 918.

*Loving*, 517 U.S. at 752-54 (internal citations omitted) (emphasis added). The important part of this passage is the Supreme Court's recognition that, in 1950, with the passage of the UCMJ, Congress allowed, perhaps by its silence, prosecutions by the military for capital crimes committed during peacetime.

      This court is well aware that it must "give Congress the highest deference in ordering military affairs." *Id*. at 768. *See also Weiss v. U.S.*, 510 U.S. 163, 176 (1994) ("the tests and limitations of due process may differ because of the military context. The difference arises from the fact that the Constitution contemplates that Congress has plenary control over rights, duties, and responsibilities in the framework of the Military Establishment, including regulations, procedures, and remedies related to military discipline. Judicial deference thus is at its apogee when reviewing congressional decisionmaking in this area."). Therefore, given the status of the UCMJ and the lack of any contradictory directive from Congress, this court finds that the military courts did indeed have jurisdiction over Petitioner's crimes.

      Petitioner further challenges jurisdiction on the basis that there existed no adequate service connection to his crimes. The Supreme Court has been very clear on the need for a service connection in *non*-capital cases: it is no longer necessary. In 1987, the Court held that

"the proper exercise of court-martial jurisdiction over an offense [depends] on one factor: the military status of the *accused*." *Solorio v. United States*, 483 U.S. 435, 439 (1987) (emphasis added); *accord Williams v. Weathersbee*, 280 Fed. Appx. 684, 686 (10th Cir. 2008) (holding that "[t]he proper exercise of court-martial jurisdiction over an offense [turns] on one factor: the military status of the accused.").

To be certain, there was a time when the Supreme Court departed from the "military status" test and adhered to the view "that a military tribunal may not try a serviceman charged with a crime that has no service connection." *Solorio*, 483 U.S. at 440 (citing *O'Callahan v. Parker*, 395 U.S. 258 (1969), wherein the Court held that a serviceman's off-base sexual assault on a civilian could not be tried by court-martial). However, the Supreme Court was very clear in *Solorio* that this "service connection" test has been overturned, holding "we have decided that the service connection test announced in that decision should be abandoned." *Id*. at 441.

While the Supreme Court has never announced whether the "military status" test applies in capital cases, there is no indication that the Court would be inclined to revert back to the "service connection" requirement for these cases. Therefore, the court finds that Petitioner's argument that the military courts lacked jurisdiction due to a lack of a service connection is without merit. As a result, habeas assignment of error 21 is denied in its entirety.

## B.    Full and Fair Consideration

Most of Petitioner's claims must be denied because the military courts have already dealt with them. "The federal civil courts have jurisdiction over habeas corpus actions filed under § 2241 by prisoners convicted in the courts-martial." *Piotrowski v. Commandant*, 2009 WL 5171780, at *3 (D. Kan. Dec. 22, 2009); *see also Burns*, 346 U.S. at 139 ("In this case, we are dealing with habeas corpus applicants who assert . . . that they have been imprisoned and

sentenced to death as a result of proceedings which denied them basic rights guaranteed by the

Constitution. The federal civil courts have jurisdiction over such applications."). Review of

these actions, however, "is very limited." *Piotrowski*, 2009 WL 5171780, at *3. This is so

because, as noted above, "the military has its own independent criminal justice system governed

by the Uniform Code of Military Justice." *Lips*, 997 F.2d at 810. Historically, review "was

limited to the question of jurisdiction." *Fricke v. Sec'y of Navy*, 509 F.3d 1287, 1289 (10th Cir.

2007). In *Burns*, the United States Supreme Court expanded the scope of review, holding that

"civil courts could consider constitutional claims regarding such proceedings if the military

courts had not 'dealt fully and fairly' with such claims." *Id.* (quoting *Burns*, 346 U.S. at 142).

The Tenth Circuit has articulated a four-part standard for reviewing military convictions in

habeas corpus:

> To assess the fairness of the consideration, our review of a military conviction is
> appropriate only if the following four conditions are met: (1) the asserted error is
> of substantial constitutional dimension, (2) the issue is one of law rather than
> disputed fact, (3) no military considerations warrant a different treatment of
> constitutional claims, and (4) the military courts failed to give adequate
> consideration to the issues involved or failed to apply proper legal standards.

*Thomas v. United States Disciplinary Barracks*, 625 F.3d 667, 670-71 (10th Cir. 2012) (citing

*Dodson v. Zelez*, 917 F.2d 1250, 1252-53 (10th Cir. 1990)). While the courts in this circuit

continue to apply this four-part test, "recent cases have emphasized the fourth consideration as

the most important." *Id.* at 671.

When dealing with these factors, the Tenth Circuit has "consistently held full and fair

consideration does not require a detailed opinion by the military court." *Id.* Rather, "an issue is

deemed to have been given full and fair consideration when it has been briefed and argued in the

military court, even if that court resolved the matter summarily." *Young v. Belcher*, 2012 WL

1308308, at *4 (D. Kan. Mar. 27, 2013) (citing *Thomas*, 625 F.3d at 671); *see also Watson*, 782 F.2d at 145 ("When an issue is briefed and argued before a military board of review, we have held that the military tribunal has given the claim fair consideration, even though its opinion summarily disposed of the issue with the mere statement that it did not consider the issue meritorious or requiring discussion.").

"Where the military courts have given 'full and fair consideration' to the claims presented in a petition, a federal court may not grant habeas relief 'simply to re-evaluate the evidence,' and should deny the petition." *Piotrowski*, 2009 WL 5171780, at *3 (quoting *Lips*, 997 F.2d at 811); *see also Burns*, 345 U.S. at 142 (holding that "when a military decision has dealt fully and fairly with an allegation raised in [a petition for habeas corpus], it is not open to a federal civil court to grant the writ simply to re-evaluate the evidence."). "The burden is on the Petitioner to establish that the review in the courts-martial was 'legally inadequate.'" *Piotrowski*, 2009 WL 5171780, at *3 (quoting *Watson*, 782 F.2d at 144).[15]

## 1.   Petitioner's Argument Against Full and Fair Consideration

At the outset, this court notes that it is Petitioner's belief that the full and fair consideration standard should not apply to *any* of his claims, arguing that the test "does not apply and would be inadequate to give effect to a military capital petitioner's habeas corpus rights where the underlying crimes were committed in the United States during peacetime."  Dkt. 42, at

---

[15] It has also long been settled that a federal court "will not entertain petitions by military prisoners unless all available military remedies have been exhausted." *Piotrowski*, 2009 WL 5171780, at *3 (quoting *Schlesinger v. Councilman*, 420 U.S. 738 (1975)).  "If a claim was not presented to the military courts, the federal habeas court considers the claim waived and not subject to review."  *Id*. at *11-12 (citing *Watson*, 782 F.2d at 145).  "To obtain federal habeas review of claims based on trial errors to which no objection was made at trial, or of claims that were not raised on appeal, a state prisoner must show both cause excusing the procedural default and actual prejudice resulting from the error."  *Lips*, 997 F.2d at 812 (citing *Murray v. Carrier*, 477 U.S. 478, 491 (1986)).  This rule has also been applied to challenges to a court-martial conviction.  *Id*. (citing *Wolff v. United States*, 737 F.2d 877 (10th Cir. 1984)).

16.   Petitioner provides lengthy discussion about how civil courts have always maintained preeminence over military courts in the prosecution of capital crimes committed in the United States during peacetime, how the constitutional requirement of heightened reliability for all capital cases necessitates this court's substantive review of Petitioner's claims, and how recent Supreme Court law underscores the necessity of substantive review by an Article III court.  Dkt. 42, at 16-30.  Additionally, Petitioner argues that the military courts' consideration of some of his assignments of error on direct appeal was merely cursory in nature.

Whether these arguments carry any merit is not for this court to now say.  This court can find no indication by Congress, by our Supreme Court, or by the Tenth Circuit that the full and fair consideration test is either: (1) no longer applicable, or (2) not applicable to capital crimes committed in the United States during peacetime.  Therefore, the court holds that full and fair consideration is the proper analysis for those of Petitioner's claims that were presented to the military courts.

### 2.   Grounds 2, 3, 5-10, and 13-17

In Grounds 2, 3, 4(a)-(c), 5-10, and 13-16, Petitioner alleges as follows:

Claim 2      In a capital court-martial during peacetime, the convening authority's power to handpick military subordinates – whose careers he can directly and immediately affect and control – to serve as court members violates the Fifth and Eighth Amendments.

Claim 3      The trial court failed to conduct a proper analysis under *Batson* when the court granted the prosecutor's peremptory strike without having the prosecutor present a race-neutral explanation for the strike or considering such a reason, in violation of Petitioner's constitutional rights.

Claim 5      The peremptory challenge procedure in the military justice system, which allows the government to remove one juror without cause, is unnecessary and subject to abuse in its application and was abused in Petitioner's case.

Claim 6          Petitioner was denied his rights under the Fifth, Sixth, and Eighth
                 Amendments because the panel member selection pool in
                 Petitioner's case did not include any females.

Claim 7          The military judge improperly denied a defense motion for a
                 mistrial based on the prosecutor's comments on Petitioner's right
                 to remain silent.

Claim 8          The military judge precluded the sentencing panel from
                 considering Petitioner's background as a basis for a sentence less
                 than death in violation of the Fifth, Sixth, and Eighth
                 Amendments.

Claim 9          Article 18 of the UCMJ and R.C.M. 201(F)(1)(c), which require
                 trial by members in a capital case, violate the Fifth, Sixth, and
                 Eighth Amendments.

Claim 10         The rules of prohibition against guilty pleas in capital courts-
                 martial deprive Petitioner of a critical mitigating factor and caused
                 other irreparable prejudice in violation of the Fifth, Sixth, and
                 Eighth Amendments.

Claim 13         The military judge improperly instructed the panel jury in violation
                 of Petitioner's Fifth, Sixth, and Eighth Amendment rights.

Claim 14         The military denied resources necessary to the defense to retain
                 investigative assistance in violation of the Fifth, Sixth, and Eighth
                 Amendments.

Claim 15         The aggravating factor stated in R.C.M. 1004(c)(7)(i) is vague,
                 fails to sufficiently clarify the factor involved, and does not narrow
                 the class of persons eligible for the death penalty, and is therefore
                 invalid under the Eighth Amendment.

Claim 16         Based on the Supreme Court's reasoning in *Ring v. Arizona*, 536
                 U.S. 584 (2002), Congress unconstitutionally delegated to the
                 President the power to enact the functional equivalent of elements
                 of capital murder, a purely legislative function.

In each of these cases, the assignment of error now before this court is nearly identical, if

not *verbatim*, what was before the military courts on direct appeal.  *See* pages 6-25, *supra*.  The

record shows that Petitioner's briefing on these issues is voluminous.  There is also evidence that

the military courts conducted hearings on the issues after which both the ACCA and the CAAF issued in-depth opinions demonstrating that, even where the issue was summarily dismissed, both courts had considered in great detail Petitioner's arguments.  *See Gray I*, 37 M.J. 730; *Gray II*, 37 M.J. 751; *Gray III*, 51 M.J. 1.

The court therefore finds that Petitioner's habeas Grounds 2, 3, 4(a)-(c), 5-10, and 13-16 were briefed and argued before the military courts and thus were fully and fairly considered by those courts.  No argument is made that incorrect legal standards were applied.  Accordingly, these assignments of error are denied.

### 3.      Ground 1

In Ground 1 of his habeas claim, Petitioner alleges as follows:

> During peacetime, allowing a member of the armed forces to be sentenced to death by a court-martial panel of less than twelve, when there is no fixed panel size, promotes unreliability, undermines the right to an impartial fact finder and sentencer, and creates an arbitrary factor in violation of the Fifth, Sixth, and Eighth Amendments.

Petitioner raised, briefed, and argued a portion of this assignment of error to the ACCA in Ground XVIII and to the CAAF in Ground XXXIX.  He raised this assignment of error in its entirety in his petition for writ of certiorari to the Supreme Court and in his petition for writ of error *coram nobis*.  At the very least, Petitioner's claim alleging constitutional violations for the *actual* composition of his court-martial panel, as briefed and argued before the ACCA and the CAAF on direct appellate review, is subject to full and fair consideration and is therefore denied.

With regard to the *systemic* failure of the UCMJ to fix a court-martial panel size for peacetime capital crimes, which was presented to the Supreme Court on direct appeal, even Petitioner admits that

-48-

> the unconstitutionality of a capital jury of unfixed size with as few as five
> members is *inextricable* from the claim that, in this capital case, Petitioner was
> sentenced unconstitutionally by a jury of six.   Further, with the CAAF's
> permission, Petitioner filed a Petition for Reconsideration before that court, in
> which he raised this aspect of his claim.  The CAAF *denied* the petition, but
> provided no explanation for its action.

Dkt. 42, at 55 (emphasis added).

This court would agree that what could be perceived as two separate assignments of error

is really just one single assignment of error that has previously been briefed and argued before

the military courts and at least briefed to the Supreme Court.  As such, the entire current

assignment of error is subject to full and fair consideration and is therefore denied.

### 4.      Ground 11

In Ground 11, Petitioner alleges as follows:

> Petitioner was denied his Sixth Amendment right to effective assistance of
> counsel at his capital sentencing.

More specifically, Petitioner alleges that his sentencing counsel was ineffective for failing to

conduct an adequate investigation into Petitioner's life history, mental illness, and mental illness

history.   Petitioner claims that sentencing counsel unreasonably cut short their life-history

investigation, thereby preventing them from presenting evidence such as Petitioner's prenatal

trauma, his mother's repeated neglect and abandonment, his improper exposure to sexuality as a

young child, his brain damage, his family history of psychotic illness, of his own childhood

mental illness, or of his severe and intensifying mental illness while in the Army.  Furthermore,

Petitioner argues, his sentencing counsel only presented a meager and misleading "hint" of the

abuse that Petitioner suffered in his own home.

Whether or not any of this *substantive* evidence is relevant is not for *this* court to now

say.  Petitioner's appellate counsel did indeed present, as an assignment of error to both the

ACCA (ground XXIII) and the CAAF (ground VI), sentencing counsel's failure to adequately investigate the mitigating circumstances of Petitioner's traumatic family background and Petitioner's history with mental health issues. *See Gray I*, 37 M.J. at 745-47; *Gray III*, 51 M.J. at 18-19. Because this claim was therefore briefed and argued before the military courts, and because the military courts issued a ruling, this claim is now foreclosed by full and fair consideration and is therefore denied.

## C.    Remaining "Coram Nobis" Claims

This leaves only those claims that have not been adjudicated on the merits by the military courts, namely:

1.    Petitioner was denied his rights under the Sixth and Eighth Amendments when he was tried while incompetent to proceed and when he was incompetent during portions of the appellate proceedings; the trial court and the appellate courts erred in not conducting competency proceedings; and prior counsel were ineffective for failing to litigate Petitioner's obvious incompetence.

2.    Petitioner was denied his rights to due process, to a fair sentencing proceeding, to a public trial, and against cruel and unusual punishment, as guaranteed by the Fifth, Sixth, and Eighth Amendments, where the President, acting in a judicial role, approved Petitioner's death sentence in reliance upon confidential reports that were not disclosed to Petitioner.

3.    The proportionality review in this case was insufficient as a matter of law in violation of the Fifth, Sixth, and Eighth Amendments; Petitioner's death sentence must be reversed because the death sentencing system as applied is unconstitutional and his sentence was the result of racial discrimination, in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution

4.    Petitioner was denied his right to effective assistance of counsel where appellate counsel articulated and argued the incorrect standard of law regarding Petitioner's claim under *Witherspoon v. Illinois*.

5.    Petitioner's appellate counsel rendered ineffective assistance of counsel in violation of the Fifth, Sixth, and Eighth Amendments for appellate

counsel's failure to conduct an adequate investigation into Petitioner's background.[16]

It would be very tempting to do here what the district court did in *Thomas* with claims that had only been presented to the military courts via a petition for writ of error *coram nobis* and find them subject to full and fair consideration.  The procedural posture of these two cases is very similar: claims presented for the first time in a federal petition for habeas corpus, which would ordinarily be subject to procedural default, were taken back to the military courts on an extraordinary writ in an attempt to have the claims heard on the merits.[17]  The one difference, which might be key, is that where the military court in *Thomas summarily* denied the writ of error *coram nobis* (*Thomas*, 2009 WL 3125962, at *3), the ACCA here ruled as follows:

> In the military justice system, a Petitioner must satisfy several, stringent threshold requirements in order to obtain *coram nobis* relief:
>
>> (1) the alleged error is of the most fundamental character; (2) no remedy other than *coram nobis* is available to rectify the consequences of the error; (3) valid reasons exist for not seeking relief earlier; (4) the new information presented in the petition could not have been discovered through the exercise of reasonable diligence prior to the original judgment; (5) the writ does not seek to reevaluate previously considered evidence or legal issues; and (6) the sentence has been served, but the consequences of the erroneous conviction persist.
>
> Here, Petitioner cannot traverse these threshold requirements because there is, as a matter of law, a remedy other than *coram nobis* available to him.  Although in our view Petitioner's right to habeas corpus in the military justice system has ended, this is not so for Article III courts.  In fact, Petitioner has filed a writ of habeas corpus in federal district court and the government does not dispute the

---

[16] To be clear, these assignments of error *were* raised before the military courts, just not on direct review. Rather, these are *coram nobis* claims 1-4, and 6, respectively.

[17] The court notes here that while the review in *Thomas* seems somewhat different than it is here, it is, for all intents and purposes, identical.  In fact, Thomas' non-exhausted claims *were* originally procedurally defaulted by the district court.  It was not until the appeal that he decided to try and correct this.  Here, the process has simply skipped the step of this court first procedurally defaulting Petitioner's claims because Petitioner filed the writ of error *coram nobis* while his habeas claims were still pending before the district court.

jurisdictional basis for doing so.  The merits of Petitioner's claims are now for the federal district court, rather than this court, to decide.

We are cognizant of the preference for military courts to hear issues potentially of first impression, but we are also mindful of clear constraints imposed on this court by statute and our superior court.

Dkt. 59-1, at 3 (internal citations omitted).

The ACCA's reference to "a remedy other than *coram nobis*" is somewhat illusory: for claims that were properly presented to the military courts on direct review, this court defers to the full and fair consideration standard.  *See Burns*, 346 U.S. at 139.  However, the ACCA's language clearly indicates that the Court did *not* rule on the merits of the *coram nobis* issues. Accordingly, and contrary to the government's argument in this case, this language precludes the application of the full and fair consideration standard to these *coram nobis* issues.

For those issues that were not first presented to the military courts, this court assigns procedural default and, absent a showing of cause and actual prejudice, must dismiss the claims. *See Piotrowski*, 2009 WL 5171780, at *3; *see also Lips*, 997 F.2d at 812.  With this well-established law, it is unclear what remedy, exactly, the ACCA expected this court to provide.

The only other option, which comes from a single line in *Burns*, is for this court to consider the ACCA's decision a manifest refusal to consider the *coram nobis* claims, in which case, the district court could hear these claims *de novo*.  The Court in *Burns* stated that "[h]ad the military courts manifestly refused to consider those claims, the District Court was empowered to review them *de novo*."  346 U.S. at 142.  The Tenth Circuit has recognized this language as well. *See Faison v. Belcher*, 496 Fed. Appx. 890, 891-92 (10th Cir. Sept. 25, 2012) (holding that the district court "will entertain military prisoners' claims if they were raised in the military courts and those courts refused to consider them.").   Such a remedy is rarely, if ever, invoked, let alone

*used*, undoubtedly because of the great deference the federal courts grant to decisions arising out of the nation's military courts.[18]

The lack of caselaw on this subject is both helpful and unhelpful to this court. It is unhelpful because there is no precedent, no guidelines to help explain what seems to be a sentence of such import. But, ironically, it is helpful for that very same reason. This court cannot help but conclude that if this were truly a workable solution, a *proper* solution, that examples would be plentiful. After all, it would allow military petitioners to have multiple, if not infinite, bites at the apple.

"Empowered" does not mean "required." The language from *Burns* is permissive, not mandatory. Had the Supreme Court desired the federal district courts to hear such claims *de novo* always and without reservation, it would have and could have used stronger language.

Moreover, this court is aware of the history of the relationship between the military and the civil courts. The Supreme Court in *Burns* stated it best:

> The statute which vests federal courts with jurisdiction over applications for habeas corpus from persons confined by the military courts is the same statute which vests them with jurisdiction over the applications of persons confined by the civil courts. But in military habeas corpus the inquiry, the scope of the matters open for review, has always been more narrow than in civil cases. Thus the law which governs a civil court in the exercise of its jurisdiction over military habeas corpus applications cannot simply be assimilated to the law which governs the exercise of that power in other instances. It is sui generis; it must be so, because of the peculiar relationship between the civil and military law.

> Military law, like state law, is a jurisprudence which exists separate and apart from the law which governs in our federal judicial establishment. This Court has played no role in its development; we have exerted no supervisory power over the courts which enforce it; the rights of men in the armed forces must perforce be conditioned to meet certain overriding demands of discipline and duty, and the

---

[18] Neither the submissions of the parties, nor the research of this court, have identified any instance of a district court actually employing *de novo* review of a military court's decision.

civil courts are not the agencies which must determine the precise balance to be struck in this adjustment. The Framers expressly entrusted that task to Congress.

Indeed, Congress has taken great care both to define the rights of those subject to military law, and provide a complete system of review within the military system to secure those rights. Only recently the Articles of War were completely revised, and thereafter, in conformity with its purpose to integrate the armed services, Congress established a Uniform Code of Military Justice applicable to all members of the military establishment. These enactments were prompted by a desire to meet objections and criticisms lodged against court-martial procedures in the aftermath of World War II. Nor was this a patchwork effort to plug loopholes in the old system of military justice. The revised Articles and the new Code are the result of painstaking study; they reflect an effort to reform and modernize the system—from top to bottom.

Rigorous provisions guarantee a trial as free as possible from command influence, the right to prompt arraignment, the right to counsel of the accused's own choosing, and the right to secure witnesses and prepare an adequate defense. The revised Articles, and their successor—the new Code—also establish a hierarchy within the military establishment to review the convictions of courts-martial, to ferret out irregularities in the trial, and to enforce the procedural safeguards which Congress determined to guarantee to those in the Nation's armed services. And finally Congress has provided a special post-conviction remedy within the military establishment, apart from ordinary appellate review, whereby one convicted by a court-martial, may attack collaterally the judgment under which he stands convicted.

*Burns*, 346 U.S. at 139-41.

It is because of this long-held deference to the military courts that this court must reluctantly abstain from hearing Petitioner's *coram nobis* claims *de novo*. Furthermore, this court notes language from *Piotrowski*:

The Court in *Denedo* also specifically held that the rule of finality . . . does not prohibit military appellate courts' collateral review of their earlier judgment. If respondent's argument were correct, that a military prisoner cannot obtain post-appeal review in a military court when civil court review is available under § 2241, *Denedo* would effectively be nullified, since § 2241 is generally available to any military prisoner.

2009 WL 5171780, at *12. Moreover, it seems clear that the CAAF, the highest military appellate court, left open the door for Petitioner to present these claims to the military courts

again upon learning what *this* court would do by denying the petition for *coram nobis without prejudice*.

Finally, the ACCA did not manifestly refuse to address Petitioner's *coram nobis* claims. Rather, the military court determined that the procedural vehicle of *coram nobis* precluded relief in light of the pending civilian habeas action. With the dismissal of the present case, that procedural defect is removed and the ACCA may address the merits of Petitioner's *coram nobis* claims.

The court is conscious of the delay reflected in the present case and has no wish to further defer justice. Both Petitioner and his victims deserve better. Nevertheless, the court is obliged to pursue the strong preference expressed in *Burns* that the military courts first be given every reasonable opportunity to address the merits of a military prisoner's post-conviction arguments. Civil courts must, if possible, *review* the decisions of the military courts, not seek to substitute their own judgment in place thereof.

Further, consideration of the additional *coram nobis* claims *de novo* would serve to encourage repeated or delayed presentation of claims to the military courts. Dismissal of the additional issues without prejudice, on the other hand, serves to discourage such belated, piecemeal assertions of error. The policy expressed in *Burns* contemplates the orderly presentation of *all* issues to the military courts, and only afterwards presented by habeas corpus to civilian courts.

Therefore, the court finds that Petitioner's five "*coram nobis*" claims, as set forth above, are dismissed without prejudice.

### D.     Ground 18

Finally, in Ground 18 of his petition, Petitioner alleges that "the manner in which the military would carry out Petitioner's execution violates the Eighth Amendment."  Both in his original petition and the Traverse, Petitioner notes that the challenge to the means and methods used to potentially execute Petitioner can now be brought in a separate civil rights action under 42 U.S.C. § 1983.  *See Hill v. McDonough*, 126 S.Ct. 2096 (2006).  He admits that he only raises the assignment of error in his petition to avoid potential procedural default if and when such a separate proceeding becomes necessary.

Unfortunately for Petitioner, he failed to raise this assignment of error *anywhere* in the military courts, including in his extraordinary petition for *coram nobis* relief.  It has "long been settled that a federal court 'will not entertain petitions by military prisoners unless all available military remedies have been exhausted.'"  *Piotrowski*, 2009 WL 5171780, at *3 (quoting *Schlesinger v. Councilman*, 420 U.S. 738, 758 (1975)).  "If a claim was not presented to the military courts, the federal habeas court considers the claim waived and not subject to review." *Id.* at *11-12 (citing *Watson*, 782 F.2d at 145).

Therefore, because Petitioner never raised this argument on review to the military courts, direct appeal or otherwise, this court has no choice but to deem the claim waived.  As such, Petitioner's Claim 18 is denied.[19]

---

[19] The court is aware that the government challenges this assignment of error on several other grounds, including the fact that Petitioner cannot bring a § 1983 claim against the Department of the Army nor the Commandant because neither of these parties act under state law and a civil rights action cannot lie against the federal government, its agencies, or employees.  The government also argues that Petitioner's claim is meritless and dilatory.  Because this court finds sufficient basis to dismiss the claim due to procedural default, it declines to address these additional justifications.

**V.       Conclusion**

In summary, the court makes the following rulings:

(1)      Petitioner's habeas assignments of error 1-3, 4(a)-(c), 5-11, and 13-16 are denied on the basis of full and fair consideration.

(2)      Petitioner's habeas assignments of error 4(d), 12, and 17-20 (which correspond to *coram nobis* claims 1-4, and 6, respectively), are dismissed without prejudice.

(3)      Petitioner's habeas assignments of error 18 and 21 are denied.

**IT IS SO ORDERED**, this 29th day of September, 2015.

s/J. Thomas Marten
J. THOMAS MARTEN, JUDGE